1

```
              IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA :
                         :
                         :
                         :
     vs                  :    3:CR-23-26
                         :
                         :
                         :
KEVIN JONES              :
                         :
                         :


        BEFORE:      THE HONORABLE MALACHY E. MANNION

        PLACE:       COURTROOM NO. 3

        PROCEEDINGS:  JURY TRIAL

        DATE:        TUESDAY, MAY 28, 2024



APPEARANCES:

For the United States:

ROBERT J. O'HARA, ESQ.
GERARD T. DONAHUE, ESQ.
OFFICE OF THE U.S. ATTORNEY
WILLIAM J. NEALON FEDERAL BUILDING
235 NORTH WASHINGTON AVENUE
SCRANTON, PA 18501


For the Defendant:

CORNELIUS J. ROTTEVEEL, ESQ.
ROTTEVEEL LAW
410 JEFFERSON AVENUE
SCRANTON, PA 18510
```

2

1

<u>INDEX TO WITNESSES</u>

2

3  FOR GOVERNMENT:    DIRECT  CROSS  REDIRECT  RECROSS

4  SHANE YELLAND        95

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1      THE COURT:  Have to yours up, C. J., too?

2      MR. ROTTEVEEL:  Sorry, one second.

3      THE COURT:  On the government's one through six I do.

4  They are basically my own.  Seven through ten you can do if you

5  want to ask.  Eleven, no.  I'm going to do my own.  Twelve is

6  about the law.  No one will be asking any questions about the

7  law.  Both of you have those in there.  That's my -- 11 is

8  mine.  I'm going to -- I got one already in there.  If anyone

9  thinks before you ask questions that one of the ones I do that

10  cover these things aren't sufficient, then when I say do you

11  have any questions, just ask to approach and you can revisit

12  whatever.  Twelve is out.  It's the law.  Thirteen I will do my

13  own.  Fourteen is out.  It's the law.  Fifteen you can ask.

14  Seventeen you can ask.  Eighteen is out.

15      Sixteen, my own.  I'm doing that.  That would be in

16  there at some point.  All right.  C. J., one through seven is

17  my own basically, so you're not going to do those.  Eight you

18  can ask.  Nine, ten and 11 are my own.  I am doing those.  Same

19  thing with you, if you feel like somehow that's covered enough

20  when I ask if you have any additional questions, just ask me to

21  approach first so we can decide whether or not there's

22  something that wasn't covered in that.  Twelve and 13 are the

23  law.  They're out.  Fourteen you can ask.  Fifteen and 16 are

24  out.

25      That's covered by 14.  Seventeen and 18 are out.

4

1  They are the law.  Actually 19, 20, 21, 22, 23 are all law.

2  They're out.  Twenty-four and 25 I should cover.  Twenty-six

3  and 27 I should cover as part of my normal thing as well as 28,

4  29, 30, 31, 32, 33.  All of those are ones that should be

5  covered with my question of them concerning them.

6          I think that's what I -- if there's something else

7  that comes up during the course of the questions or the answers

8  -- I don't want to get into the law.

9          Peremptory challenges, six and ten, one for each of

10 the two alternates so really seven and eleven is what you're

11 going to get.  You can use them wherever you use them.  We will

12 pick two alternates in the case.  We will go today, tomorrow

13 and up until noon on Thursday, and then we will be back on

14 Monday and Tuesday, whatever is necessary, all right.

15          As to the business records, you agreed to that,

16 right.  Anything else?

17          MR. O'HARA:  No.

18          (A brief recess was taken.)

19          THE COURT:  Welcome to the federal courts.  I am sure

20 all of you are ecstatic to get your jury notice.  All right.

21 Good morning again.  My name is Mal Mannion.  I'm a judge here

22 in the United States District Court for the Middle District of

23 Pennsylvania, and I welcome all of you to federal court.  As I

24 mentioned to some of you as you came in, my guess is that when

25 you got that jury notice you had some reaction similar to, oh,

1  crap, and we understand that when you get the notice that it's
2  a bit of a concern because everyone has busy lives and jury
3  duty interferes to some extent with our busy lives, and we do
4  appreciate that.  And we understand that.  But it's important
5  for everyone to understand especially -- as I think about this,
6  we just passed Memorial Day.  And when you think about on
7  Memorial Day the fact that we have such special rights in this
8  country compared to almost every other country in the world,
9  and along with all of those rights come duties.  And jury duty
10  is one of those rights.
11          In fact, it's been described as the highest form of
12  duty an American citizen can perform outside of defending your
13  country in a time of war.  The highest form of duty an American
14  citizen can perform outside of defending your country in a time
15  of war.  Pretty heavy stuff.  But in our country matters of
16  importance and disagreements between parties are decided by
17  jurors, people from all walks of life, people from all
18  different geographical areas, people from different ages,
19  different genders, different races, different religions,
20  different economic levels, and the idea is that 12 jurors sit
21  and listen to the facts.  They decide what the facts actually
22  are, and then they apply the law as the Court gives them that
23  law.
24          So it's a very solemn and important duty.  But as I
25  said before, it's really an important duty.  So while we

6

1  understand that you are here, all of you, at some personal

2  inconvenience, the importance of what you're doing -- you are

3  actually involved now in the system of justice as set forth in

4  the United States Constitution that we're all protected by.  So

5  it's very important that you are here.  So what do we now?

6  This is voir dire.  It means to speak the truth.

7          It's the jury selection process, and I'm going to sit

8  down in a moment and more formally go through some advice for

9  you as to why we're here and what it is we're going to do.  I

10  want to give you some overview of that and thank you for being

11  here.  So all of that being said, this case is the matter of

12  the United States of America against Kevin Jones.  This is a

13  criminal case in which the defendant, Kevin Jones, is charged

14  with violating federal criminal laws.

15          Specifically, an indictment has been filed against

16  him charging with him with one count of conspiring to

17  distribute and possess with intent to distribute fentanyl,

18  which is a controlled substance under federal law.  From this

19  panel all of you that are here we will select the jurors who

20  will decide this case.  We will also select two alternate

21  jurors who will be part of the trial and available if one of

22  the regular jurors becomes unavailable for some reason.

23          Now, as I mentioned to you earlier, we rely on jurors

24  in this country to decide cases tried in our courts.  So

25  service on a jury is an important duty.  Jurors must conduct

1  themselves with honesty, integrity and fairness.  Under our

2  system of justice, the role of the jury is to find what the

3  facts of the case are based upon the evidence that's presented

4  at trial, that is, from the evidence that you see and hear in

5  the courtroom from the witness stand or exhibits that are

6  admitted into evidence during the course of the case.  You will

7  then decide what the facts are.  After you determined what the

8  facts are, you would then apply those facts to the law as the

9  Court tells you the law is.

10         My role as the trial judge is to make whatever legal

11  decisions must be made in the case during the trial and to

12  explain to the jury the legal principles that would guide your

13  determination of what the facts are and then the law that

14  applies to it, and then when you add those together, that's how

15  one comes up with the verdict.  As I mentioned to you earlier,

16  we recognize that you are all here at some sacrifice, and we do

17  our best to accommodate you during the course of the trial in

18  that regard.

19         However, we cannot excuse anyone merely because of

20  personal inconvenience unless serving on a jury would be a

21  compelling hardship.  Let me give you some examples of a

22  compelling hardship.  You've been waiting six months for a

23  medical appointment in Philadelphia and it's going to be this

24  week.  That would be a compelling hardship.  You have a

25  vacation planned for which you have spent $5,000 or some large

8

1   amount of money to rent a house on the eastern shore of North

2   Carolina and that if you would end up losing that money.  That

3   would be a compelling hardship.  Let me give you some examples

4   of what are not compelling hardships.  You're really busy at

5   work.  We appreciate that, but that's not a compelling

6   hardship.  I know earlier not that long ago within the last

7   week actually, I had a case where an employer had indicated

8   that because of the business they had it was a hardship for

9   them not to have a particular employee there.

10          While I appreciated the hardship, I explained to the

11  employer that jury duty is something that must be conducted and

12  that it is a responsibility.  I will note for you in that

13  regard while that wasn't necessary, that individual was very

14  understanding and had no problem with it that federal law

15  specifically indicates that an employer cannot in any way

16  punish an employee for being on jury duty, and to the extent

17  that it's necessary Courts have the power to impose up to

18  $5,000 fines, to have the employer come in.  I never had a

19  problem with that, but you should know that you as an employee

20  cannot be discriminated against or punished in any way for your

21  jury duty in no way.  And if anyone is in any way, you're to

22  tell it to me, and I promise you it will it be resolved very,

23  very quickly.  But that should not be a problem.

24          In a few minutes you'll be sworn in to answer

25  questions truthfully.  This question process as I mentioned is

1  called voir dire, which means to speak the truth.  The lawyers

2  and I will conduct the questioning.  It is, of course,

3  essential that you answer all of the questions truthfully.  A

4  deliberately untruthful answer could result in severe

5  penalties.  Now, throughout the voir dire process, you will be

6  asked questions to find out whether you have any personal

7  interest this case or you know of any of the individuals in

8  this case or you have any reason why you could not render a

9  fair and impartial jury verdict in this case.  We want to know,

10  as I said, whether you're related to or personally acquainted

11  with anybody that's involved in the case, the lawyers, any of

12  the witnesses, and we will name those for you names that you

13  will hear during the trial to make sure nobody has any

14  relationship with any of those individuals or that you know

15  anything about this particular case.

16        Now, other questions will be asked to determine if

17  you have any beliefs, feelings or life experiences that might

18  cause you to be influenced in your potential jury verdict.

19  Now, the questions that are asked are never meant to embarrass

20  you in any way.  So if any question is asked that you feel

21  uncomfortable answering in public, let me know.  We will take

22  you up to sidebar, and you can answer the question here.  It's

23  never our intention to embarrass anybody during the course of

24  the questioning.  After the questioning is done, 12 of you and

25  two alternates, 14 of the 53 that are here will be selected to

1   sit on jury duty.  Please don't take it personally if you're

2   not selected.  As you can imagine, the mere mathematics tell us

3   that the vast majority of you will be going home today.  During

4   the voir dire process at the end when the -- the lawyers are

5   going through the selection process, there may be quiet at that

6   point in time.  If you wish to look at your mobile devices,

7   cell phones, you're welcome to do so as long as you promise not

8   to tell any of the other judges in this building I let you do

9   that, but no conversation or discussion about why you're here

10  or anything that's going on in the case.  That is very, very

11  important.

12          Just so we have a sense of the timing of the case,

13  today is Tuesday.  Once we finish jury selection, we will

14  continue directly into trial today, all day tomorrow.  We will

15  only have half day until noon on Thursday.  We will not be here

16  on Friday.  I got other matters that could not be changed.  So

17  we will be here all day today, Wednesday, half a day on

18  Thursday.  Then we will come back if necessary on Monday and

19  Tuesday.  I anticipate and expect this case will probably be

20  done within a week so by next Tuesday.  It may be shorter than

21  that.  I guess it's possible it could be longer if there's

22  something that occurs, but that's my best estimate they will be

23  done at the latest by Tuesday of next week.  So that will be

24  our schedule so you have that in mind as well.  Gina, let me

25  ask you to swear all the jurors, please.

1          (The jury panel was sworn at this time.)

2          THE COURT:  Now, as I said, the case is United States

3   of America against Kevin Jones.  Have any of you heard anything

4   about this case?  All right.  I see no hands.  I will note, by

5   the way -- and before we get back to the rest of the questions

6   that federal court is different than state court.  All of you

7   when you're in state court would go to the county court where

8   you live.  If you lived in Lackawanna County, it would be

9   across the street in the Court of Common Pleas of Lackawanna

10  County.  Federal court is different.

11          In the State of Pennsylvania, there are three federal

12  districts, eastern, western and middle.  We're the Middle

13  District of Pennsylvania.  Our borders go from the Maryland

14  boarder down near York to the new York boarder past Susquehanna

15  County.  It goes out to Williamsport and down to State College

16  where Penn State is to the east to the Delaware Water Gap.

17  Geographically it's about half of the state.  So what we do is

18  we have federal buildings in Harrisburg, in Williamsport, in

19  Wilkes-Barre and Scranton.  Scranton is the head of the Middle

20  District of Pennsylvania.

21          We divide that large geographical area within the

22  Court system itself in three ways.  So the 11 counties around

23  the Scranton Wilkes-Barre area are our veneer.  So the result

24  is you could come from any one of those 11 counties around

25  there.  It's not unusual for us to have individuals that take

12

1  an hour and 45 minutes to get here for jury selection, and so

2  we also look at that in terms of what time we start and end

3  each day because unlike the county court where you only be

4  within your own county, here all of you could be anywhere

5  within an 11 county area in federal court and be here.

6        So I just want you to know we also take -- when we

7  are done and you're selected, I look at where all of you are

8  from.  We will schedule in terms of what time we start

9  depending upon what time or how long that it takes you to be

10  here.  I'll also note anybody who lives more than an hour away,

11  more than 60 miles away, if they decided they wanted to, we

12  would put them up here at a hotel for the time that they're on

13  jury duty as well.  So you should all be aware of that.  All

14  right.

15        Back to our questions concerning this particular

16  case, I'm going to begin by asking the government's counsel,

17  Mr. O'Hara, if you'd introduce yourself, if you would introduce

18  your co-counsel, the agent that will be present here, if you're

19  going to have somebody who will be here running the electronics

20  and then also a list of any of the names that you anticipate

21  people may hear during the course of the trial.  I'd ask

22  everyone to listen carefully because when Mr. O'Hara is done

23  I'm going to ask if anyone recognizes any of those individuals.

24        MR. O'HARA:  Yes, good morning, ladies and gentlemen.

25  I will move around so you can see me.  My name is Bob O'Hara.

1  I'm an assistant United States attorney, one of the prosecutors

2  in this case.  We will be presenting this case over the next

3  few days.  Seated with me at counsel table is my colleague,

4  assistant United States attorney Jerry Donahue.  At the back

5  table is F.B.I. task force officer Shane Yelland.  We will have

6  a litigation support technologist helping us with exhibits.

7  She will be seated here.  Her name is Sierra Moreno.

8          As to the witnesses you'll be hearing from, F.B.I.

9  task force officer Yelland will be testifying in the case as

10  well as United States postal inspector Lauren Fetch.  Civilian

11  or non-law enforcement witnesses who will be testifying include

12  Rachel Smyden, Samantha Smart, Shayna Colon Acosta, Tyla

13  Griffin, Davon Beckford and Sabrina Cleveland.

14          THE COURT:  Does anyone recognize any of those names

15  or know any of the people including counsel who have introduced

16  themselves?  All right.  I see no hands.  Now, Mr. O'Hara, as

17  he said, works for the United States Attorney's Office.  Is

18  there anyone here that has any dealings with the United States

19  Attorney's Office here in the Middle District of Pennsylvania?

20  Again, I see no hands.  And Mr. Agent Yelland is with the

21  Scranton task force of the Federal Bureau of Investigation.

22  Anyone who has any dealings with them?  All right.  I see no

23  hands.  Mr. Rotteveel, let me ask you if you would introduce

24  yourself, your client, anyone else in your firm who may be here

25  or any other names that you feel may be heard or that we may

1  hear about during the trial.

2          MR. ROTTEVEEL:  Thank you, Your Honor.  Good morning,

3  ladies and gentlemen.  My name is C. J. Rotteveel.  I'm an

4  attorney, local office in Scranton, and my client is Kevin

5  Jones.  That's pretty much it for the defense side.  Anyone --

6  anyone recognize me or know me or heard of me or anything like

7  that?

8          THE COURT:  I see no hands.  Does anyone know Mr.

9  Jones?  Again, I see no hands.  All right.  Now, we're going to

10 get a lot of answers to the next question.  So what I'm going

11 to do is after I ask it I'll ask if there's any positive

12 answers in the first row of the jury box, second row, first row

13 in the back and then second row.  If there is an answer that's

14 a positive answer, please just raise your hand, and then I will

15 call on you as we go down.  When you are called on, I would ask

16 if you would please start by referring to you as your juror

17 number.  I'm juror No. 1, for example.

18          The reason I say that is believe it or not we can't

19 memorize all 53 of your names, and so we have a list that goes

20 down.  And so by telling us your juror number, I'm able to find

21 you on the list and then record if necessary whatever your

22 answer is related to that.  So the first question is, have you

23 ever served on a -- as a juror in a criminal or civil case or

24 as a member of a grand jury in either federal or state court?

25 Remember federal court would be -- for you would be most likely

1  here.  But if you lived someplace else, it could be another
2  location.  And your state court would most likely be the place
3  where you have lived in the county.  So is there anyone who has
4  served as a juror in a criminal case, civil case or on a
5  federal or state grand jury?  First row, all right.  Juror
6  number 8?
7          PROSPECTIVE JUROR 8:  Yes.
8          THE COURT:  I'm going to ask everybody the same
9  questions when I do it.  Was it federal or state?
10          PROSPECTIVE JUROR 8:  State.
11          THE COURT:  And was it criminal or civil?
12          PROSPECTIVE JUROR 8:  I think it was criminal.
13          THE COURT:  Approximately how long ago?
14          PROSPECTIVE JUROR 8:  I would say eight years ago.
15          THE COURT:  The next question I'm going to ask is
16  important that you listen to the instructions.  I'm going to
17  ask you did the jury deliberate.  But what I am not going to
18  ask anybody is what the jury verdict was if they deliberated.
19  I do not want to know that.  I don't want you to tell us that.
20  I just want to know if the jury deliberated in the case.  So
21  the question then, did the jury deliberate in the case?
22          PROSPECTIVE JUROR 8:  Yes.
23          THE COURT:  Thank you.  Anything about that
24  experience that would make you feel you could not be fair and
25  impartial in this case?

16

1          PROSPECTIVE JUROR 8:  No.

2          THE COURT:  All right.  Thank you very much.  Second

3   row no hands, first row across the front -- juror number?

4          PROSPECTIVE JUROR 17:  17.

5          THE COURT:  Was it federal or state?

6          PROSPECTIVE JUROR 17:  State.

7          THE COURT:  Was it criminal or civil?

8          PROSPECTIVE JUROR 17:  Civil.

9          THE COURT:  Approximately how long ago?

10          PROSPECTIVE JUROR 17:  Seven years.

11          THE COURT:  Did the jury deliberate?

12          PROSPECTIVE JUROR 17:  Yes.

13          THE COURT:  Anything about that experience that would

14   make you feel you could not be fair and impartial in this case?

15          PROSPECTIVE JUROR 17:  No.

16          THE COURT:  Juror number?

17          PROSPECTIVE JUROR 21:  21.

18          THE COURT:  Was it federal or state?

19          PROSPECTIVE JUROR 21:  State.

20          THE COURT:  Civil or criminal?

21          PROSPECTIVE JUROR 21:  Criminal.

22          THE COURT:  Approximately how long ago?

23          PROSPECTIVE JUROR 21:  Six years.

24          THE COURT:  And did the jury deliberate?

25          PROSPECTIVE JUROR 21:  Yes.

17

1      THE COURT:  Anything about that experience that would

2 make you feel you could not be fair and impartial in this case?

3      PROSPECTIVE JUROR 21:  No.

4      THE COURT:  All right.  Juror number 22, federal or

5 state?

6      PROSPECTIVE JUROR 22:  Federal.

7      THE COURT:  Civil or criminal?

8      PROSPECTIVE JUROR 22:  Civil.

9      THE COURT:  Pardon me?

10      PROSPECTIVE JUROR 22:  Civil.

11      THE COURT:  Approximately how long ago?

12      PROSPECTIVE JUROR 22:  12 years.

13      THE COURT:  Did the jury deliberate?

14      PROSPECTIVE JUROR 22:  Yes.

15      THE COURT:  Anything about that experience that would

16 make you feel you could not be fair and impartial in this case?

17      PROSPECTIVE JUROR 22:  No.

18      THE COURT:  Juror number?

19      PROSPECTIVE JUROR 34:  34.

20      THE COURT:  Was it federal or state?

21      PROSPECTIVE JUROR 34:  Federal.

22      THE COURT:  Civil or criminal?

23      PROSPECTIVE JUROR 34:  Civil.

24      THE COURT:  Approximately how long ago?

25      PROSPECTIVE JUROR 34:  About seven years.

1          THE COURT:  Did the jury deliberate?

2          PROSPECTIVE JUROR 34:  Yes.

3          THE COURT:  Anything about that experience that would

4   make you feel you could not be fair and impartial in this case?

5          PROSPECTIVE JUROR 34:  No.

6          THE COURT:  Okay.  Second row going down, juror

7   number?

8          PROSPECTIVE JUROR 42:  42.

9          THE COURT:  Was it federal or state?

10          PROSPECTIVE JUROR 42:  Twice, and it was both state.

11          THE COURT:  Both state two times.  Let's talk the

12   first one.  Was it civil or criminal?

13          PROSPECTIVE JUROR 42:  Criminal.

14          THE COURT:  Approximately how long ago?

15          PROSPECTIVE JUROR 42:  1986.

16          THE COURT:  Did the jury deliberate?

17          PROSPECTIVE JUROR 42:  Yes.

18          THE COURT:  The second one, civil or criminal?

19          PROSPECTIVE JUROR 42:  Criminal.

20          THE COURT:  And approximately how long ago?

21          PROSPECTIVE JUROR 42:  About 12 years ago.

22          THE COURT:  Did the jury deliberate?

23          PROSPECTIVE JUROR 42:  Yes.

24          THE COURT:  Had anything about either of those

25   experiences that would make you feel you could not be fair and

19

1    impartial in this case?

2            PROSPECTIVE JUROR 42:  No.

3            THE COURT:  Okay.  Thank you.

4            PROSPECTIVE JUROR 44:  44.

5            THE COURT:  Was it federal or state?

6            PROSPECTIVE JUROR 44:  State.

7            THE COURT:  Was it civil or criminal?

8            PROSPECTIVE JUROR 44:  Both.  I was on twice.

9            THE COURT:  So let's talk the civil first.

10   Approximately how long ago?

11           PROSPECTIVE JUROR 44:  Five years ago.

12           THE COURT:  Did the jury deliberate?

13           PROSPECTIVE JUROR 44:  Mistrial, no.

14           THE COURT:  Did the second one?

15           PROSPECTIVE JUROR 44:  20 years ago.

16           THE COURT:  That was criminal?

17           PROSPECTIVE JUROR 44:  Criminal.

18           THE COURT:  20 years ago.  Did the jury deliberate?

19           PROSPECTIVE JUROR 44:  Yes, sir.

20           THE COURT:  Anything about that experience or those

21   experiences that would make you feel you could not be fair and

22   impartial in this case?

23           PROSPECTIVE JUROR 44:  No.

24           THE COURT:  Thank you very much.  Continuing -- yes,

25   juror 46.  Was it federal or state?

20

1          PROSPECTIVE JUROR 44:  State.

2          THE COURT:  Civil or criminal?

3          PROSPECTIVE JUROR 44:  Criminal.

4          THE COURT:  Approximately how long ago?

5          PROSPECTIVE JUROR 44:  Eight years.

6          THE COURT:  Did the jury deliberate?

7          PROSPECTIVE JUROR 44:  Yes.

8          THE COURT:  Anything about that experience that would

9   make you feel you could not be fair and impartial in this case?

10          PROSPECTIVE JUROR 44:  No, Your Honor.

11          THE COURT:  Thank you very much.  Continuing on down

12   --

13          PROSPECTIVE JUROR 51:  51.

14          THE COURT:  Was it federal or state?

15          PROSPECTIVE JUROR 51:  State.

16          THE COURT:  Civil or criminal?

17          PROSPECTIVE JUROR 51:  Civil.

18          THE COURT:  Approximately how long ago?

19          PROSPECTIVE JUROR 51:  About 20 years.

20          THE COURT:  Did the jury deliberate?

21          PROSPECTIVE JUROR 51:  We didn't.

22          THE COURT:  Anything about that case or that

23   experience that would make you feel you could not be fair and

24   impartial in this case?

25          PROSPECTIVE JUROR 51:  No.

21

1          THE COURT:  Anybody else?  Did we miss anybody?  I

2    see no other hands.  All right.  Now, have you or any members

3    of your family or a close personal friend been a member of or

4    employed by a law enforcement agency starting in the first row

5    juror number seven -- who was it?

6          PROSPECTIVE JUROR 7:  I was employed by the F.B.I.

7    for two years.  I don't know if that counts.

8          THE COURT:  How long ago was that?

9          PROSPECTIVE JUROR 7:  Four years ago.

10          THE COURT:  Can ask you what capacity you worked with

11    the F.B.I.?

12          PROSPECTIVE JUROR 7:  I was an I. T. professional.

13          THE COURT:  I. T.  And was that here in the middle

14    district or --

15          PROSPECTIVE JUROR 7:  West Virginia.

16          THE COURT:  Anything about that experience that would

17    make you feel you could not be fair and impartial in this case?

18          PROSPECTIVE JUROR 7:  No.

19          THE COURT:  All right.  Juror number eight, did you

20    raise your hand?

21          PROSPECTIVE JUROR 8:  Yes.

22          THE COURT:  Who was it?

23          PROSPECTIVE JUROR 8:  Who?

24          THE COURT:  Who is it --

25          PROSPECTIVE JUROR 8:  My sister-in-law is a police

22

officer in Michigan.

THE COURT:  Sister-in-law police officer in Michigan.
Anything about that relationship that would make you feel you
could not be fair and impartial in this case?

PROSPECTIVE JUROR 8:  No.

THE COURT:  Okay.  Yes, juror number?

PROSPECTIVE JUROR 5:  5.  My husband's cousin's
daughter is a Scranton police officer.

THE COURT:  Husband's cousin's daughter.  Anything
about that relationship that would make you feel you could not
be fair and impartial in this case?

PROSPECTIVE JUROR 5:  No.

THE COURT:  Thank you.  Second row, juror number?

PROSPECTIVE JUROR 13:  13.  My God son is a
Pennsylvania state trooper.

THE COURT:  Do you know where he's -- where he's
stationed?

PROSPECTIVE JUROR 13:  Philly.

THE COURT:  Anything about that relationship that
would make you feel you could not be fair and impartial in this
case?

PROSPECTIVE JUROR 13:  No.

THE COURT:  Juror number 14?

PROSPECTIVE JUROR 14:  New York City retired
correctional officer, gang task force.

23

1          THE COURT:  That's you?

2          PROSPECTIVE JUROR 14:  Yes.

3          THE COURT:  New York City retired C. O., correction

4  officer.  And how long ago did you retire?

5          PROSPECTIVE JUROR 14:  20 years.  It was actually 24

6  years.

7          THE COURT:  Anything about that experience that would

8  make you feel you could not be fair and impartial in this case?

9          PROSPECTIVE JUROR 14:  No.

10          THE COURT:  Continuing -- juror number?

11          PROSPECTIVE JUROR 16:  16.

12          THE COURT:  Who is it?

13          PROSPECTIVE JUROR 16:  My great uncle.  He's a Texas

14  cop.

15          THE COURT:  Great uncle is a --

16          PROSPECTIVE JUROR 16:  Local police officer.

17          THE COURT:  Anything about that relationship that

18  would make you feel you could not be fair and impartial in this

19  case?

20          PROSPECTIVE JUROR 16:  No.

21          THE COURT:  Thank you.  First row going down, juror

22  number?

23          PROSPECTIVE JUROR:  20.

24          THE COURT:  Who is it?

25          PROSPECTIVE JUROR 20:  Close friend is a Pennsylvania

1   state trooper.

2           THE COURT:  Anything about that relationship that

3   would make you feel you could not be fair and impartial in this

4   case?

5           PROSPECTIVE JUROR 20:  No, sir.

6           PROSPECTIVE JUROR 21:  21.  Cousin is a Pennsylvania

7   state trooper.

8           THE COURT:  Anything about that experience or that

9   relationship that would make you feel you could not be fair and

10  impartial in this case?

11          PROSPECTIVE JUROR 21:  No, Your Honor.

12          THE COURT:  Juror number 22, Mr. Cooper.

13          PROSPECTIVE JUROR 22:  Two uncles are police

14  officers.

15          THE COURT:  Where?

16          PROSPECTIVE JUROR 22:  Locally.

17          THE COURT:  Are they still working or retired?

18          PROSPECTIVE JUROR 22:  Both deceased.

19          THE COURT:  Anything -- well, I think that --

20  anything about that relationship that would make you feel you

21  could not be fair and impartial in this case?

22          PROSPECTIVE JUROR 22:  No.

23          THE COURT:  Thank you.  Continuing in that first row,

24  juror number?

25          PROSPECTIVE JUROR 29:  29.  I was a Pocono Mountain

1  regional police officer 20 years ago.

2          THE COURT:  Anything about that experience that would

3  make you feel you could not be fair and impartial in this case?

4          PROSPECTIVE JUROR 29:  Absolutely not.

5          THE COURT:  Who else in the row, juror number?

6          PROSPECTIVE JUROR 31:  31.  I have a sister-in-law

7  that's a Pennsylvania state trooper and a cousin that's also a

8  Pennsylvania state trooper.

9          THE COURT:  Anything about either of those

10  relationships that would make you feel you could not be fair

11  and impartial in this case?

12          PROSPECTIVE JUROR 31:  No.

13          THE COURT:  Thank you.  Continuing on, yes, juror

14  number 32?

15          PROSPECTIVE JUROR 32:  Yes.  I have a nephew that was

16  a prison guard.

17          THE COURT:  Where was that?

18          PROSPECTIVE JUROR 32:  Out in California.

19          THE COURT:  Okay.  Anything about that relationship

20  that would make you feel you could not be fair and impartial in

21  this case?

22          PROSPECTIVE JUROR 32:  No.

23          THE COURT:  All right.  Juror number 33.

24          PROSPECTIVE JUROR 33:  Coworker who was a former New

25  York City police detective, and I have neighbors who are local

1  police officers.

2          THE COURT:  Then you said the coworker is a former

3  New York City police detective.  And then what was the other

4  one?

5          PROSPECTIVE JUROR 33:  Some neighbors who are local

6  police officers.

7          THE COURT:  Anything about any of those relationships

8  that would make you feel you could not be fair and impartial?

9          PROSPECTIVE JUROR 33:  No.

10          THE COURT:  34?

11          PROSPECTIVE JUROR 34:  Yes, sir.  I have close friend

12  that's a Pennsylvania state trooper.

13          THE COURT:  Anything about that relationship that

14  would make you feel you could not be fair and impartial in this

15  case?

16          PROSPECTIVE JUROR 34:  No.

17          THE COURT:  Juror 35?

18          PROSPECTIVE JUROR 35:  Yes, sir.  My cousin works at

19  the Northampton County prison.

20          THE COURT:  Anything about that that makes you feel

21  you could not be fair and impartial in this case?

22          PROSPECTIVE JUROR 35:  No.

23          THE COURT:  Second row in the back, juror number?

24          PROSPECTIVE JUROR 40:  40.  My sister-in-law is a

25  correctional officer at Canaan.  I have a cousin who is a

1  retired P. A. state trooper.

2          THE COURT:  Did you say Canaan?

3          PROSPECTIVE JUROR 40:  Yes.

4          THE COURT:  Federal facility, okay.  The other one?

5          PROSPECTIVE JUROR 40:  My cousin is a retired P.A.

6  state trooper.

7          THE COURT:  Anything about either those two

8  relationships that would make you feel you could not be fair

9  and impartial in this case?

10          PROSPECTIVE JUROR 40:  No, sir.

11          THE COURT:  Thank you.  Continuing on down, juror

12  number?

13          PROSPECTIVE JUROR 42:  42.  My brother-in-law is a

14  retired Scranton police officer.

15          THE COURT:  Anything about that relationship that

16  makes you feel you could not be fair and impartial in this

17  case?

18          PROSPECTIVE JUROR 42:  No, Your Honor.

19          THE COURT:  Thank you.  Continuing on down that --

20  juror number 43, who is it?

21          PROSPECTIVE JUROR 43:  My mother is retired from the

22  F.B.I.  I also have a friend that was in the F.B.I.

23          THE COURT:  Do you know where was she retired from?

24          PROSPECTIVE JUROR 43:  D. C.

25          THE COURT:  Then you said you got a friend.

28

1          PROSPECTIVE JUROR 43:  Friend F.B.I. in Louisiana.

2    My ex-husband was a correctional officer in Georgia.

3          THE COURT:  Let me ask you anything about any of

4    those relationships that would make you feel you could not be

5    fair and impartial in this case?

6          PROSPECTIVE JUROR 43:  No, sir.

7          THE COURT:  Last row, juror number?

8          PROSPECTIVE JUROR 47:  47.  Can I speak with you a

9    moment?

10         THE COURT:  Sure.  Come on up.

11         (The following discussion took place at sidebar:)

12         PROSPECTIVE JUROR 47:  I have a family member --

13   nephew is a member of the D.E.A.  However, I have another

14   family member who lost his life due to his drug laced with

15   fentanyl.

16         THE COURT:  We're going to cover that, but so I'm

17   assuming that as a result of that you feel you can't be fair.

18         PROSPECTIVE JUROR 47:  I feel like I always wish to

19   be fair and I'm unbiased, but I want you to know.

20         THE COURT:  She had a family member who died of an

21   overdose of fentanyl.  So the question then related to that is

22   going to be -- my condolences.  Do you feel that would affect

23   your ability to be fair and impartial in a case that

24   involves --

25         PROSPECTIVE JUROR 47:  No.

29

1          THE COURT:  You don't.

2          PROSPECTIVE JUROR 47:  Just want to let you know

3    that.

4          THE COURT:  We will ask a question about that.  You

5    don't have to answer it.  Do you have any follow-up questions?

6          MR. O'HARA:  How long ago was that, ma'am?

7          PROSPECTIVE JUROR 47:  A few years ago.

8          MR. O'HARA:  I don't have anything else.

9          MR. ROTTEVEEL:  No, Your Honor.

10         THE COURT:  I am going to ask a question shortly if

11   anyone have any family members or personal friends or been

12   involved in any drug matters.  You -- if there's anything else

13   -- you don't need to raise your hand for that, okay.

14         PROSPECTIVE JUROR 47:  Okay.

15         THE COURT:  We will wait to see.  We are not going to

16   get to 46 anyway.

17         (The discussion at sidebar concluded.)

18         THE COURT:  Juror number?

19         PROSPECTIVE JUROR 48:  48.  My great aunt is a New

20   York State retired corrections officer, and I have a cousin

21   chief of police in South Carolina.

22         THE COURT:  Anything about either of those

23   relationships that would make you feel you could not be fair

24   and impartial in this case?

25         PROSPECTIVE JUROR 48:  No.

30

1          THE COURT:  All right.  Thank you very much.

2     Continuing on down -- all right.  Next juror -- that's juror

3     number 49.

4          PROSPECTIVE JUROR 49:  My brother-in-law is a police

5     officer in the Wilkes-Barre area.

6          THE COURT:  Where in the Wilkes-Barre area?

7          PROSPECTIVE JUROR 49:  Plains Township.

8          THE COURT:  Is he presently a police officer there?

9          PROSPECTIVE JUROR 49:  Yes.

10          THE COURT:  Can I ask you what's his name?

11          PROSPECTIVE JUROR 49:  Michael Bohan.

12          THE COURT:  The reason I ask some of the facts are

13     from the Wilkes-Barre area.  I want to make sure if the

14     government is aware that individual has any part in the case

15     that we would know that.  Anything about that relationship that

16     would make you feel you could not be fair and impartial in this

17     case?

18          PROSPECTIVE JUROR 49:  No, Your Honor.

19          THE COURT:  Thank you very much.  Continuing on down,

20     juror number?

21          PROSPECTIVE JUROR 51:  51.  My nephew works at the

22     federal prison as a C. O. in Canaan, and my brother-in-law also

23     is -- he was a C. O. there, but he's been promoted into another

24     position also at Canaan.

25          THE COURT:  Anything about either those relationships

31

1  that would make you feel you could not be fair and impartial in

2  this case?

3          PROSPECTIVE JUROR 51:  No.  No, sir.

4          THE COURT:  All right.  Thank you very much.  Juror

5  number 52, who is it?

6          PROSPECTIVE JUROR 52:  I was a former corrections

7  officer, and my husband is a former sergeant.

8          THE COURT:  I got you're a former correction officer

9  in Monroe County.  How long ago was that?

10          PROSPECTIVE JUROR 52:  Three years ago.

11          THE COURT:  Your husband?

12          PROSPECTIVE JUROR 52:  He was a sergeant in Wyoming

13  Area Police Department.

14          THE COURT:  That's down in that area.  Can I just ask

15  what his name is?

16          PROSPECTIVE JUROR 52:  Peppers.

17          THE COURT:  Anything about either your former

18  position or his present position -- any -- anything about

19  either of those that would make you feel you could not be fair

20  and impartial in this case?

21          PROSPECTIVE JUROR 52:  No, sir.

22          THE COURT:  Thank you very much.

23          PROSPECTIVE JUROR 53:  53.  I have three relatives.

24  My brother-in-law is a current C. O. I believe in Waymart.  I

25  have a cousin who is retired Pennsylvania State Police and

 1   another cousin who is a retired local Scranton police officer.

 2            THE COURT:  Anything about any of those relationships

 3   that would make you feel you could not be fair and impartial in

 4   this case?

 5            PROSPECTIVE JUROR 53:  No.

 6            THE COURT:  All right.  Have you been involved in a

 7   court in a criminal matter that concerned yourself, a member of

 8   your family or a close personal friend as a defendant, a

 9   witness or a victim of a crime?  First row.

10            PROSPECTIVE JUROR 3:  3.  Yes, I have a close friend

11   that just completed a death by delivery charge.

12            THE COURT:  Aside from the fact it was a close

13   friend, did you have any involvement in the court activities

14   related to that?

15            PROSPECTIVE JUROR 3:  No, sir.

16            THE COURT:  Was there anything about that that would

17   make you feel you could not be fair and impartial in this case?

18            PROSPECTIVE JUROR 3:  No, sir.

19            THE COURT:  Thank you very much.  Juror number four?

20            PROSPECTIVE JUROR 4:  I've been a witness in two

21   cases, and I was a defendant in one.

22            THE COURT:  Witness in two cases, what kind of case?

23            PROSPECTIVE JUROR 4:  One was a traffic case.  One

24   was a vehicular homicide case, and I'm not sure what the charge

25   was, but I didn't check an I. D. when I was bartending.

1          THE COURT:  How long ago?

2          PROSPECTIVE JUROR 4:  Traffic case was over 20 years.

3    The vehicular homicide was about 15 years ago, and the criminal

4    case was 25 years ago.

5          THE COURT:  Anything about any of those cases that

6    would make you feel you could not be fair and impartial in this

7    case?

8          PROSPECTIVE JUROR 4:  No.

9          THE COURT:  Thank you very much.  Continuing in the

10   first row, second row, juror number?

11         PROSPECTIVE JUROR 14:  14.  I was involved in a case

12   regarding -- as a defendant.  The individual called me a

13   nigger, so that's -- that was the extent of the case, and it

14   was dismissed because there was no further interaction with the

15   case.

16         THE COURT:  How long ago was that?

17         PROSPECTIVE JUROR 14:  About two months ago.

18         THE COURT:  Just so I'm clear, you were the defendant

19   in the case?

20         PROSPECTIVE JUROR 14:  Yes.

21         THE COURT:  The case was dismissed?

22         PROSPECTIVE JUROR 14:  Yes.

23         THE COURT:  Anything about that experience that would

24   make you feel you could not be fair and impartial in this case?

25         PROSPECTIVE JUROR 14:  That's a hard decision, Your

34

1  Honor.  It's a hard thing, so I think it would have an effect

2  on this case being that the defendant is -- happens to be a

3  person of color.

4             THE COURT:  Who else, 16?

5             PROSPECTIVE JUROR 16:  16.  Can I take it up --

6             THE COURT:  Sure.

7             (The following discussion took place at sidebar:)

8             PROSPECTIVE JUROR 16:  In New York I was convicted of

9  D. U. I.

10            THE COURT:  Okay.  How long ago?

11            PROSPECTIVE JUROR 16:  2018.

12            THE COURT:  Anything about that experience that would

13  make you feel you could not be fair and impartial in this case?

14            PROSPECTIVE JUROR 16:  No.

15            THE COURT:  Questions from the government?

16            MR. O'HARA:  No.

17            MR. ROTTEVEEL:  No.

18            THE COURT:  All right.  Thank you.

19            (The discussion at sidebar concluded.)

20            THE COURT:  First row, yes, juror number 17?

21            PROSPECTIVE JUROR 17:  I was a defendant in a case

22  charged with harboring a dangerous animal.  The dog was accused

23  of attacking somebody.  The case was dismissed.

24            THE COURT:  About how long ago was that?

25            PROSPECTIVE JUROR 17:  Four years.

35

1          THE COURT:  Anything about that experience that would

2    make you feel you could not be fair and impartial in this case?

3          PROSPECTIVE JUROR 17:  No.

4          (The discussion at sidebar concluded.)

5          THE COURT:  First row, yes, juror number?

6          PROSPECTIVE JUROR 29:  29.  Victim of domestic

7    violence.

8          THE COURT:  There was a court case related to it?

9          PROSPECTIVE JUROR 29:  Yes, sir.

10          THE COURT:  How long ago was that?

11          PROSPECTIVE JUROR 29:  35 years.

12          THE COURT:  All right.  Anything about that

13    experience or the Court activities that make you feel you could

14    not be fair and impartial in this case?

15          PROSPECTIVE JUROR 29:  No.

16          THE COURT:  Thank you very much.  Continuing on down,

17    juror number?

18          PROSPECTIVE JUROR 33:  33.  Can I come up?

19          THE COURT:  Sure.

20          (The following discussion took place at sidebar:)

21          PROSPECTIVE JUROR 33:  It's kind of embarrassing,

22    okay.  It was a harassment and cursing at somebody over the

23    phone and threatening.  It was in the county.

24          THE COURT:  How long ago was that?

25          PROSPECTIVE JUROR 33:  2013.

36

1          THE COURT:  Did it go to court?

2          PROSPECTIVE JUROR 33:  It was expunged A. R. D.  I

3    paid a fine.

4          THE COURT:  Anything about that experience that would

5    make you feel you could not be fair and impartial in this case?

6          PROSPECTIVE JUROR 33:  No.

7          THE COURT:  Follow-up questions by the government?

8          MR. O'HARA:  You were the person charged.

9          PROSPECTIVE JUROR 33:  Yes.

10         MR. O'HARA:  A. R. D?

11         PROSPECTIVE JUROR 33:  Yes.

12         THE COURT:  A. R. D. becomes expunged.  Any

13   questions?

14         MR. ROTTEVEEL:  I don't.

15         THE COURT:  Thank you very much.

16         PROSPECTIVE JUROR 33:  That was embarrassing.

17         THE COURT:  It's okay.

18         (The discussion at sidebar concluded.)

19         THE COURT:  Continuing down in that first row, anyone

20   else, no, second row, all right, juror number?

21         PROSPECTIVE JUROR 37:  37.  I testified on behalf of

22   the F.B.I. in a federal murder trial five years ago.

23         THE COURT:  Where was that?

24         PROSPECTIVE JUROR 37:  In here.

25         THE COURT:  Do you remember which case that was or

37

1    what it was about?

2            PROSPECTIVE JUROR 37:  It was actual -- it was a

3    fentanyl overdose, and the drug dealer was gone to trial.

4            THE COURT:  That occurred here in our courtroom?

5            PROSPECTIVE JUROR 37:  Yeah, James Rought.

6            THE COURT:  Anything about that experience that would

7    make you feel you could not be fair and impartial in this case?

8            PROSPECTIVE JUROR 37:  I think so since it was to do

9    with the fentanyl.

10           THE COURT:  You think it would have an effect?

11           PROSPECTIVE JUROR 37:  Yes.

12           THE COURT:  Thank you very much.  Juror number 38.

13           PROSPECTIVE JUROR 38:  Yes.  It was a simple case --

14   or a criminal case.  It was property damage, and I -- it was a

15   drunk driver.  They called us in.  It ended up being dismissed

16   though.

17           THE COURT:  You were a witness?

18           PROSPECTIVE JUROR 38:  It was my property.

19           THE COURT:  You were the victim, all right.  How long

20   ago was that?

21           PROSPECTIVE JUROR 38:  Probably three, four years.

22           THE COURT:  Anything about that experience that would

23   make you feel you could not be fair and impartial in this case?

24           PROSPECTIVE JUROR 38:  No.

25           THE COURT:  Continuing on that down that row, juror

38

1  number?

2          PROSPECTIVE JUROR 43:  43.  My sister.  I was a

3  witness in a child custody you case.

4          THE COURT:  Anything about that experience that would

5  make you feel you could not be fair and impartial in this case?

6          PROSPECTIVE JUROR 43:  No, sir.

7          THE COURT:  Thank you very much.  Juror number 44?

8          PROSPECTIVE JUROR 44:  Victim, assault -- school

9  assault.

10          THE COURT:  About how long ago was that?

11          PROSPECTIVE JUROR 44:  12 years.

12          THE COURT:  Did the case go to trial or --

13          PROSPECTIVE JUROR 44:  No.

14          THE COURT:  Anything about that experience that would

15  make you feel you could not be fair and impartial in this case?

16          PROSPECTIVE JUROR 44:  No.

17          THE COURT:  Last row I see -- yeah.

18          PROSPECTIVE JUROR 51:  51.  I had two things.  A

19  different nephew was convicted of dealing drugs, currently

20  serving time in state prison.

21          THE COURT:  That's here in Pennsylvania?

22          PROSPECTIVE JUROR 51:  It is, yes.

23          THE COURT:  That was one.  Is there another one?

24          PROSPECTIVE JUROR 51:  I was a witness in two cases

25  on behalf of my employer.  One was an issue with signature

1  cards and a non-profit related to banking.  The other one was

2  also a banking related issue with the drive up.

3          THE COURT:  Generally bank fraud of some sort?

4          PROSPECTIVE JUROR 51:  Yes.

5          THE COURT:  First with your nephew, anything about

6  any of those experiences that would make you feel you could not

7  be fair and impartial in this case?

8          PROSPECTIVE JUROR 51:  No.

9          THE COURT:  Anybody else in that row?

10         PROSPECTIVE JUROR 31:  31.  Can I add something?

11         THE COURT:  Yes, you can.  Give me a minute.

12         PROSPECTIVE JUROR 31:  My uncle was the former warden

13  of the Dallas Correctional Facility.

14         THE COURT:  How long ago was that?

15         PROSPECTIVE JUROR 31:  About five or six years ago

16  when he retired.

17         THE COURT:  Anything about that that changes your --

18         PROSPECTIVE JUROR 31:  No.

19         THE COURT:  -- ability to be fair and impartial?

20         PROSPECTIVE JUROR 31:  No.

21         THE COURT:  Have you yourself, any member of your

22  family or a close personal friend have any experience involving

23  the use or possession of illegal drugs or narcotics?  First

24  row.  If you've already answered this in some way, you don't

25  need to reanswer it, but -- juror number 3?

1          PROSPECTIVE JUROR 3:  Same.

2          THE COURT:  You already answered that question, all

3    right.  Going down, juror number eight?

4          PROSPECTIVE JUROR 8:  Close personal friends of my

5    husband and myself lost their 26-year-old son to fentanyl

6    poisoning.

7          THE COURT:  Anything that either experience or

8    relationship or information that you had that would make you

9    feel you could not be fair and impartial in this case?

10          PROSPECTIVE JUROR 8:  Yes.

11          THE COURT:  Second row.

12          PROSPECTIVE JUROR 12:  12.  My sister's granddaughter

13    O. D.'d.

14          THE COURT:  Anything about that experience or

15    circumstance that would make you feel you could not be fair and

16    impartial in this case?

17          PROSPECTIVE JUROR 12:  No.

18          THE COURT:  Thank you.  It's important for everyone

19    to understand and know obviously if an experience that you've

20    had affects you in a manner you can't be fair we need to know

21    that.  The other side of that coin is this is not whatever that

22    case is.  This case has to be judged on its own merits and

23    nothing else, and so it's important that it be judged on its

24    own merits and nothing else.  All right.  So anyone else in the

25    second row?  I see no hands.  First row, yes, juror number?

41

1        PROSPECTIVE JUROR 17:  17.  I lost two childhood
2   friends to overdoses.
3        THE COURT:  Can I ask you how long ago that was?
4        PROSPECTIVE JUROR 17:  One was six years, and the
5   other one was five.
6        THE COURT:  Let me just ask you -- two childhood
7   friends.  Individuals you were still close with or just --
8        PROSPECTIVE JUROR 17:  Yes, one in particular I was
9   still very close with.
10        THE COURT:  Anything about either of those
11   circumstances that would make you feel you could not be fair
12   and impartial in this case?
13        PROSPECTIVE JUROR 17:  I don't know.  I -- yeah, I
14   can separate.
15        THE COURT:  18, Mr. Young?
16        PROSPECTIVE JUROR 18:  Myself, and I was on
17   painkillers.  My very close friend O. D.'d on fentanyl, and my
18   cousin almost died from fentanyl.
19        THE COURT:  Anything about any of those
20   circumstances, your own or your friends or your cousin's
21   circumstance that would make you feel you could not be fair and
22   impartial in this case?
23        PROSPECTIVE JUROR 18:  Yeah.
24        THE COURT:  You feel you could or could not?
25        PROSPECTIVE JUROR 18:  I would -- I don't think I can

42

1    separate it.

2          THE COURT:  Thank you very much.  Next to you is

3    juror number 19.  All right.

4          PROSPECTIVE JUROR 19:  I lost close friends a year

5    and a half to fentanyl overdose.

6          THE COURT:  Anything about that experience or

7    circumstance that would make you feel you could not be fair and

8    impartial in this case?

9          PROSPECTIVE JUROR 19:  Yeah.

10         THE COURT:  Continuing on down that row, juror

11   number?

12         PROSPECTIVE JUROR 21:  21.  My brother overdosed.

13         THE COURT:  How long ago was that?

14         PROSPECTIVE JUROR 21:  2018, 2019.

15         THE COURT:  Four or five years ago.  Anything about

16   that experience that would make you feel you could not be fair

17   and impartial in this case?

18         PROSPECTIVE JUROR 21:  I want to say I don't believe

19   so.  I will say no.

20         THE COURT:  You can be fair and impartial?

21         PROSPECTIVE JUROR 21:  Yeah.

22         THE COURT:  Continuing in that row, juror number 29.

23         PROSPECTIVE JUROR 29:  Your Honor, I lost my

24   34-year-old son to fentanyl overdose seven years ago.

25         THE COURT:  My condolences.

43

1      PROSPECTIVE JUROR 29:  Thank you, sir.

2      THE COURT:  Anything about that experience that would

3  make you feel you could not be fair and impartial in this case?

4      PROSPECTIVE JUROR 29:  Actually, Your Honor, I can

5  say with a hundred percent certainty that I would be impartial.

6      PROSPECTIVE JUROR 30:  30.  I have a son that was

7  incarcerated twice for drugs.

8      THE COURT:  When was it?

9      PROSPECTIVE JUROR 30:  Five years ago and then about

10 three years ago, and it was in Luzerne County.

11     THE COURT:  Anything about that experience that would

12 make you feel you could not be fair and impartial in this case?

13     PROSPECTIVE JUROR 30:  No.

14     THE COURT:  Thank you very much.  Continuing on that

15 row, juror number 31?

16     PROSPECTIVE JUROR 31:  Can you repeat the question?

17     THE COURT:  Yes.  The question is, have you yourself,

18 any member of your family or a close personal friend have any

19 experience involving the use or possession of illegal drugs or

20 narcotics?

21     PROSPECTIVE JUROR 31:  I'm involved with it in my

22 work.  I handle controlled substances almost on a daily basis.

23     THE COURT:  And I -- aside from the handling of

24 controlled substances --

25     PROSPECTIVE JUROR 31:  Do I use, no.

44

1          THE COURT:  That doesn't count so to speak.  You have

2     a legitimate reason to be able to by your profession to.  So

3     that doesn't count.  Thank you for trying to be thorough and

4     complete.  Anybody else in the first row, yes?

5          PROSPECTIVE JUROR 35:  35.  I lost a personal friend

6     a couple years ago to overdose.

7          THE COURT:  How long ago was it?

8          PROSPECTIVE JUROR 35:  Two or three years ago.

9          THE COURT:  Anything about that circumstance that

10    would make you feel you could not be fair and impartial in this

11    case?

12         PROSPECTIVE JUROR 35:  No.

13         THE COURT:  Thank you very much.  Second row, juror

14    number?

15         PROSPECTIVE JUROR 38:  38.  My step daughter is a

16    recovering addict.

17         THE COURT:  Anything about that circumstance that

18    makes you feel you could not be fair and impartial in this

19    case?

20         PROSPECTIVE JUROR 38:  No.

21         THE COURT:  Second row, juror number?

22         PROSPECTIVE JUROR 43:  43.  My son was an addict and

23    also did time I think it was in Rockview.

24         THE COURT:  How long ago was that?

25         PROSPECTIVE JUROR 43:  Eight years.

45

1          THE COURT:  Anything about that that would make you

2    feel you could not be fair and impartial in this case?

3          PROSPECTIVE JUROR 43:  No, sir.

4          THE COURT:  Thank you.  Continuing on down, juror

5    number?

6          PROSPECTIVE JUROR 48:  48.  Over the last ten years I

7    lost three close personal friends to O. D., and I had two

8    cousins die of O. D.s as well, and I have a recovering addict

9    -- my best friend is a recovering addict as well.

10          THE COURT:  So anything about any of those

11    experiences or relationships that would make you feel you could

12    not be fair and impartial in this case?

13          PROSPECTIVE JUROR 48:  I want to say -- I want to say

14    no, but, unfortunately with my experience I can't.

15          THE COURT:  Okay.

16          PROSPECTIVE JUROR 49:  49.  My God son is a

17    recovering addict and overdosed on fentanyl.

18          THE COURT:  Anything about that relationship or

19    circumstance that makes you feel you could not be fair and

20    impartial in this case?

21          PROSPECTIVE JUROR 49:  Yes.

22          THE COURT:  You cannot?

23          PROSPECTIVE JUROR 49:  No.

24          THE COURT:  Okay.  No. 50?

25          PROSPECTIVE JUROR 50:  Yes.  My son's friend is in

46

1  prison right now for dealing fentanyl, and his other friend

2  died of an overdose.

3          THE COURT:  They are your son's friends?

4          PROSPECTIVE JUROR 50:  Yeah, it was a neighborhood.

5  They're like my sons, very close knit.

6          THE COURT:  Anything about either of those

7  circumstances or relationships that would make you feel you

8  could not be fair and impartial in this case?

9          PROSPECTIVE JUROR 50:  I believe so.

10         THE COURT:  You believe?

11         PROSPECTIVE JUROR 50:  Impartial.

12         THE COURT:  You can be impartial.  Continuing on

13 down?  If you were selected to be a juror in this case, are you

14 be able to render a verdict solely based on the evidence

15 presented at this trial within the four walls of this courtroom

16 and in the context of the law as I give it to you in my

17 instructions disregarding any ideas, notions or beliefs about

18 the law or what it should be in reaching your verdict?  In

19 other words, your job as the jurors is to find the facts.  My

20 job is to tell you what the law is, and then your job is to

21 apply that law whether you agree with it or not to the facts as

22 you have found them.

23         That's how we reach a verdict in a trial.  Is there

24 anyone that would have a problem in following the law as I tell

25 you the law is and applying that law to those facts as you find

1  them?  I see no hands.

2          Is there any member of the potential panel that has

3  any particular disability, problem that would cause them to

4  serve as a juror?  Let me give you some examples of that.  We

5  will make accommodations for you.  Sometimes we have a juror

6  that has a real difficulty hearing, and we have headphones that

7  are tied into the system that they can use so that they can be

8  sure to hear everything that is said.  Sometimes we will have a

9  juror that has a particular sight problem, and we will

10  rearrange where they sit so they sit closer to the witnesses

11  and they all -- everyone has screens.

12          So any exhibits will be shown on those screens, or

13  any electronic exhibits will be shown on the screen.

14  Occasionally we get people who have diabetes and they need to

15  have with them orange juice or they need to -- we accommodate

16  that.  We have people with serious back problems where they

17  need to stand up and stretch every once in a while.  We will

18  accommodate that as well.

19          We try to make all reasonable accommodations for our

20  jurors for any conditions that they have, and I will mention

21  always that if anyone during the course of the trial needs to

22  use the facilities, the restroom, they just need to raise their

23  hand.  We will take a break.  It isn't like you're stuck here

24  forever.  I say -- anyone that has any other particular

25  illness, ailment or condition that they feel would make them

48

1   unable to be a part of the jury in this case?  All right.  I

2   see no hands.  Let me bring counsel up for a second, please.

3              (The following discussion took place at sidebar:)

4              THE COURT:  Any other questions aside from the ones I

5   told you guys if you want to ask?  You don't have to ask them,

6   but you can if you want.  Do you want to ask them questions?

7              MR. O'HARA:  Just a couple.

8              MR. ROTTEVEEL:  Can I have --

9              THE COURT:  No law.  Don't make me interrupt you.

10             PROSPECTIVE JUROR 22:  I have a medical procedure

11  scheduled on Tuesday.  I have prep on Monday to Tuesday.

12             THE COURT:  Colonoscopy?

13             PROSPECTIVE JUROR 22:  Yes.

14             THE COURT:  That's Tuesday.

15             PROSPECTIVE JUROR 22:  Prep Monday.

16             THE COURT:  Thank you.  Good.  Let him go.  Any

17  objection to letting him go?

18             MR. ROTTEVEEL:  No.

19             MR. O'HARA:  No.

20             (The discussion at sidebar concluded.)

21             MR. O'HARA:  Ladies and gentlemen, a few follow-up

22  questions.  I will try to be brief.  It's the only chance we

23  have to ask.  Bear with me.  Do any of you consciously disagree

24  with laws that prohibit the distribution or possession of drugs

25  such as fentanyl or heroin?

49

1          THE COURT:  I see no hands.

2          MR. O'HARA:  Any of you been associated with any

3  group or organization that supports or promotes the

4  legalization of illegal drugs?

5          THE COURT:  I see no hands.

6          MR. O'HARA:  You will hear in this case that the

7  government utilized what are known as confidential informants

8  to investigate in this particular case.  Do any of you oppose

9  the government's use of informants in investigating the

10  trafficking of narcotics?

11          PROSPECTIVE JUROR 3:  3, yes.

12          THE COURT:  You are opposed to the government use of

13  confidential informants?

14          PROSPECTIVE JUROR 3:  Absolutely.

15          MR. O'HARA:  Thank you.  Kind of a catch all question

16  here, do any of you have any religious or moral or ethical or

17  philosophical beliefs that would prevent from you sitting in

18  judgment of a fellow human being in a criminal case?

19          THE COURT:  I see no hands.

20          MR. O'HARA:  And lastly, the government will call

21  witnesses in this case who have been involved in the criminal

22  conduct that is drug trafficking that is the subject of this

23  trial.  Some of those individuals -- some of the witnesses have

24  already entered guilty pleas, and they've entered into plea

25  agreements with the government whereby they agree to cooperate

1  with the government, what are known as cooperating witnesses.

2  Knowing that these witnesses are cooperating witnesses, would

3  you still listen to their testimony and simply not discount it

4  because they are cooperating witnesses with the government?

5              THE COURT:  I see no hands.

6              MR. O'HARA:  Thank you, Judge.  That's all I have.

7              THE COURT:  Thank you, Mr. O'Hara.  Mr. Rotteveel.

8              MR. ROTTEVEEL:  Thank you, Your Honor.  I just have a

9  couple questions.  Is there anyone here who would give greater

10 weight to the testimony of a police officer merely because he

11 or she is a police officer?

12             THE COURT:  We have two hands.

13             MR. ROTTEVEEL:  Three.

14             THE COURT:  Let's begin with juror number --

15             PROSPECTIVE JUROR 14:  14.  I've been in law

16 enforcement --

17             THE COURT:  Thank you.  We don't need any additional

18 information.  Who else had their hand up?  Juror number?

19             PROSPECTIVE JUROR 18:  18.

20             THE COURT:  Let me make sure we're clear on this.

21 All right.  That is that the job of the jury is to listen

22 carefully and to find the facts of the case based upon all of

23 the evidence that was presented in the trial, not upon the

24 testimony of one individual or two individuals but all of the

25 testimony and the evidence that is offered during the case.

51

1  That being said Mr. -- what number is it?

2          PROSPECTIVE JUROR 18:  18.

3          THE COURT:  Mr. Young, all right, so your answer to

4  the question is yes, you would give law enforcement

5  automatically even without hearing anything more credibility

6  than you would give anybody else?

7          PROSPECTIVE JUROR 18:  Yes.

8          THE COURT:  Who else?  No. 18.  In the first row,

9  second row, juror number 39.  I want to make clear even if you

10 were instructed by the Court that a law enforcement witness

11 under our laws is not entitled to any more or less credibility

12 than any other witness you cannot follow that law.  Is that

13 what you're telling me?

14         PROSPECTIVE JUROR 39:  No, I can follow the law.

15         THE COURT:  Well, then let me make sure that the

16 question is properly answer -- answered then.  You'll be

17 instructed as part of the law in this case that the testimony

18 of a law enforcement witness is to receive no greater or no

19 lesser credibility than that of any other witness in the case.

20 Does that affect or change your answer?

21         PROSPECTIVE JUROR 39:  Yes.

22         THE COURT:  Your question again Mr. Rotteveel.

23         MR. ROTTEVEEL:  Judge, my question is, is there

24 anyone who'd give greater weight to the testimony of a police

25 officer merely because they were a police officer?

52

1          THE COURT:  Then included in that if you were

2     instructed by the Court that you were not to give greater or

3     lesser weight to a police officer than any other witness in the

4     case could you follow that instruction.

5          PROSPECTIVE JUROR 39:  Yes.

6          THE COURT:  You were juror number?

7          PROSPECTIVE JUROR 39:  39.

8          THE COURT:  Juror number 44, given that additional

9     instruction, does that change your position or --

10          PROSPECTIVE JUROR 44:  Yeah, I can.  I can.  I am

11     being told --

12          THE COURT:  You can follow the instruction?

13          PROSPECTIVE JUROR 44:  Yes.

14          THE COURT:  That a police officer is like any other

15     witness in the case, it's somebody who you're not to give more

16     or less credibility than any other witness, you're to listen to

17     them like any other witness, you can follow that instruction?

18          PROSPECTIVE JUROR 44:  Yes.

19          THE COURT:  All right.  We had another hand up here

20     -- no other hand.  Mr. Rotteveel, go ahead.

21          MR. ROTTEVEEL:  Thank you.  Race can have no part on

22     guilt or innocence of the defendant.  Does everyone understand

23     and agree with that?

24          THE COURT:  I see no hands.

25          MR. ROTTEVEEL:  That's all I have, Your Honor.

1           THE COURT:  You heard a lot of questions here.  Is

2    there anything that was not asked of you that you know would

3    affect your ability to be fair and impartial if selected as a

4    juror in this case?  I see no hands.  All right.  What we're

5    going to do is we're going to take a break, give you an

6    opportunity to use the facilities.  Here's what you need to do.

7           You need to look where you're sitting because you got

8    to come back to the same place.  The second thing is -- these

9    would be instructions for the jurors when the case begins.  You

10   can't have any conversation or discussion with anyone including

11   among yourselves about any of the questions that you have heard

12   here or anything that we have discussed at this stage of the

13   proceedings.  That includes if you text home to say I'm in the

14   middle of a jury selection, you can't tell them now what kind

15   of case it is or any questions that have been asked of you.

16   All right.

17          The reason for that is we want to make sure that you

18   remain presently only aware of what we have asked and don't

19   receive any information from some outside source that would

20   change the responses that you have given to the questions we

21   have asked you.  All right.  So no conversation or discussion.

22   Don't form -- by the way -- any opinion.  You have not heard

23   any -- as wit here -- one single syllable of evidence in this

24   case, not one, so you have no basis whatsoever to form any

25   opinions.  Don't read or listen to anything about the case.  We

54

1  will take a 10 minute, 15 minute break.  Can I have counsel,

2  please?

3              (The following discussion took place at sidebar:)

4              THE COURT:  Okay.  Challenges for cause.

5              MR. O'HARA:  Number three opposes the use of

6  confidential informants.

7              MR. ROTTEVEEL:  I mean I'm okay with it.

8              THE COURT:  Any objection?

9              MR. ROTTEVEEL:  No.

10             THE COURT:  She's gone.  Next.

11             MR. O'HARA:  Next I have is No. 8.

12             THE COURT:  Can't be fair.  No objection to that.

13  She is gone.

14             MR. O'HARA:  14.

15             THE COURT:  Said he couldn't be fair as well.

16             MR. O'HARA:  Greater weight to a police officer.

17             THE COURT:  More importantly said he couldn't be

18  fair.

19             MR. O'HARA:  There was an incident -- it would have

20  an effect.  He trailed off at the end.

21             THE COURT:  He said -- he must be potentially

22  Hispanic.  He said apparently he was charged by calling an

23  African-American person a nigger.  I thought he was the

24  defendant in the case.

25             MR. ROTTEVEEL:  I think somebody called him and he

1  did something.

2           THE COURT:  I thought it was the opposite that he did

3  something and that's why said he couldn't be fair to an

4  African-American guy, your client.  Any objection to him?

5           MR. ROTTEVEEL:  He did indicate he can't be fair and

6  impartial some this point in time.  I think it was with respect

7  to law enforcement -- former law enforcement.

8           THE COURT:  14 is gone.  17 can't be fair.

9           MR. ROTTEVEEL:  I have 17 and 18.

10           MR. O'HARA:  I put separate it and be fair.

11           THE COURT:  Your motion is on who?

12           MR. O'HARA:  My motion is on 18.

13           THE COURT:  Do you have any objection to 18?

14           MR. ROTTEVEEL:  No.

15           THE COURT:  We will get back to yours.

16           MR. O'HARA:  22 --

17           THE COURT:  Let's go back then because I have 17

18  saying they cannot be fair.  What do you have?

19           MR. ROTTEVEEL:  I have could not be fair.

20           THE COURT:  I have that.  17 is gone.  And I also

21  have 19 saying that she could not be fair.

22           MR. O'HARA:  Yes, could not be fair.

23           THE COURT:  Okay.  22, the gentleman that has a

24  colonoscopy we agreed he's gone.

25           MR. O'HARA:  29 said she can be impartial.  No. 28 --

56

1  Sierra Moreno who is part of our team knows her.  They went to

2  school together.  She may not recognize Sierra's married name.

3  She did tell us she knows that girl.  They went to school

4  together.

5          THE COURT:  Do you want her out?

6          MR. ROTTEVEEL:  Probably best.

7          MR. O'HARA:  Next I have is 37.

8          THE COURT:  She said she could not be fair.  She's

9  out.

10          MR. O'HARA:  48.

11          THE COURT:  Yeah, 48, okay.

12          MR. O'HARA:  49 could not be fair.

13          THE COURT:  I think that's it.

14          MR. ROTTEVEEL:  That's all I have.

15          THE COURT:  Do you have any others?

16          MR. O'HARA:  Recap 3, 8, 14, 17, 18, 19, 22, 28, 37,

17  48 and 49.

18          THE COURT:  Is that agreeable?

19          MR. ROTTEVEEL:  It is, Your Honor.

20          THE COURT:  I have 11 peremptory challenges so --

21          MS. GEBHARDT:  I am up to 41.

22          THE COURT:  My calculation is 53 jurors and 11 will

23  be gone for cause which leaves us with 42 jurors.  We need 32

24  jurors because we need 14 -- 12 jurors and two alternates or

25  14.  Then you have 11 preemptories, and you have seven.  That's

57

1  18.   That leaves us 32 that -- how many preemptories are before

2  32?   How many causes before 32?

3          MS. GEBHARDT:  I'm up to 41.

4          THE COURT:  Eight.  It means that realistically you

5  can't get past No. 40 it looks like to me, right.  Eight for

6  cause -- so 41 -- which means effectively anybody after juror

7  No. 41 no matter what you do, they're not getting on the jury.

8          MR. ROTTEVEEL:  Very good.

9          (The discussion at sidebar concluded.)

10          MS. GEBHARDT:  No. 1, No. 3, 7, 8, 10, 11, 14 and 16,

11  if you can please just go to the other side of the courtroom.

12  Juror No. 2, you will now be juror No. 1.  Juror No. 4, you are

13  juror No. 2.  Juror No. 5, you are juror No. 3.  Juror No. 6,

14  you are four.  Nine, you are five.  If you can come down,

15  please.  Juror 12, you are No. 6 if you can please come down.

16  Thank you.  No. 13, you are seven.  You can move to the end,

17  and, No. 15, you are No. 8.  You can move to the second seat.

18  When I call your number, please come over.  Juror 24, you are

19  selected as juror No. 9.  Juror No. 27, you are selected as

20  juror No. 10.  Juror No. 29, you are selected as juror No. 11.

21  Juror 31, you are selected as juror No. 12.  And then No. 34

22  and No. 41, if you can please come over, you are alternate one

23  and alternate No. 2.  Thank you.

24          THE COURT:  That completes our jury selection.  So

25  everyone who is in the back of the courtroom or standing we

1  appreciate your time in being here.  You will all be excused

2  for three years from federal jury service.  We don't have

3  anything to do with state jury service.  But remember you're

4  one in a million, so buy that lottery ticket on the way home.

5  You -- we appreciate you being here.

6          For anyone who is going home and thinks that was a

7  waste of time, I came there and didn't get selected, it's not.

8  In order to make our process work properly and to be able to

9  make sure we have selection of jurors, we always need to have

10 more than will actually be in service so we have a fair cross

11 reference of society and a lot of fair and impartial jurors to

12 be here in order to select the case.  So while you weren't

13 selected, your attendance here is, in fact, important, and so

14 we appreciate that.  I will leave you with what I started with,

15 and that is that jury duty is the highest form of duty an

16 American citizen can perform outside of defending your can

17 country in a time of war.

18         So your being here is part of how our justice system

19 works, and it is exceptionally important under our

20 Constitution.  And why while we may not be perfect in this

21 country , we are the envy of the world because no king or

22 potentate decides whether you're guilty or not guilty or what

23 charges will be or won't be.  In our country matters of

24 importance are decided by citizens just like us.

25         When we do a naturalization ceremony, we have a

59

1  videotape that's played by President Biden, who I am proud to

2  say is, you know, two blocks up here is where he was born and

3  lived, but when he does that video, one of the things he says

4  to the new citizen, my most important title is not president,

5  it's citizen, and I am so proud of your being here really makes

6  a difference.  Thank you all very much.  You're excused.  Have

7  a great day, and enjoy the nice weather.  All right.

8          Welcome to jury duty.  We will take a break and allow

9  you to go to lunch.  You're going to hear some admonitions

10 every time we break whether it's for a five minute break to use

11 the bathroom or whether it it's a break for lunch or at the end

12 of the day when you go home.  They're all part of very

13 important activities that you do as jurors in the case.  They

14 include you're not to discuss the case with anyone including

15 among yourselves.

16         Jurors find that to be odd because they sit there and

17 say we're the ones going to decide the case, why can't we talk

18 about it with each other.  You can at the very end of the case.

19 At that point it's your duty to deliberate.  In the interim

20 you're to listen to all the evidence on your own, make up your

21 own minds as to the facts before you get into that

22 conversation.

23         So no conversations and discussions about the case

24 with anyone including among yourselves.  That means, of course,

25 when you call home to say I got selected for a jury, the first

1  question will be what kind of case is it and what's it about,

2  and your answer has to be, I can't talk about it now.  You can

3  tell them it's a criminal case.  You can tell them it's in

4  federal court.  Aside from that, you can tell them as soon as

5  the case is done I will tell you everything you want to know

6  until you're blue in the face but until that time you can't.

7         And the reason for that is that we want the jurors to

8  make sure that all -- they learn about this case from within

9  the four walls of this courtroom.  That's where all of the

10 evidence will be, no place else.  So someone else's opinions or

11 thoughts or whatever are not something we want you to bring

12 back into the courtroom.

13        So no conversation and discussion with anyone

14 including among yourselves.  Don't listen to or read anything

15 about the case.  I doubt there will be anything about the case

16 either on television, radio or in print.  But if there was for

17 some reason, if it's in print, put it aside.  When the case is

18 done you can read it.  If it was on the radio, turn it off.

19 You can find it on the internet later on.  We go back to the

20 fact in order to do your duty properly you must decide the case

21 based only on what you hear and see within the courtroom, not

22 what has been somebody else's interpretation of anything.

23        Don't form any opinions until you heard all of the

24 evidence in the case and you heard the law that I tell you.

25 Keep an open mind during the entire trial.  As of right now,

1  you have not heard a single syllable or letter of any evidence,

2  nothing, so you have no basis right now to form any opinions.

3  You should keep an open mind so you can listen to everything

4  and the law at the end of the case before you start forming

5  opinions in the case.

6          If anyone were to try to speak to you about the case,

7  you must advise us of that immediately.  Aside from that, that

8  clock obviously lies.  We will get it fixed.  It's now 12:37.

9  So enjoy lunch and be back in an hour and ten minutes at a

10 quarter of two.  We will then continue with first some

11 preliminary instructions I'll give you about your duties as a

12 juror, how we are going to proceed, and then we will go on to

13 opening statements of counsel, and we will see from there how

14 far we get today.  All right.  All of that being said, enjoy

15 your lunch.

16          (A lunch recess was taken.)

17          (The jury was sworn at this time.)

18          THE COURT:  Welcome back.  So what we are going to

19 now is some preliminary instructions so you have a sense of

20 your role, my role, how the case will proceed, and then once we

21 have completed that, counsel will do their opening statements,

22 and I'll speak to that in a few minutes.  So, members of the

23 jury, now that you've been sworn, let me tell you what your

24 role is as a juror in the case.

25          Under our system of justice, the role of the jury is

1   to find the facts of the case based on the evidence that was

2   presented here in trial within the four walls of this

3   courtroom.  You must decide the facts only from the evidence

4   presented to you in this trial.  From the evidence that you

5   will hear and see in court, you will decide what the facts are

6   and then apply those facts to the law as I will give it to you

7   in my final instructions.

8           That's how you will reach your verdict in the case.

9   Now, whatever your verdict, it must be unanimous.  All of the

10  jurors will have to agree, or there will be no verdict.  In the

11  jury room at the conclusion of the case, you will discuss the

12  case among yourselves, but ultimately each of you has the

13  responsibility to which you cannot avoid and should do your

14  best throughout the trial to fulfill the responsibility of

15  coming up with a just verdict in the case.

16          Now, I play no part in the finding of the facts.  You

17  should not take anything that I may say or do during the trial

18  as indicating what I think of the evidence or what I think your

19  verdict should be.  My role is to make whatever legal decisions

20  have to be made during the course of the trial and to explain

21  to you legal principles that must guide you at the conclusion

22  of the case in your deliberations and ultimate decision in the

23  case.

24          Now, you must apply my instructions about the law.

25  Each of the instructions will be important.  You must not

63

1  substitute your own notion or opinion of what the law is or

2  ought to be.  You must follow the law as I give it to you

3  whether you agree with it or not.  Now, perform these duties

4  fairly and impartially.

5           Do not allow sympathy, prejudice, fear or public

6  opinion to influence you in any way.  You should also not be

7  influenced by a person's race, color, religion, national

8  ancestry or gender.  Now, here are some important rules about

9  your conduct as jurors in the case.  Keep an open mind.  Do not

10 make up your mind about the verdict until you have heard all of

11 the evidence and I have given you those final instructions on

12 the law at the end of the case and you have had the opportunity

13 at that point in time to discuss it with your fellow jurors in

14 the jury room.

15          Second, do not discuss the case with anyone or among

16 yourselves until the end of the trial when you retire to the

17 jury room to deliberate.  You need to allow each juror the

18 opportunity to keep an open mind throughout the entire trial.

19 During the trial you may certainly talk with your fellow jurors

20 about anything of a personal nature, common interest, anything

21 unrelated to the trial.  Now, during the trial you should not

22 speak to any of the parties, lawyers or witnesses involved in

23 the case not even just to pass the time of day.  If any of the

24 lawyers, parties or witnesses do not speak to you if you pass

25 them in the hall or happen to be in the elevator with them or

1  the like, remember it's not because they're being rude.  It's

2  because it's their ethical duty not to interact with the jury

3  during the trial.  That's why, in fact, we ask you to wear

4  those jury tags when you're in the building so that everyone

5  can clearly identify that you're on a jury and not to interact

6  with you during that period of time.  Now, fourth, do not talk

7  with anyone else or listen to others talk about this case until

8  the trial has ended and you have been discharged as jurors.

9          It's important not only that you do justice in the

10  case but also that you give the appearance of justice.  If

11  anyone should try to talk to you about the case during the

12  trial, you need to report that to me immediately.  And when you

13  do that, do not discuss even that situation with any fellow

14  juror.  Now, do not discuss the case with anyone outside of the

15  courtroom or at home including your family and friends.  You

16  may tell your family or friends that you've been selected as a

17  juror in a case, and you may tell them how long you expect the

18  case to last.

19          However, you should tell them that the judge has

20  specifically instructed you that you are not to discuss the

21  case with anyone including them and they should not try to talk

22  to you about the case either.  The reasons for this is someone

23  else's thoughts can influence you and your thinking should be

24  influenced only by what you learn in this courtroom.  At the

25  conclusion of the case, you can tell them everything they ever

65

1  wanted to know about the case, but until that time no

2  conversations or discussions.  Until the trial is over and your

3  verdict is returned, do not watch or listen to any television

4  or radio news programs or reports about the case or read any

5  news or internet stories or articles about the case or about

6  anyone involved in the case.

7          Do not use a computer, cell phone, other electronic

8  devices, tools of technology while in the courtroom or during

9  your deliberations.  These devices may be used during breaks or

10 recesses for personal use but may not be used to obtain or

11 disclose any information about the case.  You may not

12 communicate with anyone about the case on your cell phone,

13 e-mail, messaging, blogs, web sites, you know, any of the

14 social media post areas during the trial.  You may not use any

15 similar technology or social media even if I haven't mentioned

16 the specific one, you know, Facebook, X., Twitter, Instagram

17 whatever you want to say.

18         The bottom line is don't use any of that related to

19 this case while you are a juror in this case.  Do not conduct

20 any research or make any individual investigation on your own

21 about matters related to this case or this type of case.  That

22 means, for example, you must not visit any scenes, conduct any

23 experiments, conduct reference -- consult reference works or

24 dictionaries or search internet web sites, blogs for additional

25 information or use any of the tools of technology to try to

1  gain additional information in the case.  Please do not try to

2  find out information from any source outside of the confines of

3  this courtroom.

4         You must decide this case based only on the evidence

5  that's presented in this courtroom and my instructions to you

6  about the law.  It would be improper for you to try to

7  supplement that information on your own.  Obviously part of the

8  concern about that would be, you know, you would find out

9  something that you believe to be correct, it may or may not be

10 and nobody else would know about it.  So only what's presented

11 in this courtroom, the evidence that's admitted is what you can

12 consider in the decision in the case along with the law as I

13 give it to you.

14        Finally, you should not concern yourselves with or

15 consider the possibilities of punishment that might be imposed

16 based upon your verdict.  That determination and decision if it

17 becomes necessary is mine and mine alone.  The jury has no part

18 in that whatsoever and should never consider it or think about

19 it.  Now, during the trial it may be necessary for us to talk

20 with the lawyers outside of your hearing, similar to what you

21 heard during the voir dire process where we had some sidebars.

22        That's called a bench conference or a sidebar

23 conference.  If it happens, please be patient.  We also ask

24 that you advise me if you're able to hear any of the bench or

25 sidebar conference because the purpose is to hold those

1  discussions outside of jury's hearing for important reasons.

2  We're discussing legal matters that are not the jury's concern,

3  and so I don't want you to get confused with any of that.  I

4  know you might be curious about what's being discussed.  We're

5  not trying to keep anything from you.  These are just

6  conferences that are necessary for me to discuss with the

7  lawyers objections to evidence sometimes or to make things --

8  make sure things are presented properly and correctly under the

9  rules and for other reasons that are not related to your

10  function as a juror.

11        We will, of course, do what we can to keep any number

12  or length of those conferences to an absolute minimum.  If I

13  think for some reason the conference will be long, we will

14  break and allow you to go out while we have the remainder of

15  whatever that discussion is.  I may not grant a lawyer's

16  request for a sidebar conference.  Don't consider my granting

17  or denying the request as suggesting my opinion as to what your

18  verdict should be.  It does not.

19        Now, let's talk a little about note taking.  I see

20  some of you brought your -- the pads outside .  At the end of

21  the trial you must make your decision based upon what you

22  remember of the evidence.  You will not be given a written

23  transcript of the testimony to review.  You must pay close

24  attention to the testimony as it is given.  If you wish, you

25  may take notes to help you remember what witnesses said.  Gina,

1  my courtroom deputy, arranged for pens, pencils and paper to be

2  present in your jury deliberation room.  If you take notes,

3  keep them to yourself until when you go back to the jury room

4  to decide the case.  Here are some specific points to keep in

5  mind about note taking should you decide to do it.  First is

6  note taking is permitted, it is not required.  You are not

7  required to take notes.  How many notes you want to take, if

8  any, is entirely up to you.  Secondly, be brief.

9          Do not allow note taking to serve as a distraction in

10 the case.  Do not let your note taking distract you from your

11 task as jurors.  You must listen to the testimony of each

12 witness.  You also need to decide whether and how much to

13 believe each witness.  That will require you to watch the

14 appearance, behavior and manner of the witness while he or she

15 is testifying.  You cannot write down everything that a witness

16 said, and there's always a fear that the juror will focus so

17 much on note taking that he or she will miss the opportunity to

18 make important observations during the witness' testimony.

19         Now, notes are memory aids.  They are not evidence.

20 Notes are not a record or written transcript of a trial.

21 Whether or not you take notes, you will need to rely on your

22 own memory of what was said.  Notes are only to assist your

23 memory.  You should not be overly influenced by notes.  In your

24 deliberations at the end, do not use your notes or any other

25 jurors' notes as authority to persuade fellow jurors, and do

1  not give more or less weight to the views of a fellow juror

2  just because they did or did not take notes.  Do not assume

3  that just because something is in someone's notes that it

4  necessarily took place in court.  It is just as easy to write

5  something down incorrectly as it is to hear or remember it

6  incorrectly.

7         Notes are not entitled to any greater weight than

8  each jurors' independent memory of the evidence.  You should

9  rely on your individual and collective memories when you

10  deliberate and reach a verdict at the conclusion of the case.

11  Now, do not take any notes away from the courthouse.  I repeat.

12  At the end of the each day place your notes in the jury room.

13  If you do take notes, take them each time you leave the jury

14  room out to the court and each time you go back into the jury

15  room with you.  When you leave at night at the conclusion of

16  the case, are leave your notes -- there will be envelopes in

17  there.  Write your name on the envelope.  Put your notes in

18  your envelope.  Leave those envelopes in the jury room.  No one

19  will read your jury notes, and they will stay safe during that

20  period of time.

21         At the conclusion of the case when we're done, we

22  will collect all of the notes, and they will be shredded

23  without anyone reading those notes.  The purpose of that among

24  other reasons is that the jurors should feel absolutely free to

25  speak their minds and opinions in that jury room without any

1  repercussions from anybody else writing something down related

2  to that.  So if you do keep notes, they must stay in the

3  courthouse.  At the conclusion of the case, they'll be

4  collected and shredded.  Nobody will read those notes.  Let's

5  talk about the evidence that you will hear in the case.

6         You must make your decision in the case based only on

7  the evidence that you will see and hear in this courtroom.  Do

8  not let rumors or suspicion or anything you may see or hear

9  outside the court influence your decision in any way.  The

10 evidence from which you will find the facts of the case

11 consists of the following:  The sworn testimony of witnesses

12 who will appear to testify before you in court.  Documents or

13 other things that are received into evidence as exhibits and

14 any fact or testimony that is stipulated to, that is, formally

15 agreed to by the parties.

16        Now, the following are not evidence.  Statements and

17 arguments of the lawyers in the case, questions by the lawyers

18 and any question that I might ask of a witness.  You must not

19 assume that a fact is true just because one of the lawyers or

20 me for that matter ask a question about it.  It is the witness'

21 answers that are the evidence, but, of course, you need to

22 consider the question so that you know what the witness means

23 by their answer.  For example, if a witness answered yes to a

24 question, you would have to consider what the question was to

25 understand what the answer yes meant.

1          Now, objections by lawyers in the case including

2    objections in which the lawyers state facts are not evidence.

3    Any testimony that I strike or tell you to disregard in the

4    case is not evidence.  Anything that you may see or hear

5    outside of this courtroom is not evidence.  You should use your

6    common sense in weighing the evidence.  Consider it in the

7    light of your everyday experience as people with events and

8    give it whatever weight you believe the evidence deserves.

9          If your experience and common sense tell you that

10   certain evidence reasonably leads to a conclusion, you may

11   reach that conclusion.  Now, the rules of evidence control what

12   can be received into evidence.  When the lawyers ask a question

13   or offer an exhibit into evidence and a lawyer on the other

14   side thinks that it is not permitted under the rules of

15   evidence, that lawyer may object.  An objection simply means

16   the lawyer is asking me to decide whether the evidence should

17   be allowed under the rules.  Lawyers have a responsibility to

18   their client to make objections when the evidence being offered

19   they believe is improper under the rules of evidence.

20         You should not be influenced by the fact that an

21   objection was made.  Now, you should not be influenced by my

22   rulings on the objections to evidence.  If an objection is

23   overruled, the question will be answered or the exhibit will be

24   received into evidence.  You should consider that testimony or

25   exhibit just like any other.  I may allow evidence for a

72

1  limited purpose.  If I do that, I will instruct you that the

2  evidence is only admitted for a limited purpose, and you must

3  follow that instruction and only use that evidence for that

4  limited purpose.  If I sustain an objection, the question will

5  not be answered or the exhibit will not be received into

6  evidence.

7            Whenever I sustain an objection, you must disregard

8  the question or the exhibit entirely.  Do not think about or

9  guess what the witness might have said or what the exhibit

10 might have shown.  Sometimes a witness may possibly have

11 already begun to answer before the lawyer objects or before I

12 rule on an objection.

13           If I sustain the objection, you must disregard

14 whatever part of the answer was given.  Also I may order some

15 testimony or evidence be stricken or removed from the record.

16 If I do that, I will instruct you to disregard that evidence.

17 This means when you are deciding the case you must not consider

18 or be influenced in any way by that testimony or that evidence

19 I have told you to disregard.

20           Now, although the lawyers may call your attention to

21 certain facts or factual conclusions that they think are

22 important in the case, what the lawyers say is not evidence and

23 is not binding on you.  It will be your own recollection and

24 interpretation of the evidence that controls your decision.

25 Also do not assume from anything I do or say during the trial

1  that I have any opinion about the evidence or any opinion about

2  the issues in the case or any opinion about what your verdict

3  should be.

4          Now, there's generally two types of evidence that can

5  be used in trial, direct evidence and circumstantial evidence.

6  Both types of evidence may be used by you in reaching your

7  verdict in the case.  Now, direct evidence is simply evidence

8  which if believed -- which if believed directly proves a fact.

9  An example of direct evidence occurs when a witness testifies

10 about something the witness knows from his or her own senses,

11 something the witness has seen, touched, heard or smelled.

12         Circumstantial evidence is evidence which if believed

13 indirectly proves a fact.  It is evidence of proof of one fact

14 from which you can reasonably infer the existence of other

15 facts.  Now, an inference is simply a deduction or conclusion

16 that reason, experience and common sense leads to you make from

17 the evidence.  An inference is not, however, a suspicion or a

18 guess.  It's a reasoned, logical decision to find a disputed

19 fact exists based upon another fact.

20         An example that we use sometimes if someone walked

21 into the courtroom wearing a wet raincoat and carrying a wet

22 umbrella.  You can reasonably assume that it probably is

23 raining outside.  That would be circumstantial evidence you

24 find they're wet and as a result in carrying a wet raincoat and

25 wet umbrella that it would be reasonable for you to assume it's

74

1  raining outside.  If at the same time you turned around and

2  looked out the window and you saw water coming from the sky,

3  rain drops from the sky, that would be direct evidence that it

4  was raining outside.

5        Now, sometimes different inferences may be drawn from

6  the same set of facts.  The government may ask you to draw one

7  set of inferences.  The defense may ask you to draw a different

8  set of inferences.  You and you alone must decide what

9  inferences you will draw based upon all of the evidence that's

10 presented.

11       Now, you should consider all of the evidence that is

12 presented in trial, direct and circumstantial.  The law makes

13 no distinction between the weight you should give to either

14 direct or circumstantial evidence.  It is for you to decide how

15 much weight to give to any of the evidence.  Now, we will talk

16 for a moment about credibility of witnesses.  In deciding what

17 the facts are, you must decide what testimony you believe and

18 what testimony you do not believe.  You are the sole judges of

19 the credibility of witnesses.

20       Now, credibility refers to whether a witness is

21 worthy of belief.  Is the witness truthful?  Is the witness

22 'testimony accurate?  You may believe everything a witness says

23 or only part of it or none of it.  You may decide whether to

24 believe a witness based on his or her manner and behavior while

25 testifying, the explanation the witness gives and all of the

1  other evidence in the case just as you would in any important

2  matter where you were trying to decide if a person is truthful,

3  straightforward and accurate in his or her recollections in

4  your regular life.  Now, in deciding the question of

5  credibility, remember to use your common sense, your good

6  judgment and your worldly experience.

7         In deciding what to believe you may consider a number

8  of factors.  They include the following, the opportunity and

9  ability of the witness to see or hear or know the things about

10  which the witness testifies, the quality of the witness'

11  knowledge, understanding and memory, the witness' appearance,

12  behavior and manner while testifying, whether the witness has

13  an interest in the outcome of the case or any motive, bias or

14  prejudice, any relation the witness may have to a party in the

15  case and any effect the verdict may have on the witness,

16  whether the witness said or wrote anything before trial that is

17  different from the witness' testimony during trial, whether the

18  witness' testimony is consistent or inconsistent with other

19  evidence that you believe and any other factors that bear on

20  whether the witness should be believed.

21         Now, inconsistencies or discrepancies in a witness'

22  testimony or between the testimony of different witnesses may

23  or may not cause you to disbelieve that witness' testimony.

24  Two or more persons witnessing an event may simply see or hear

25  it differently.  Mistaken recollection like failure to recall

1  is a common human experience.  In weighing the effect of an

2  inconsistency you should consider whether it is about a matter

3  of importance or an insignificant detail.  You should also

4  consider whether the inconsistency is innocent or intentional.

5  Now, you're not required to accept testimony even if the

6  testimony is not controverted and the witness is not impeached.

7           You may decide that the testimony is not worthy of

8  belief because of the witness' bearing or demeanor or because

9  of the inherent improbability of the testimony or for other

10 reasons that are sufficient to you.  After you make your own

11 judgment about the believability of a witness, you can then

12 attach to that witness' testimony the importance or weight that

13 you believe it deserves.  Now, the weight of the evidence to

14 prove a fact does not necessarily depend on the number of

15 witnesses who testify.  What is more important than numbers is

16 how believable the witnesses are and how much weight you

17 believe their testimony deserves.  Now, this is a criminal

18 case.

19          The government has charged the defendant, Kevin

20 Jones, with violating federal criminal laws.  Specifically, the

21 defendant is charged with conspiracy to distribute and

22 conspiracy to possess with intent to distribute controlled

23 substances, namely fentanyl.  This charge against the defendant

24 is contained in a document called an indictment.  An indictment

25 is just the formal way of specifying the exact crime the

1  defendant is accused of committing.  An indictment is simply a

2  description of the charge against the defendant.  It is an

3  accusation only.  An indictment is not evidence of anything,

4  and you should not give any weight to the fact that the

5  defendant has been indicted in making your decision in the

6  case.

7           It is merely the formal method by which a case comes

8  to trial for a jury to then decide whether or not the

9  government has proven the defendant's guilt beyond a reasonable

10 doubt.  Now, the defendant has pled not guilty to the charge --

11 the offense charged.  He is presumed to be innocent.  He starts

12 the trial with a clean slate with no evidence against him.  The

13 presumption of innocence stays with the defendant unless and

14 until the government presents evidence that overcomes that

15 presumption by convincing you that the defendant is guilty of

16 the offense charged beyond a reasonable doubt.

17          The presumption of innocence requires that you find

18 the defendant not guilty unless you are satisfied the

19 government has proved guilt beyond a reasonable doubt.  The

20 presumption of innocence means that the defendant has no burden

21 or obligation to present any evidence at all or to prove that

22 he is not guilty.  The burden or obligation of proof is on the

23 government to prove the defendant is guilty, and that burden

24 stays with the government throughout the trial.

25          In order for to you find the defendant guilty of the

78

offenses charged, the government must convince you that he is guilty beyond a reasonable doubt.  That means the government must prove each and every element of the offense charged beyond a reasonable doubt.  A defendant may not be convicted based on suspicion or conjecture but only upon evidence proving guilt beyond a reasonable doubt.

Now, proof beyond a reasonable doubt does not mean proof beyond all possible doubt or to some mathematical certainty.  Possible doubts or doubts based on conjecture or speculation are not reasonable doubts.  A reasonable doubt is a fair doubt based on reason, logic, common sense and experience. A reasonable doubt means a doubt that would cause an ordinary reasonable person to hesitate to act in matters of importance in his or her own life.  It may arise from the evidence or from the lack of evidence or from the nature of the evidence.

If after hearing all of the evidence you are convinced that the government has proved the defendant guilty beyond a reasonable doubt, you should return a guilty verdict against him.  However, if you have a reasonable doubt as to any element of the offense, then you must return a verdict of not guilty.  That concludes the kind of the law -- preliminary law aspect.  At the conclusion of the case I will give you more a extensive version of that, and will also give you a written copy that you can take with your deliberations if you want to review anything.  We will talk about the procedures.  In a

1  moment we will begin with opening statements where counsel has

2  the opportunity to do an opening statement which has been

3  described sometimes as a contents of an index of a book, to

4  give you a summary what they expect that the evidence will show

5  so you can follow that as we go through the trial.

6          The prosecution goes first since the government has

7  the burden of proof.  The defense has an opportunity if they

8  wish to go second.  After opening statements are complete then

9  we will begin the case.  The government will begin by calling

10 witnesses to the stand who will testify before you.  When the

11 witness is on the stand, the government lawyers will ask

12 questions of the witness.  That's called direct examination.

13 After they have completed asking whatever questions they wish

14 to ask, defense counsel has the opportunity to question the

15 witness, cross-examine that witness.  Once that's done, the

16 government may have an opportunity in some cases to do a short

17 redirect examination.

18          That process will continue until the government has

19 called all of the witnesses it intends to call in the case and

20 rests its case.  Once the government has rested its case, the

21 defense has the option if they choose to call or present any

22 witnesses they wish .  If they do call witnesses, same process.

23 They'll put a witness on the stand, ask that witness questions.

24 That's direct examination.  When they're done, the government

25 has an opportunity to question or cross-examine that same

1  witness, and then under some circumstances the defense may have
2  an opportunity to do a short redirect examination.  That
3  process will continue until the defense called whatever
4  witnesses they wished to call and they rest.  After both sides
5  have rested, which means all of the evidence has been presented
6  to you, then I will instruct you on the law of the case.  And
7  after I do that, counsel will have an opportunity to do their
8  closing arguments where they will argue to you why they believe
9  the evidence shows you should find in their favor.

10          After those closings are complete and done, I will
11  give you what I call my housekeeping instructions how you will
12  perform your deliberations.  Then after that you get your case
13  for deliberation.  That's the process we will go through and we
14  will begin as soon as you're ready.

15          MR. DONAHUE:  May it please the Court, counsel.  Good
16  afternoon.  Ladies and gentlemen, when you begin a puzzle you
17  start with a bunch of pieces, and you don't know how they fit.
18  But you look at the sizes.  You consider the shapes, and you
19  try to identify some important pieces.  Slowly the puzzle's
20  picture becomes clear.

21          In February of 2021 a woman by the name of
22  Michaelena Kowalczyk passed away from an overdose.  Ms.
23  Kowalczyk was found with three blue pills marked M. 30 on her
24  person.  In the subsequent investigation the F.B.I. found a
25  wide ranging conspiracy of drug trafficking pills from Arizona

1  to Pennsylvania and elsewhere.  During that investigation

2  investigators found three key pieces of evidence, a man named

3  Davon Beckford, United States postal tracking receipts and

4  records of money going from Pennsylvania and surrounding areas

5  to Arizona.

6          The evidence will show that the investigators

7  followed the mail and then they followed the money.  When they

8  put together all of the pieces of the puzzle, it became clear,

9  and the evidence will show that the defendant Kevin Jones,

10  a/k/a Hat, was a member and major participant of a criminal

11  conspiracy to distribute and possess with intent to distribute

12  a schedule two controlled substance, fentanyl, in the Middle

13  District of Pennsylvania and elsewhere.

14          Ladies and gentlemen, my name is Gerard Donahue.

15  Along with my colleague, Bob O'Hara, we have a privilege of

16  representing the United States of America in this matter.  We

17  truly appreciate you being here as Judge Mannion said.  It's

18  one of the highest civic duties that you can do.  As a member

19  of this jury, we will be asking you to put together your own

20  type of puzzle.  We intend to bring you pieces of evidence and

21  connect them for you.

22          Over the next few days we will present to you

23  testimony and documents, and it will be your job to assess and

24  consider that evidence.  Count one charges the defendant, Mr.

25  Jones, with conspiracy to distribute controlled substances and

82

1  possess with an intent to distribute schedule two controlled

2  substances within the Middle District of Pennsylvania and

3  elsewhere from on or about January 2020 through February 14th,

4  2023.  It is said that the essence of a criminal conspiracy is

5  an agreement, an agreement between two or more people to commit

6  a crime or engage in criminal conduct.

7          In this case we allege that the conspiracy was an

8  agreement to distribute controlled substances, specifically a

9  mixture and substance containing a detectable amount of

10  fentanyl -- I'm sorry, schedule two controlled substance -- and

11  that conspiracy existed sometime between January 2020 and

12  February 14th, 2023.  Now, Judge Mannion will instruct you on

13  the law.

14          I just want to briefly touch on conspiracy, which is

15  kind of a criminal partnership.  The law does not require that

16  all the partners or all of the members play an equal role in

17  that conspiracy.  It doesn't require that all of the members of

18  the conspiracy know each other, and it doesn't require the

19  members of the conspiracy to be members of the conspiracy from

20  the beginning of the conspiracy.  The government must establish

21  that the defendant was a member of the conspiracy at some point

22  during its existence.

23          And the government must show that Mr. Jones was a

24  member of the agreement and understood the agreement's

25  objectives.  There must be a unity of purpose.  That's a

1  criminal conspiracy.  Now, conspiracy by the very nature are

2  covert and secretive.  You don't see advertising the sale of

3  illegal drugs, right.  So the question is, how do we prove a

4  conspiracy?  And the sensible answer is that we do that through

5  that the testimony of witnesses, and in this case you will have

6  the opportunity to hear testimony from witnesses who will tell

7  you they were a part of this criminal conspiracy but -- and I

8  will give you a road map of that testimony in a few minutes.

9         But before we get there, I just want to say that

10  common sense tells you that, for example, if you were going to

11  board a pirate ship, you would meet some pirates.  Well, in

12  this case we're investigating a drug trafficking ring.  You're

13  going to meet some people who sold drugs.  You're going to meet

14  some people who use drugs, and you're going to meet some people

15  who did both.  As I told you, you're going to hear testimony

16  from witnesses that had a were part of this conspiracy and they

17  pled guilty and awaiting sentence.

18         Before we get into the participants of the

19  conspiracy, your first witness is going to go F.B.I. task force

20  officer Shane Yelland.  Officer Yelland will give you an

21  investigator's vantage point of this case.  Officer Yelland

22  will tell you that he was initially tasked with finding the two

23  dealers that sold Ms. Kowalczyk those drugs.

24         He will tell you that he was able to locate them and

25  both of those this individuals agreed to cooperate with the

84

1   government.  Those two brought us to our first piece of the

2   puzzle, a man named Davon Beckford.  Now, Mr. Beckford and his

3   then girlfriend Tyla Griffin were originally from the

4   Wilkes-Barre area.

5           In 2020 -- in February 2020 they moved out to

6   Arizona, and they quickly began to sell pills to distributors

7   back in the Wilkes-Barre area and elsewhere.  Using a

8   confidential informant, officer Yelland was able to set up four

9   controlled buys, three from Beckford and one from Griffin.

10          Officer Yelland will explain that a controlled buy is

11  a drug deal that is organized and then closely observed by law

12  enforcement officials with the purpose of gaining evidence.

13  From the controlled buys officer Yelland will tell you that

14  they learned that Beckford and Griffin had a simple business

15  model.  First a local dealer would reach out to them, ask for a

16  package of pills.  Beckford would ask for an initial payment,

17  and that payment would be made by an application on your phone

18  that's connected to a money source.

19          So some of the you may be familiar with Cash App or

20  Zelle.  One they received that initial payment, Beckford would

21  go to his source, get pills, drive to the local post office,

22  put it in an express mail package and disguise it with toys and

23  beauty accessories and mail it off.  He would take a picture of

24  the tracking receipt that he received from the local post

25  office, and he would send it to the local dealer.  That way Mr.

1  Beckford and the local dealer both could track the status of

2  those packages.  I just want to take one step back to the

3  express mail package.  There's a reason they use these

4  packages.  It's because they provide a tracking number.  They

5  usually get there within 24 hours, and it doesn't require a

6  signature when it gets there.  So once the package did arrive,

7  Beckford would expect another payment from the local dealer.

8       As I indicated, officer Yelland was able to make four

9  controlled buys.  This process played out with each one.  When

10 Beckford and Griffin sent those packages of pills, officer

11 Yelland notified the United States Postal Service, which seized

12 the package.  Each time the packages were found to contain

13 pills, and each time officer Yelland sent it to the lab to be

14 tested and the pills came back each time with a confirmable

15 trace of fentanyl, and that is not in dispute.

16      After the fourth controlled buy, the informant let

17 officer Yelland know that Mr. Beckford was on his way back to

18 Wilkes-Barre for a visit.  Because of weather and a

19 cancellation, officers were not able to locate Beckford on the

20 way in, but when he arrived at the Wilkes-Barre Scranton

21 airport to go back home to Arizona, officer Yelland was waiting

22 for him and he placed him under arrest.  A few weeks later Ms.

23 Griffin was also placed under arrest.  Now, ladies and

24 gentlemen, you will have an opportunity to hear from both Davon

25 Beckford and Tyla Griffin.  Mr. Beckford will tell you he has

pled guilty to distribution of a controlled substance resulting

in death for his role in the overdose death of Ms. Kowalczyk.

He has agreed to cooperate with the government.  Ms. Griffin

has also pled guilty to being part of this criminal conspiracy.

She is also cooperating with the government.

Beckford and Griffin will largely confirm what I just

told you about their process and distribution model.  The

controlled buys were just a snapshot of how they ran their

trafficking of fentanyl pills out of Arizona to Pennsylvania

and elsewhere.  They required upfront payment via Cash App.

Beckford used primarily Cash App.

We expect him to testify that he had two accounts

which he named Justin Case and Millionaire Mindset E.N.T.  once

Beckford and Griffin received the first payment, they will get

the their pills from the source and drive to the post office

and send the pills in the express mail package.

They would take the picture of the receipt, send it

to the local dealer.  Mr. Beckford will tell you that he often

went on the United States Postal Service tracking website and

he would look up the status of the package and also take a

picture of that tracking result.  Once the package arrived,

Beckford and Griffin would expect another payment.  Beckford

and Griffin will tell you that they both had their own set of

individuals that bought fentanyl pills from them.

They will both tell you that they never sent a

1  package during their time in Arizona that did not contain

2  fentanyl pills.  Most importantly for the purposes of this

3  trial, Mr. Beckford is expected to testify that he repeatedly

4  sent 500 to a thousand fentanyl pills at the cost of $5 a pill

5  to the defendant, Kevin Jones, for his own distribution.

6        When Beckford first began to cooperate with law

7  enforcement officials, he allowed them to search his phone, and

8  when officer Yelland performed that search, he found the second

9  piece of our puzzle, which were screen shots of United States

10 postal tracking receipts.  When officer Yelland found those

11 tracking receipts, he called in United States postal inspector

12 Lauren Fetch.

13        Inspector Fetch will be the second witness you hear

14 from in this trial, and it was her and her team that

15 investigated the tracking receipts.  Inspector Fetch will

16 testify as soon as she began to investigate she found that the

17 tracking receipts revealed that Beckford and Griffin were

18 sending multiple packages to multiple people at the same

19 addresses.  Inspector Fetch will further testify that in

20 reviewing Beckford's receipts she found ten packages that went

21 to addresses associated with Mr. Jones, three to 6 Woodward

22 Street in Wilkes-Barre, Pennsylvania and seven to 14 Potter

23 Avenue, Unit Two, in Plainville, Massachusetts, a residence

24 that he resided at with his then girlfriend Sabrina Cleveland.

25 Ladies and gentlemen, as I indicated, you will have an

88

1  opportunity to hear from other individuals who have admitted to

2  being a part of this conspiracy who have pled guilty and are

3  awaiting sentence, and you will have the testimony from

4  inspector Fetch who will be able to tell you how many packages

5  each of those individuals received at their residences.

6          Rachel Smyden will testify that she began to use

7  pills in 2019 and for about a year she bought her pills

8  directly from the defendant.  Ms. Smyden will tell you she took

9  the pills, she got high and she became addicted.  When Tyla

10  Griffin reached out to her to buy pills through the mail, she

11  jumped at the chance.  Ms. Smyden will tell you she had the

12  pills sent to 42 Red Maple Avenue in Mountain Top, P.A., and

13  inspector Fetch will be able to tell you at least 11 packages

14  went to that location.  Ms. Smyden the further testify when

15  some he received the pills she took some of them, she got high

16  and she also sold some of them to fuel her addiction.

17          We expect Samantha Smart to testify similarly.  She

18  will tell you she began using pills around 2019 and she bought

19  pills from the defendant on at least three occasions in 2020.

20  Ms. Smart will tell you she began to buy pills from Mr.

21  Beckford through the mail and Beckford would send the pills to

22  her home at 82 Parsonage Avenue in Pittston, P.A.

23          Inspector Fetch will tell you that her team found at

24  least 13 packages that went to Ms. Smart's residence.  Ms.

25  Smart will tell you she used the pills, she got high and she

also sold some of the pills again to fuel her addiction.
Shayna Colon Acosta is expected to testify after a facial
injury she became addicted to pain medication.  When her pain
medication ran low, she went to the street.  Two of her pill
dealers, a gentleman named Akee Miller, a/k/a Mitch and Rahmel
Wigfall, two other conspirators in this criminal conspiracy
offered her the opportunity to receive packages for them at her
apartment.

Mr. Wigfall and Mr. Miller offered either $200 to Ms.
Acosta or $200 worth of pills.  She always chose the pills.
Inspector Fetch will tell you that Ms. Acosta's home at 15
Lanning Lane received 13 packages from Beckford.  Ladies and
gentlemen, you will also hear testimony from Sabrina Cleveland,
Mr. Jones' former girlfriend.  Ms. Cleveland will tell you she
lives at 14 Potter Avenue, Unit Two, in Plainville,
Massachusetts, a location that received seven packages from
Beckford in Arizona.

Ms. Cleveland will tell you that Mr. Jones directed
her to pay a person on Cash App with the Cash App name Justin
Case and Mr. Jones would then receive packages shortly
thereafter at her house.  Ms. Cleveland will also tell you that
when she visited the Wilkes-Barre area with Mr. Jones they
would stay at this house at 6 Woodward Street in Wilkes-Barre,
a location that received three packages.  With respect to that
6 Woodward Street location, inspector Fetch will tell you an I.

90

1   P. address repeatedly checked on two of the packages that were

2   sent there in October 2021 and November 2021.  When

3   investigators obtained the account information for that I. P.

4   address, it came back to the defendant, Mr. Jones.

5         Ladies and gentlemen, after following the mail,

6   investigators followed the money, and they found the third

7   piece of the puzzle establishing Mr. Jones as part of this

8   criminal conspiracy.  Cash App records.  Now, as I indicated

9   earlier we expect Mr. Beckford to tell you that he had two Cash

10  App accounts, Justin Case and Millionaire Mindset E.N.T.  Ms.

11  Cleveland will tell you she sent money on Mr. Jones' behalf to

12  Justin Case, and her Cash App records will also support that

13  she repeatedly sent Mr. Beckford's Cash App account money from

14  March 2021 through May 2021.

15        When investigators obtained Mr. Jones' Cash App

16  records, it shows he also repeatedly sent money to Beckford's

17  two Cash App accounts from May 2021 through November 2021.  At

18  $5 a pill and 500 to a thousand pills in each buy, the money

19  adds up.  The evidence will show that between March 2021 and

20  November 2021, Mr. Jones, Ms. Cleveland sent Beckford over

21  $30,000.  At the end of this trial we expect the evidence will

22  show that during the dates of this conspiracy the defendant,

23  Mr. Jones, a/k/a Hat would send money to Mr. Beckford.

24        A few days later he would receive a package, and then

25  he would send more money to Mr. Beckford.  Mr. Beckford is

1  going to come in here and tell you that every time he sent a

2  package to Mr. Jones it was fentanyl pills.  Other witnesses

3  and participants in this conspiracy will tell you that when

4  they sent money to Mr. Beckford and Ms. Griffin and they got a

5  package it was fentanyl pills.  Ladies and gentlemen, over the

6  next few days the evidence will be your pieces of the puzzle.

7  Listen to it.  Listen to the testimony.  Consider the

8  documents.  Follow the mail.  Follow the money.

9           When you put together the puzzle's picture, you're

10  confident it will show Mr. Jones was a member and participant

11  of the conspiracy to distribute and possess with intent to

12  distribute a schedule two controlled substance fentanyl.  We

13  will ask you to find him guilty.  Thank you.

14           THE COURT:  Thank you, Mr. Donahue.  Mr. Rotteveel.

15           MR. ROTTEVEEL:  Thank you, Your Honor.  Counsel.

16  Good morning, everyone -- sorry -- good afternoon, everyone.

17  C. J. Rotteveel on behalf of Mr. Jones.  The government has

18  just presented their opening statement to you referring to this

19  case as a puzzle, and we all know a puzzle you start with the

20  boarder and find corner pieces and fill everything in between .

21  The problem is with the government's puzzle is it's missing

22  pieces.  And what are the pieces missing?  The drugs.  They

23  have collected no drugs off of my client whatsoever through the

24  mail, on his person, his house, car, anywhere.

25           The judge gave you a whole synopsis of the law, and

1  it's a lot.  It's a lot to take in.  It's one thing after

2  another.  You probably got done eating lunch.  There's a couple

3  things I want you to focus on if you gleaned over it while the

4  judge was going over it with you.  The number one thing I want

5  you to think about is the presumption of innocence.  I'm sure

6  you've all heard presumption of innocence before whether it's a

7  name of a book by John Grisham or some show on Netflix or a

8  movie, but the idea here is as Mr. Jones sits here at this

9  table he's innocent.  Mr. O'Hara sitting at this table is

10 innocent.  The judge is innocent.  I'm innocent, and he is just

11 as innocent as everyone else in this room.

12        The burden of proof is the second concept I want you

13 to consider, and that is the government's responsibility.  It's

14 their responsibility, their burden of proof to prove beyond a

15 reasonable doubt whether or not my client is guilty.  It is

16 their job.  Technically I don't have to do anything nor my

17 client.  We have to sit here.  We're not going to do that.  But

18 the law says the government has this burden of proof and they

19 have to prove their case beyond a reasonable doubt.

20        The judge instructed you what is beyond a reasonable

21 doubt.  There's no mathematical equation to this.  It's not 51

22 percent guilty, 49 percent innocent, anything like that.  It is

23 hard to describe, but the best way to describe it is it is our

24 highest legal standard, okay.  This isn't a car accident where

25 someone gets rear ended.  This is our highest legal standard.

1  When they bring their case and they bring their evidence and

2  try to prove their case beyond a reasonable doubt, they've got

3  to get it right.  They've got to make sure they have all of the

4  pieces of the puzzle.  The government had gone over this case

5  with you and what this case is about.  Again, this started with

6  a drug delivery resulting in death.  Someone had died from

7  taking fentanyl, and they were able to trace it back to an

8  individual by the name of Davon Beckford and his girlfriend

9  Tyla Griffin who had moved out to Arizona and met some other

10 drug dealers out there and sending pills to Pennsylvania.

11         They were sending pills to other individuals in

12 Pennsylvania.  Those individuals were going and dealing these

13 pills.  Now, the representatives or the players involved in

14 this case the government is going to present -- and the

15 government had gone over a couple names -- Tyla Griffin.  That

16 was Davon Beckford's girlfriend out in Arizona.  Tyla Griffin

17 pled guilty to a conspiracy charge to distribute fentanyl.

18         She's facing a maximum life sentence in prison, so

19 she is going to come up here and testify.  And I'm sure you can

20 understand why she is here to testify and why she is

21 cooperating with the government when facing life in prison.

22 Likewise, Samantha Smart was mentioned.  Samantha Smart pled

23 guilty to conspiracy to distribute fentanyl.  She's facing 20

24 years in prison.  I'm sure you can draw an inference as to why

25 and what is motivating Ms. Smart to come in here and testify.

1    Rachel Smyden was mentioned.  Conspiracy to commit or

2    distribute fentanyl.  She is coming in to testify.  She is also

3    facing a maximum of 20 years to life in prison.  None of those

4    individuals I just mentioned can pinpoint and say for certain

5    that, yes, I've seen drugs in a package sent to Kevin Jones, or

6    I saw Kevin Jones open up a package and there they were, these

7    fentanyl pills or -- no one can identify that out of those

8    witnesses.  The star witness for the government is Davon

9    Beckford.

10          Only Davon Beckford can say, yes, I sent fentanyl

11   pills and they went to Kevin Jones, I sent them to this address

12   and he sent me money.  The one person the government is going

13   to rely on is Davon Beckford.  They are going to put on an

14   F.B.I. agent.  A postal investigator will testify.  They're

15   going to have as many people come up and try to convince you

16   that my client is guilty of this, but it really comes down to

17   Davon Beckford and whether or not you trust him.

18          Davon Beckford has pled guilty to drug delivery

19   resulting in death.  He is facing life in prison and at the

20   very least a 20-year mandatory minimum sentence.  That means at

21   the very least he would have to serve at least 20 years in

22   jail, potentially life in jail.  All these individuals we just

23   mentioned also signed cooperation agreements if they work

24   substantially for the government the government can file a

25   motion to greatly reduce these individual's sentences even

95

1  below that 20-year mandatory minimum sentence, someone that

2  delivered drugs that resulted in someone's death.  He can go

3  below that 20-year mandatory minimum sentence.  Ladies and

4  gentlemen, thank you for being here.  Thank you for listening

5  to the judge's instructions, and thank you for being honest

6  during voir dire or the jury questions.  We picked you for a

7  reason.

8        We picked you because you raised your hand at the

9  right time and said the right thing.  You looked engaged and

10 wanted to be here.  You looked like this mattered to you.  And

11 it matters to us.  It matters that you understand that my

12 client is presumed innocent.  It matters that the government

13 bears the burden to prove beyond a reasonable doubt our highest

14 legal standard that he's guilty.  But it's our submission they

15 cannot do it.  There are pieces of their puzzle missing, and

16 because of that they cannot do it.  Thank you for taking the

17 time to be here.  Keep an open mind, and thanks for listening.

18 Thank you.

19        THE COURT:  Thank you, Mr. Rotteveel.  All right.

20 Mr. O'Hara or Mr. Donahue.

21        SHANE YELLAND, called as a witness, being duly sworn,

22 testified as follows:

23 DIRECT EXAMINATION

24 BY MR. O'HARA:

25 Q.   Officer Yelland, I will ask you to keep your voice up so

1 the folks in the very back of the jury box can hear you.

2 Adjust that microphone to your liking and your seat as well.

3 And can you tell us again your name, please?

4 A.    Good afternoon.  My name is Shane Yelland.

5 Q.    And how are you presently employed, sir?

6 A.    I'm a Wilkes-Barre City police detective assigned to the

7 F.B.I.'s Safe Streets Task Force.

8 Q.    How long have you been in law enforcement?

9 A.    Since 2005, just over 19 years.

10 Q.    How long have you been with the Wilkes-Barre Police

11 Department?

12 A.    19 years.

13 Q.    How long have you been with the F.B.I. Safe Streets Task

14 Force?

15 A.    Right around eight years I think I just hit.

16 Q.    You testified in court before, correct?

17 A.    Yes.

18 Q.    What kind of investigations do you conduct with the F.B.I.

19 Safe Streets Task Force?

20 A.    Yes, we focus on violent crime, robbery, murder, assaults

21 and drug dealing.

22 Q.    Can you tell the members of the grand jury -- tell the

23 members of the grand jury the background of this particular

24 investigation?

25            THE COURT:  The jury.  This is not a grand jury.

97

1          MR. O'HARA:  Right, it's a petit jury.  It's Tuesday,
2 however, which is grand jury.
3 BY MR. O'HARA:
4 Q.    Tell the members of the jury the background of this
5 particular investigation.
6 A.    Yes, in February of 2021 Wilkes-Barre City police
7 responded to an unresponsive female inside of a vehicle.  The
8 vehicle was noticed the night before.  Neighbors saw the
9 vehicle outside, and it snowed a little bit that night.  The
10 vehicle was running all night.  They woke up -- the neighbors
11 woke up, saw the vehicle was still there, went outside to
12 investigate it, saw a female slumped over the driver's seat,
13 called the police and started the investigation.
14 Q.    Okay.  Who was that female if you remember?
15 A.    Michaelena Kowalczyk.
16 Q.    Was she, in fact, deceased?
17 A.    Yes, later it was confirmed through an autopsy and
18 toxicology that she died from a fentanyl overdose.
19 Q.    And, officer Yelland, there are some paper exhibits up
20 there in the file.  Look at Government's Exhibit No. 17.
21 A.    Got it.
22 Q.    What is it?
23 A.    It is a picture of three fentanyl pills.
24 Q.    Where were those fentanyl pills found?
25 A.    Inside the vehicle along with Michaelena Kowalczyk's cell

98

1  phone.

2       MR. O'HARA:  Any objection?

3       MR. ROTTEVEEL:  No.

4       MR. O'HARA:  We move for admission of Government's

5  Exhibit 17.

6       THE COURT:  No objection, correct?

7       MR. ROTTEVEEL:  No objection.

8       THE COURT:  It's admitted.

9       MR. O'HARA:  We'd like to publish it to the jury.

10 BY MR. O'HARA:

11 Q.   What's depicted in Government's Exhibit 17?

12 A.   Picture of three off color off blue colored fentanyl

13 pills.  You can see the number 30 visible on the one I just

14 circled.  On the other side would be an M.

15 Q.   Marked with 30 and M.  Were those pill, in fact, tested?

16 A.   Yes.

17 Q.   Did they turn out to be fentanyl?

18 A.   Yes.

19 Q.   So what's the next step that takes place in the

20 investigation?

21 A.   Yes, during the investigation it's crucial you find the

22 cell phone and -- everybody carries pretty much their whole

23 life in a cell phone anymore.  If we can access the phone and

24 get the conversations, start to recreate the last moments to

25 the couple hours of the life, typically we're able to identify

99

the person who sold the fatal dose.

Q.   All right.  Were you able to do that in this particular

case?

A.   Yes, the fatal dose was sold prior -- the night before

Michaelena was found by a friend.  Her name was Kristina

Shumway.

Q.   How many pills did Ms. Shumway sell to Michaelena

Kowalczyk?

A.   Ms. Shumway purchased four pills for a hundred dollars,

and three of them were located.

Q.   And did one of those pills -- did she ingest the other

one?

A.   Yes.

Q.   Is that what caused her death?

A.   Yes.

Q.   Okay.  So now Michaelena Kowalczyk, and now we have

Kristina Shumway?

A.   Yes.

Q.   Where did the investigation go from there point?

A.   We approached Kristina Shumway and showed her some of the

evidence, and she admitted to her role in the incident and

agreed to cooperate so we can go after the person who sold her

the drugs.

Q.   And so the jury understands was, in fact, Kristina Shumway

way charged as part of this investigation?

100

1   A.    Yes, Kristina Shumway was charged with drug delivery

2   resulting in death in the Pennsylvania state system.

3   Q.    She pled guilty to that?

4   A.    Yes.

5   Q.    Where does the investigation go?

6   A.    Kristina Shumway was able to lead us to her drug dealer.

7   Akee Miller, a/k/a Mitch or Mitch Money.

8   Q.    What was his role?

9   A.    So his role was to -- he met Kristina Shumway the night --

10  for Michaelena and sold the four pills for a hundred dollars to

11  Kristina Shumway which were later -- gave them to Michaelena

12  Kowalczyk, who ingested one of them.

13  Q.    So Kowalczyk gets them from Shumway who buys from Akee

14  Miller?

15  A.    That's correct.

16  Q.    Now, was Akee Miller approached by law enforcement?

17  A.    Yes.

18  Q.    And what happened?

19  A.    We approached Akee Miller, showed him some evidence and

20  requested him to cooperate so we can go after his supplier.

21  Q.    And was, in fact, Akee Miller known as Mitch -- was he

22  also charged in this investigation?

23  A.    Yes, he pled guilty to drug delivery resulting in death.

24  Q.    In federal court?

25  A.    Yes.

101

1  Q.    Okay.  What does -- what does -- approaching Akee Miller

2  and showing him the evidence, what does that yield?

3  A.    So we learned that Akee Miller's drug dealer was located

4  in Arizona, Davon Beckford.  We learned the scope of, I guess,

5  the operation of how it worked, how pills were getting sent

6  from Arizona to Pennsylvania and surrounding states.

7  Q.    Generally how did it work?

8  A.    So basically an order would be placed utilizing text

9  messaging or a third party application like a Telegram or

10  What's App, Facebook Messenger, something like that, between

11  the customer Akee Miller and the drug supplier out in Arizona,

12  Davon Beckford.  During that they would negotiate the price,

13  and they would negotiate the quantity, and then eventually Akee

14  Miller used Cash App or Zelle the money to Davon Beckford in

15  Arizona, and Davon Beckford would send the pills to an address,

16  whatever was provided from Akee Miller.

17  Q.    And Cash App and Zelle, these are methods of transferring

18  money?

19  A.    Yes.

20  Q.    For people who might not be familiar?

21  A.    Yes, it's, like, a Venmo now.  It's poplar.

22  Q.    Davon Beckford -- you were a Wilkes-Barre police officer

23  for 20 years.  Were you familiar with him when he was in the

24  Wilkes-Barre area?

25  A.    Yes, I was.

1  Q.    Did he reside or live in the Wilkes-Barre area?

2  A.    Yes.

3  Q.    Prior to moving to Arizona?

4  A.    Yes.

5  Q.    And did he have a girlfriend?

6  A.    Yes.

7  Q.    What was her --

8  A.    Tyla Griffin.

9  Q.    Were you familiar with her also from the Wilkes-Barre

10 area?

11 A.    Yes, I was.

12 Q.    Okay.  So once Akee Miller agrees to cooperate with the

13 investigators -- you said he pled guilty in this case, correct.

14 What's the next step that takes place?

15 A.    He told us the information regarding Davon Beckford.  So,

16 you know, the common thing is to prove it, contact him and see

17 if we can purchase pills.  We'll give you the money and, you

18 know, we will give you the address and prove it.  So he was

19 able to.

20 Q.    Okay.  I want to direct your attention -- well, are you

21 familiar with the term controlled purchase?

22 A.    Yes.

23 Q.    Tell the members of the jury just in general terms what is

24 a controlled purchase?

25 A.    Controlled purchase is nothing more than the police

1  conducting a drug deal utilizing either an undercover officer

2  or a confidential informant, and we supervise the drug deal.

3  We provide the money.  We provide the ride.  We provide the

4  surveillance.  I often tell the C. I.s, the confidential

5  informants, they are doing their normal routine business, they

6  just have backup now in case something goes wrong.  We will be

7  there to help them.

8  Q.    Usually a controlled purchase takes place face to face,

9  correct?

10 A.    Yeah, this is a little different because again you

11 typically have surveillance, quick reaction force in case

12 something happens if there's a robbery or something goes wrong,

13 safety protocols in place.  This was a little different because

14 we just had to electronically send money and utilize, like,

15 communications, text messages and give an address.  It was like

16 doing drug deals from the office in our building there.  It was

17 really weird.

18 Q.    And was Mr. Beckford -- he was, in fact, in another state

19 out in Arizona?

20 A.    Yes, he was in Arizona.

21 Q.    Okay.  So not the typical type of controlled purchase, is

22 it?

23 A.    No, no.

24 Q.    But it's still under the supervision of the police?

25 A.    Yes, all orchestrated by us.

1  Q.    Were a number of controlled buys -- police directed buys

2  made in this case?

3  A.    Yes.

4  Q.    I want to direct your attention to on or about June 2nd of

5  2021.

6  A.    Yes.

7  Q.    Is that the start of the first controlled buy?

8  A.    I think it was June 1st we started communications between

9  Akee Miller and Davon Beckford and it rolled into the second.

10 But that's when we were able to send him money.

11 Q.    So how did it work?

12 A.    So for the first buy on June 2nd Davon Beckford instructed

13 us to go to a third party -- Kacey Sanchez.  She was working

14 with Davon Beckford in this conspiracy where she would accept

15 money and sometimes some packages would go to her house.  She

16 would Cash App it to Davon Beckford.  With Cash App there's

17 limits.  It's kind of difficult to explain, but you can't just

18 send a million dollars through Cash App.  They flag it, and it

19 gets cut down.  So you have to be very -- you can't have one

20 person sending so much money.  So Davon Beckford had multiple

21 people sending him money.

22 Q.    And you mentioned the person named Kacey Sanchez?

23 A.    Yes.

24 Q.    Is that a man or a woman?

25 A.    It's a female.

1  Q.   Was she also charged as part of this investigation?

2  A.   Yes, she was.

3  Q.   With conspiracy to distribute controlled substances?

4  A.   That is correct, conspiracy.

5  Q.   Okay.  So at your direction you have Akee Miller ordering

6  a quantity of pills from Davon Beckford in Arizona?

7  A.   That's correct.

8  Q.   How did you do you get the money to Davon Beckford?

9  A.   Again, we did a surveillance operation when we were

10  outside the office.  We drove to Casey Sanchez's address up in

11  Plains, gave her the money, and then she eventually Cash App'd

12  it to Davon Beckford, and then he sent pills to us to the

13  address we provided.

14  Q.   How many pills did you order?

15  A.   We ordered right around 200.

16  Q.   And approximately how much money was sent?

17  A.   $1,000.

18  Q.   Is that police money so to speak?

19  A.   Yeah, prerecorded U. S. currency.

20  Q.   And once the money is sent, do you receive a package?

21  A.   Yes.

22  Q.   Do you tell Davon Beckford the address?

23  A.   Yes, we give -- I drove around Wilkes-Barre and found an

24  abandoned building.  450 South Franklin Street was an abandoned

25  building in Wilkes-Barre, since been torn down I believe.  So I

106

1  used that address, and that's the address that we gave Davon

2  Beckford to send the package to.

3  Q.    Okay.  I'm going to ask you to take a look at exhibit 1.1.

4  A.    Yes.

5  Q.    A paper copy there.

6  A.    Yes.

7         MR. O'HARA:  Your Honor, we will move for admission

8  of Government's Exhibit No. 1.1.

9         MR. ROTTEVEEL:  No objection.

10        THE COURT:  All right.  It's admitted.

11        MR. O'HARA:  We ask to publish it to the jury.  What

12  are we looking at?  What is the jury looking at here?

13        THE WITNESS:  This is a priority mail express

14  envelope.  It was mailed out of Phoenix, Arizona, cost $26.35

15  to send it.

16  BY MR. O'HARA:

17  Q.    Where is it mailed from?

18  A.    Phoenix, Arizona.

19  Q.    What's the amount of postage?

20  A.    Mailed on June 2nd, 2021 for $26.35.

21  Q.    Is there a tracking number on the outside of the envelope?

22  A.    Yes.

23  Q.    For the record, could you put that on the record?

24  A.    Yes, E. J. 629673027 U.S.

25  Q.    Who is the package sent from?  At least what is the name

1  on the package?

2  A.    Elite Kutz.

3  Q.    Address?

4  A.    4802 I think that's North 12th Street Phoenix, Arizona,

5  85014.

6  Q.    Who is the package sent to?

7  A.    Kelly Chapman, 450 South Franklin Street, Wilkes-Barre,

8  Pennsylvania, 18702.

9  Q.    What's the address of the -- that you provided to Akee

10 Miller to provide?

11 A.    450 South Franklin Street, Wilkes-Barre.

12 Q.    Is that the abandoned building you referred to?

13 A.    Yes.

14 Q.    Is the name Kelly Chapman a real person?

15 A.    Not that I'm aware of it.

16 Q.    Why don't you use the real name of the person who is

17 receiving the package?

18 A.    If it's intercepted I don't think you would want your name

19 on a package that contains fentanyl pills.

20 Q.    And in red is there a date that the package was accepted?

21 A.    Yes, it's accepted June 2nd, 2021, 2:38 p.m.

22 Q.    Is there a scheduled delivery date?

23 A.    Yes, June 3rd, 2021 by 6 p.m.  That doesn't always happen

24 though, that date.

25 Q.    A priority mail express package?

1  A.    Yes.

2  Q.    Is a signature -- see above the Kelly Chapman name,

3  address, do you see where it says delivery options?

4  A.    Correct.

5  Q.    Is a signature block marked off?

6  A.    No, there's no signature required.  You can leave this

7  right on the porch.

8  Q.    Nobody would have to sign for it?

9  A.    Correct.

10 Q.    You mentioned -- okay.  When you -- do you learn about the

11 tracking number?

12 A.    After the -- after Davon Beckford sends the package in the

13 mail he texts or uses a communication app and sends us the

14 tracking number as a confirmation he sent the package.

15 Q.    Okay.  So is that tracking number important?

16 A.    Yes.

17 Q.    What do you do when you learn about the tracking number?

18 A.    Contact the postal service, inspector Lauren Fetch, and

19 provide her the tracking number so we can make sure that this

20 package never hits the streets and if it ever did it was going

21 to a fake address.

22 Q.    Is that, in fact, what happened?

23 A.    Yes.

24 Q.    Was the package seized?

25 A.    Yes, they did something internal and took it off the line

1  once it got to Wilkes-Barre.

2  Q.    Postal authorities delivered the package to the F.B.I.?

3  A.    Yes.

4  Q.    And what happens when you receive the package?

5  A.    We open it, and we take the contents out, preserve it for

6  fingerprints and drug analysis.

7  Q.    If we can go to exhibit 1.5.  What is that?

8  A.    Contents of the parcel.

9  Q.    Photograph of the contents?

10  A.    Yes, photograph.

11          MR. O'HARA:  Your Honor, we move for admission of

12  Government's Exhibit 1.5.

13          MR. ROTTEVEEL:  No objection.

14          MR. O'HARA:  No objection.

15          THE COURT:  It's admitted.

16          MR. O'HARA:  We'd like to publish to the jury, Your

17  Honor.

18  BY MR. O'HARA:

19  Q.    What does that photograph show 1.5?

20  A.    A container of eyelashes, eyelash brush, Charms lollipop

21  and a bag of 200 fentanyl pills.

22  Q.    What was the return address on the previous envelope,

23  something to do with cosmetics?

24  A.    Yes, Elite Kutz.

25  Q.    There's a little blue package in the lower right-hand

110

1  corner.  What is that?

2  A.    That's the fentanyl pills.

3  Q.    Approximately how many?

4  A.    200.

5  Q.    What did they look like in terms of size and shape?

6  A.    They are consistent with the M. 30s found in Michaelena

7  Kowalczyk's vehicle.

8  Q.    If you can look at a physical exhibit for us, exhibit 1.2.

9  Tell us what that is.

10  A.    Sure.  This is the actual parcel, the packaging that you

11  saw in the picture.  Inside is, like, a purple bubble insulated

12  envelope.  There's a pink again, like, bubble wrapped insulated

13  envelope which contained the contents you saw the picture of.

14  Q.    Are the pills in that particular exhibit?

15  A.    No.

16  Q.    Everything but the pills, correct?

17  A.    Correct, we'd separate all this stuff that maybe we can

18  get latent prints on the drugs always have to go separate

19  because they are.

20          MR. O'HARA:  I move for admission of 1.2 if I did

21  not.

22          MR. ROTTEVEEL:  No objection.

23          THE COURT:  It's admitted.

24          MR. O'HARA:  Thank you, Judge.

25  BY MR. O'HARA:

111

1  Q.   Government's Exhibit 1.3.  What is contained in

2  Government's Exhibit 1.3?

3  A.   You can see the eyelash, eye brush, blow pop and the

4  little, like, pink bag that contained everything.

5           MR. O'HARA:  Move for admission of Government's

6  Exhibit 1.3.

7           MR. ROTTEVEEL:  No objection.

8           THE COURT:  It's admitted.

9  BY MR. O'HARA:

10  Q.   If we can have 1.4.  What is it?

11  A.   This would be the fentanyl pills 200 that were inside the

12  contents that I just showed you.  These were sent to the

13  laboratory, so they are in lab bags also.  There's a second

14  part here where the laboratory will take a certain amount of

15  the fentanyl pills and they crush them up and they do their

16  analysis on them so they were all in one bag when we sent it to

17  them.  We get it back in two bags because that's their analysis

18  protocol.

19  Q.   Okay.  Those same pills depicted in Government's Exhibit

20  1.2?

21  A.   Yes, they are.

22           MR. O'HARA:  I move for admission of Government's

23  Exhibit 1.4, Your Honor, if we haven't already done so.

24           MR. ROTTEVEEL:  No objection.

25           THE COURT:  They're admitted.

112

1  BY MR. O'HARA:

2  Q.   Now, were the pills sent for testing at the D.E.A.

3  laboratory?

4  A.   Yes, they were.

5  Q.   And if we can have Government's Exhibit exhibit 1.6.  Was

6  the lab report generated?

7  A.   Yes, it was.

8  Q.   If we can have Government's Exhibit 1.6.

9         MR. O'HARA:  We move for admission, Your Honor,

10  without objection.

11         MR. ROTTEVEEL:  No objection.

12         THE COURT:  It's admitted.  That's really hard to

13  read.  1.6 is the lab report, correct?

14         THE WITNESS:  Correct, D.E.A. lab report.

15  BY MR. O'HARA:

16  Q.   And what's the volume of pills?

17  A.   200.

18  Q.   Is that what was ordered?

19  A.   Yes.

20  Q.   Okay.  And what were those 200 pills found to contain?

21  A.   Fluorofentanyl, tramadol, fentanyl and acetaminophen.

22  Q.   One more time.

23  A.   I'm sorry -- fluorofentanyl, tramadol, fentanyl and

24  acetaminophen.

25  Q.   What was the total weight of the substance?

113

1   A.    20.684 grams.

2   Q.    200 pills came out to be 20.684 grams?

3   A.    Correct.

4   Q.    Roughly what's that ratio?

5   A.    Ten to one ratio.

6   Q.    Plus or minus a little bit?

7   A.    Yeah.

8   Q.    Okay.  So that's controlled buy No. 1?

9   A.    Correct.

10  Q.    From Davon Beckford, correct?

11  A.    Correct.

12  Q.    Now, you mentioned Davon Beckford's girlfriend Tyla

13  Griffin.

14  A.    Yes.

15  Q.    I want to direct your attention to on or about July 12th

16  of 2021.

17  A.    Yes.

18  Q.    What happened?

19  A.    Akee Miller also told us about Tyla Griffin who he can

20  purchase pills from who was down in the Arizona area, so we

21  again said prove it.  So we communicated with Tyla Griffin and

22  arranged the purchase of 249 pills for about $1,650.

23  Q.    Same process?

24  A.    Yes, she provided us her Cash App.  We sent 800 I think

25  the first time, and after the confirmation was received, the

114

1  tracking number, we sent the second portion of the money.

2  Q.   Did the same process repeat itself?

3  A.   Again, as soon as we got the tracking number, I forwarded

4  that on to postal inspector Fetch who flagged in the system the

5  address, 450 South Franklin Street, Wilkes-Barre, Pennsylvania.

6  So as soon as that hit the system, a flag took it out of

7  circulation.

8  Q.   Seized the package, correct?

9  A.   Yes, that's correct.

10  Q.   If we can have exhibit 2.1, which you can take a look at

11  it.

12          MR. ROTTEVEEL:  No objection.

13          MR. O'HARA:  We move for admission of Government's

14  Exhibit 2.1 without objection.

15          THE COURT:  All right.  It's admitted.

16          MR. O'HARA:  Thank you.

17  BY MR. O'HARA:

18  Q.   And if we can publish to the jury, please.  Okay.  What do

19  we have here?

20  A.   Again, we have a priority mail express flat envelope

21  coming from Phoenix, Arizona July 13th, 2021 for $26.35.  It's

22  coming from Cathy Johnson 2450 West Glenrosa Avenue, Phoenix,

23  Arizona 85017.  It's addressed to Joseph Franklin, 450 South

24  Franklin Street, Wilkes-Barre, Pennsylvania, 18702.  It was

25  accepted by the postal service on July 13th, 2021 right around

115

1  2:37 p.m., and it was -- expected delivery date was July 14th,

2  2021 by 6 p.m.

3  Q.    450 South Franklin Street in Wilkes-Barre, Pennsylvania?

4  A.    Yes.

5  Q.    Is that the address under law enforcement's control?

6  A.    Correct.

7  Q.    Well, I thought you told me the pills were ordered from

8  Tyla Griffin?

9  A.    They were.

10 Q.    Why does it say Cathy Johnson?

11 A.    Again, I don't believe anybody wants their name associated

12 with a package that has fentanyl pills in it.

13 Q.    So the tracking number if we can just put that on the

14 record.

15 A.    The tracking number is E. J. 557580796 U.S.

16 Q.    Tyla sends to Akee Miller that tracking number.  Are you

17 able to seize the package?

18 A.    Correct.

19 Q.    Did that, in fact, take place in this case?

20 A.    Yes, it did.

21 Q.    I will ask you to look at some photos first, 2.3, 2.6, 2.7

22 and 2.8.

23 A.    Yes, these are pictures of the contents of that package.

24        MR. O'HARA:  Your Honor, we move for admission of

25 Government's Exhibits 2.3, 2.6, 2.7 and 2.8 without objection.

116

```
 1            THE COURT:  No objection?

 2            MR. ROTTEVEEL:  No objection.

 3            THE COURT:  All right.  They're admitted.

 4            MR. O'HARA:  Thank you.

 5   BY MR. O'HARA:

 6   Q.    If we can publish to the jury.  First 2.6.

 7   A.    Newspaper.

 8   Q.    Okay.

 9   A.    Rolled up.

10   Q.    Is that what's inside the envelope?

11   A.    Correct, that's what's inside that parcel.

12   Q.    2.3?

13   A.    We opened up the first part of the newspaper to find

14   another rolled up piece of newspaper.

15   Q.    Okay.

16   A.    We opened that up to find a bag rolled up.

17   Q.    2.7?

18   A.    Yes, 2.7.

19   Q.    And the middle of that newspaper what do you see?

20   A.    Like a plastic bag.

21   Q.    How about 2.8?

22   A.    Yes, 2.8 is us opening up the plastic bag to find 249

23   fentanyl pills.

24   Q.    Did those pills -- how did they appear?

25   A.    Like, a blue, off blue color with the M. 30 on both sides,
```

1  M. on one side and 30 on the other.

2  Q.    Same type as recovered from the vehicle of Michaelena

3  Kowalczyk?

4  A.    Yeah, that's correct.

5  Q.    Let's look at some physical evidence.  First of all, 2.2.

6  We looked at a picture of the envelope.  Is that the actual

7  envelope?

8  A.    This is the actual envelope that was mailed from Tyla

9  Griffin to our address.

10         MR. O'HARA:  We move for admission of Government's

11  Exhibit 2.2.

12         MR. ROTTEVEEL:  No objection.

13         THE COURT:  It's admitted.

14  BY MR. O'HARA:

15  Q.    2.3?

16  A.    This is some newspaper and the bag, the plastic bag the

17  pills were inside that we opened up.

18  Q.    Okay.  We saw the photograph.  That's the actual paper

19  wrapping?

20  A.    Yes, this is the actual stuff.

21         MR. O'HARA:  Move for admission of 2.3, Your Honor.

22         THE COURT:  You already did.

23         MR. O'HARA:  2.4.

24         THE COURT:  Any objection?

25         MR. ROTTEVEEL:  No objection.

118

1          THE COURT:  It's admitted.

2          MR. O'HARA:  Okay.

3     BY MR. O'HARA:

4     Q.    2.5?

5     A.    2.5 is again the pills.  They were in one bag, and then

6     the lab separates them.  So you have two bags, one with crushed

7     pills and one with the other ones, 249.

8          MR. O'HARA:  We move for admission of 2.5, Your

9     Honor.

10         MR. ROTTEVEEL:  No objection.

11         THE COURT:  It's admitted.

12    BY MR. O'HARA:

13    Q.    Okay.  Now, once you get the pills, do you -- they're

14    transported to the D.E.A. laboratory for testing?

15    A.    Yeah.

16    Q.    Was, in fact, a lab report generated?

17    A.    Yes, it was.

18    Q.    Exhibit 2.9.

19         MR. ROTTEVEEL:  No objection.

20         MR. O'HARA:  We move for admission of 2.9.

21         THE COURT:  It's admitted.

22         MR. O'HARA:  I ask it be published to the jury.

23    BY MR. O'HARA:

24    Q.    Let's go over the lab report a little bit.  How many

25    pills?

119

1    A.    249.

2    Q.    And what was the weight of the substance?

3    A.    25.859 grams give or take three tenths.

4    Q.    Does that ten to one ratio hold true again?

5    A.    Yeah, right there.

6    Q.    25.859 grams but almost -- 249 pills, right?

7    A.    Right, it's a little --

8    Q.    What were those pills found to contain?

9    A.    Fentanyl and acetomorphine.

10   Q.    What is fentanyl, is that a scheduled number?

11   A.    Schedule two substance reported to be 50 to a hundred

12   times stronger than morphine.

13   Q.    Opioid?

14   A.    Yes.

15   Q.    Now, you're working with postal authorities on this,

16   correct?

17   A.    Correct.

18   Q.    And as a result of these mailings were you in contact with

19   postal authorities in Arizona?

20   A.    Yes.

21   Q.    And did you obtain some surveillance footage from inside

22   the particular post office in Phoenix, Arizona?

23   A.    Yes.

24   Q.    I'm going to ask you to take a look at Government's

25   Exhibit 2.10.

120

1          THE COURT:  10?

2          MR. O'HARA:  2.10.  Your Honor, we move for admission

3  of Government's Exhibit 2.10.  I believe it's without

4  objection.

5          THE COURT:  Any objection?

6          MR. ROTTEVEEL:  No objection.

7          THE COURT:  It's admitted.

8          THE WITNESS:  I don't have 2.10.  Thank you.

9  BY MR. O'HARA:

10 Q.   Okay.  It's on both the paper form and on the screen

11 before you.

12 A.   Yes.

13 Q.   And what are we looking at?

14 A.   This is four individual pictures.  The first one would be

15 the exhibit I showed you, the mailer, 2.2, second one to the

16 right is Tyla Griffin walking into the postal store.  The third

17 one is Tyla Griffin standing at the counter to mail it.

18 Q.   Is Tyla Griffin circled in that photo?

19 A.   Yes, that's correct.

20 Q.   And what's the fourth?

21 A.   Picture of the pills that I just showed you in 2.5.

22 Q.   We have you one buy from Davon Beckford and one buy from

23 Tyla Griffin?

24 A.   Correct.

25          THE COURT:  Are you moving on to the next one?

121

1          MR. O'HARA:  We are, Your Honor.

2          THE COURT:  We will take our afternoon break when you

3   have a second --

4          MR. O'HARA:  It's up to you.

5          THE COURT:  Let's take the break and do it.  We will

6   take a 10 minute, 15 minute break to be able to let everybody

7   use the facilities and stretch a little bit.  Same admonitions

8   you will hear all the time.  You will get tired of it.  No

9   conversation or discussion with anyone.  Keep an open mind.

10  You haven't heard all the evidence and the law related to the

11  case.  No listening to or reading anything about the case.  No

12  research of any kind concerning anything that you hear in the

13  case.  If anyone were trying to talk to you about the case, you

14  must advise us of that immediately.  All right.  So, you know,

15  today we will -- we normally go until 5 or a logical time to

16  break.  I have a 5:00 matter with lawyers from Texas we need to

17  do by Zoom, so we are going to break probably ten minutes of

18  five today so you know.  All right.

19          (A brief recess was taken.)

20          THE COURT:  Mr. O'Hara?

21  BY MR. O'HARA:

22  Q.   Officer Yelland, we covered controlled buy No. 1 and

23  controlled buy No. 2.  When we broke we were about to cover the

24  third controlled buy, the second from Davon Beckford?

25  A.   Correct.

122

1  Q.   I want to address your attention to on or about September

2  28th, 2021.  Was another controlled buy arranged from Davon

3  Beckford?

4  A.   Yes.

5  Q.   And again how did it take place?

6  A.   Again, it was the same thing, text messages through

7  Telegram application ordering up the pills and sending the cash

8  out to Davon Beckford, and then he would send the receipt with

9  the tracking number, and we would get it off the mail.

10 Q.   How much money was sent this time?

11 A.   This time was $2,000.

12 Q.   Okay.  The first one was $1,000.  Is that right?

13 A.   The first one was $1,000, yes.

14 Q.   How many pills were eventually received?

15 A.   From this one that was 249 also.

16 Q.   If we can have -- look first of all in the paper file for

17 exhibit the 3.1.

18 A.   Yes.

19 Q.   And what is it?

20 A.   Again, picture of the priority mail express envelope.

21        MR. O'HARA:  We move for admission of Government's

22 Exhibit 3.1, Your Honor.

23        THE COURT:  Let me ask you my understanding you have

24 no objection to 3.1, 3.2, 3.4, 3.5, 3.6, 3.7 or 3.8.  Is that

25 right?

123

1          MR. ROTTEVEEL:  No objection.

2          THE COURT:  You move for admission of all those?

3          MR. O'HARA:  Yes.

4          THE COURT:  They're all admitted to save time.

5     BY MR. O'HARA:

6     Q.    Bring up 3.1.  Go over the envelope.  Where is it from?

7     A.    You can see it's from Phoenix, Arizona.  It's accepted on

8     September 28, 2021.  It's $26.35.

9     Q.    Okay.  And we have the tracking number?

10    A.    Yes, tracking number of E. J. 954971326 U.S.

11    Q.    Who is it addressed -- who is it from?

12    A.    Samuel Smart 3810 North Maryvale Parkway, Phoenix, Arizona

13    85031.

14    Q.    Who is it addressed to?

15    A.    Amanda Blake, 450 South Franklin Street, Wilkes-Barre,

16    Pennsylvania, 18702.

17    Q.    Again, is that the 450 South Franklin Street in

18    Wilkes-Barre, is that address controlled by law enforcement?

19    A.    Yes, that's correct.

20    Q.    Amanda Blake a real name?

21    A.    Not that I'm aware of.

22    Q.    Was the package accepted?

23    A.    September 28th, 2021 at approximately 3:32 p.m.

24    Q.    When was it supposed to be delivered?

25    A.    Supposed to be there September 30th, 2021.  We didn't get

1  it until October 1st.  It was late.

2  Q.    It was late?

3  A.    Yes, it was late.

4  Q.    Same procedure, once you got the tracking number, what did

5  you do?

6  A.    Contacted postal inspector Fetch, flagged in the system.

7  Once it came to Wilkes-Barre, Scranton, we pulled it out of --

8  brought it to the F.B.I. building and proceeded to process it.

9  Q.    Okay.  If we can look at 3.3.

10  A.    Yes, this is a picture of the envelope which contained a

11  larger manila envelope which contained a smaller kind of like

12  pink envelope which contained a packet of eyelashes which

13  contained 249 fentanyl pills.

14  Q.    Okay.  Again, were they of the same consistency as in the

15  investigation so far?

16  A.    Yes, one side M. and the other a 30 on it.

17  Q.    Tell us approximately 249?

18  A.    Yes.

19  Q.    Okay.  Exhibit 3.6 if we can go to that for a second.

20  A.    Yes.

21  Q.    If you can zoom in on that receipt.  What is that?

22  A.    So you can see a screen capture of the chat blog between

23  Akee Miller and Davon Beckford.  That's a picture of the

24  receipt that when Davon would send it he sent that which also

25  contains the tracking number.

125

1  Q.    Tracking number?

2  A.    E. J. 954971326 U.S.

3  Q.    And where is it sent to?

4  A.    Wilkes-Barre, P.A. 18702.

5  Q.    I keep referring to these as tracking receipts.  Is that

6  what these are?

7  A.    That's what I would call them.  They have the tracking

8  number and they are a receipt.  I would say they are tracking

9  receipt.

10 Q.    This is in a text message, is it not?

11 A.    Yeah, this is the Telegram application, just third party

12 social media application.

13 Q.    Who is sending that receipt?

14 A.    That's coming from Davon Beckford.

15 Q.    And who is receiving it?

16 A.    Akee Miller.

17 Q.    Did you also in this case obtain some footage from a post

18 office out in Arizona?

19 A.    Yes.

20 Q.    And if we can go to 3.8.  And four parts there, correct?

21 A.    Yes.

22 Q.    What's in the upper right?

23 A.    So the upper right is the picture of the package, the

24 picture I just showed you, which was the parcel.  That would

25 have been exhibit 3.1.

126

1   Q.    What's in the lower left-hand corner?

2   A.    Lower left-hand corner is Davon Beckford walking into the

3   postal facility.

4   Q.    What is the date in the upper left-hand corner?

5   A.    10/6/2021.

6   Q.    Upper left?

7   A.    I'm sorry, 9/28/2021.

8   Q.    Is that the date of mailing of the package?

9   A.    Yes.

10  Q.    And in the lower right-hand corner?

11  A.    That's a picture of Davon Beckford at the counter actually

12  mailing the package.

13  Q.    And just for the record were there two individuals in the

14  picture?  Which one is Davon Beckford?

15  A.    He's the one on the other side of the counter that's

16  wearing a red hat and white T-shirt with a surgical mask.  To

17  clarify the date I said 10/6/21 was when the -- they actually

18  took the image.  They printed off the image.

19  Q.    Okay.  Those are the photos.  Let's go through the actual

20  exhibits themselves, exhibit 3.2.

21  A.    Yes.

22  Q.    Okay.  What's that?

23  A.    This is the actual package parcel.

24  Q.    That we looked at?

25  A.    Yes.

1  Q.    3.4?

2  A.    3.4 is the contents of the parcel.  You can see it's the

3  manila envelope with the padding of -- with the pink -- other

4  side has like a foil and padded envelope, package of the

5  eyelashes and a baggie that was -- contained the eyelashes.

6  Q.    And 3.5.

7  A.    3.5 is the drugs, the fentanyl pills that were located

8  inside the package.  Again, it's two bags that's from the lab.

9  They test it, some of the them.  Some are powder, 249 pills.

10 Q.    And were the pills, in fact, taken to the D.E.A. lab for

11 testing?

12 A.    That's correct.

13 Q.    And if we can have Government's Exhibit 3.7.  And how many

14 pills?

15 A.    Again, it's 249.  They weighed about 26.905 grams.  They

16 contain fentanyl and acetaminophen.

17 Q.    Fentanyl being a schedule two controlled substance?

18 A.    That's correct.

19 Q.    If we can move on to the fourth controlled buy, the third

20 from Davon Beckford on -- I direct your attention to on or

21 about January 21st now of 2022.

22 A.    Yes, we did another controlled purchase off Davon Beckford

23 utilizing Akee Miller, utilizing Telegram or third party

24 application, made contact with him, Cash App'd the money to

25 Davon Beckford in Arizona.  This time it was $3,000, and we got

128

1  a package.

2  Q.    Okay.

3          THE COURT:  So this is exhibits 4.1 through 4.8?

4          MR. O'HARA:  Exactly, Your Honor.

5          MR. ROTTEVEEL:  No objection.

6          THE COURT:  They're admitted.

7          MR. O'HARA:  Thank you, Your Honor.

8  BY MR. O'HARA:

9  Q.    If we can being go to the first envelope, exhibit 4.1, and

10 this time where is it mailed from?

11 A.    It was changed up this time mailed from Scottsdale,

12 Arizona on January 21st, 2022.  This is $26.95 to mail it.

13 Q.    Tracking number?

14 A.    Tracking number is E. I. 025814690 U.S.

15 Q.    Who was it sent from?

16 A.    Sent from Keith Freeman, Apartment 117, 15125 North

17 Scottsdale Road, Scottsdale, Arizona 85254.

18 Q.    Who was it sent to?

19 A.    R. Johnson, 450 South Franklin Street, Wilkes-Barre,

20 Pennsylvania, 18702.

21 Q.    Again, the 450 South Franklin Street address?

22 A.    The address we have been using for this investigation.

23 Q.    Exhibits 4.5 and 4.6?

24 A.    Yes, this particular package contained a manila envelope

25 with this, like, Legos type toy.

129

1  Q.   And 4.6?

2  A.   Once you open the box of the Lego type toy, you can see

3  the pills, fentanyl pills.

4  Q.   Were the pills found inside the box?

5  A.   That's correct.

6  Q.   How much money did we spend this time?

7  A.   $3,000.

8  Q.   You being law enforcement.  Approximately how many pills

9  did we receive?

10 A.   462.

11 Q.   If we can go through the -- actually look at 4.7.  What's

12 4.7?

13 A.   A picture of the tracking, the tracking receipt.  It

14 contains the tracking number that was sent from Davon Beckford

15 to Akee Miller proving that the package was in the mail.

16 Q.   Okay.  Does it have the same tracking number as the

17 package?

18 A.   Yes.

19 Q.   And where is it sent from -- or was it sent to?

20 A.   Sent to Wilkes-Barre Pennsylvania, 18702.

21 Q.   As soon as you get that receipt, you know the tracking

22 number?

23 A.   Correct.

24 Q.   Again, same procedure followed?

25 A.   Yes, once that receipt is obtained and tracking number is

1    given, we put the alert on the package so it never hits the

2    streets.

3    Q.    Let's look at the physical evidence.

4    A.    Sure.

5    Q.    4.2.    Government's Exhibit 4.2?

6    A.    Yes, this is the actual parcel envelope.

7    Q.    Okay.    We have seen earlier photographs of that?

8    A.    Yes.

9    Q.    4.3.

10    A.    This is the photographs of the manila envelope that's

11    padded, insulated manila envelope, and then the Dollar Store

12    Lego block containing the toy which contained the pills inside.

13    Q.    4.2?

14    A.    So this is the pills that were sent to the Pennsylvania

15    State Police lab.    Again they are in two packages.    They crush

16    and test it.    So there was 462 pills.

17    Q.    Okay.    And if we can have the lab report, please, 4.8.

18    This lab report is a little bit different, right?

19    A.    Yes.

20    Q.    First three from the D.E.A.?

21    A.    Yes.

22    Q.    This is from what?

23    A.    Pennsylvania State Police.

24    Q.    Was there a reason why the pills were sent to the state

25    police rather than the D.E.A. lab?

1  A.    D.E.A. lab was backed up and we wouldn't be able to get

2  the results for a several months to a year.

3  Q.    Okay.  Item 1.1, how many pills?

4  A.    462 blue tablets marked with M. and 30.

5  Q.    What were they found to contain?

6  A.    Fentanyl, schedule two.

7  Q.    Okay.  What was the weight?

8  A.    Weight was 50 grams .15.

9  Q.    Now, that was January 21st of 22?

10  A.    Yes.

11  Q.    Four controlled buys -- four controlled purchases?

12  A.    Correct.

13  Q.    What happens next in terms of the investigation?

14  A.    We obtained information that Davon Beckford was flying

15  back to Wilkes-Barre area from Arizona.  So we decided to

16  arrest him.

17  Q.    And what takes place?

18  A.    We missed -- he missed his flight, and the other flights

19  were delayed.  And we just missed him on his arrival here.  We

20  were told that he was going to be flying out a certain day, so

21  we went up there and found out that flight was cancelled and he

22  was supposed to fly out of Allentown but he never got on that

23  plane.  The next day was another flight.  Eventually we

24  isolated when he was leaving, and we arrested him.

25  Q.    Where did that take place?

1  A.    Wilkes-Barre Scranton International Airport in Avoca.

2  Q.    He's taken into custody?

3  A.    Yes.

4  Q.    Does he have anything on him?

5  A.    Yes, $9,140 I believe it was and an Apple iPhone amongst

6  his I. D. and things in a purse thing.

7  Q.    Were any -- any fentanyl pills found on Davon Beckford?

8  A.    No fentanyl pills.

9  Q.    How about in terms of communication devices?

10 A.    Yes, his Apple iPhone.

11 Q.    One?

12 A.    Yes.

13 Q.    Now, what happens with Mr. Beckford when he's charged?

14 A.    He's arrested.  He goes to jail, and then we approach him

15 and his attorney to see if he would like to cooperate so we can

16 identify his fentanyl source.

17 Q.    And what happens?

18 A.    He agrees and he comes in, and March 3rd he lays out his

19 whole network of subordinate dealers and supplier.

20 Q.    His supplier?

21 A.    Yes.

22 Q.    Who was that?

23 A.    Shane Burns in Phoenix, Arizona.

24 Q.    You mentioned that he had -- oh, network of suppliers.

25 Did that include Kevin Jones?

133

1  A.   Yes.

2  Q.   Now, you mentioned he had a phone?

3  A.   Yes.

4  Q.   I will ask you to take a look at Government's Exhibit No.

5  5.

6        MR. ROTTEVEEL:  No objection.

7        MR. O'HARA:  Move for admission of Government's

8  Exhibit No. 5, Your Honor.

9        THE COURT:  It's admitted.

10 BY MR. O'HARA:

11 Q.   What is that?

12 A.   Apple iPhone belonging to Davon Beckford.

13 Q.   And as part of his cooperation did Davon Beckford consent

14 to allow law enforcement to conduct a search of his phone?

15 A.   That's correct, he did.

16 Q.   If we can have exhibit 5.1.

17        MR. ROTTEVEEL:  No objection.

18        MR. O'HARA:  No objection, Your Honor.  We move for

19 admission.

20        THE COURT:  All right.  Let me ask you, you said

21 Government's Exhibit 5 -- what is that, the actual phone?

22        MR. O'HARA:  Actual hard phone.

23        THE COURT:  Have you discussed with counsel whether

24 they are going to have any objection to the five series?  Let

25 me ask you for tomorrow to make sure you've gone through

134

1    because if there are no objections to a particular series we

2    don't need to spend time going through the foundations for

3    every one so that will move us along on -- I think -- a bit.

4    But in the meantime, Mr. O'Hara, keep going.

5    BY MR. O'HARA:

6    Q.    Are you familiar with a system known as Cellebrite?

7    A.    Yes.

8    Q.    What is Cellebrite?

9    A.    Cellebrite is a computer program that takes cellular

10   devices and extracts the data from it and puts it into a

11   readable form, format for the user -- for law enforcement

12   really.  It doesn't always get the third party app

13   communications because some of them are encrypted for

14   proprietary software.  It gets pictures and notes and

15   conversations, the I. messages and all that stuff, call logs.

16   Q.    Was, in fact, Cellebrite utilized to conduct a download of

17   Mr. Beckford's phone?

18   A.    Yes, it was.

19   Q.    I just handed you a hard exhibit, exhibit 5.2.  What is

20   that?

21   A.    It's a hard drive that contains the Cellebrite download of

22   Mr. Beckford's phone.

23          MR. O'HARA:  Your Honor, we move for admission of

24   5.2.

25          THE COURT:  Any objection?

135

1          MR. ROTTEVEEL:  No, Your Honor.

2          THE COURT:  It's admitted.

3    BY MR. O'HARA:

4    Q.   Okay.  Now, once you conduct a download of the -- Mr.

5    Beckford's phone, what do you find?

6    A.   A lot of receipts, tracking receipts that from the post

7    office with the tracking number that I spoke about.

8    Q.   Can you give us a ball park figure how many receipts there

9    were?

10   A.   Between the receipts -- there were some screen shots of

11   the internet browser which also displayed the tracking number

12   and the actual parcel picture which would display the tracking

13   number, there's over 160 of them.

14   Q.   Okay.  Each containing a tracking number?

15   A.   That's correct.

16   Q.   What did you do when you saw the tracking numbers?

17   A.   I manually wrote every one of them down and provided them

18   to the United States postal inspector Fetch.

19   Q.   I want to go through some of the -- some of the receipts

20   that you located.  Do you have any objection?

21          MR. ROTTEVEEL:  No.

22          MR. O'HARA:  This would be 5.3 through 5.18.  Any

23   problem with those?

24          MR. ROTTEVEEL:  No.

25          THE COURT:  They're all admitted.

136

1          MR. O'HARA:  Thank you, Your Honor.

2    BY MR. O'HARA:

3    Q.    First bring up 5.3.  What is that?

4    A.    It's a picture of again the tracking number from a parcel.

5    Q.    Okay.  What's the tracking number?

6    A.    E. J. 9549771326 U.S.

7    Q.    3.6.  Earlier exhibit 3.6 was a receipt that was texted.

8    That's the correct term to use?

9    A.    Yes.

10   Q.    By Mr. Beckford or texted to Akee Miller?

11   A.    Yes.

12   Q.    The exhibit on the left 5.3, that's from Mr. Beckford's

13   phone?

14   A.    Yes.

15   Q.    Are those tracking numbers the same?

16   A.    Yes, that would be the tracking number that we ordered

17   that was our package.

18   Q.    Government's Exhibit 5.4.  What's that?

19   A.    Again it's another tracking receipt for lack of a better

20   word that contains a postal tracking number in his phone, in

21   Davon Beckford's phone.

22   Q.    What's the tracking number?

23   A.    E. 1025814690 U.S.

24   Q.    If you can bring up 4.7 alongside that.  Okay.  We have

25   5.4 and 4.7, 4.7 being on the left?

137

1  A.    Yes.

2  Q.    5.4 being on the right.  Now, 4.7 is from the controlled

3  purchase, correct?

4  A.    That's correct.

5  Q.    That was sent by text message if you recall?

6  A.    Yes, through the application.

7  Q.    Was it also found on Mr. Beckford's phone?

8  A.    Yes.

9  Q.    Same tracking numbers 4.7 and 5.4?

10 A.    Yes.

11 Q.    Go to 5.5.  There's no way I can see that.  What is that?

12 A.    This is, like, the -- from the website.  It's a tracking

13 number also provided in Davon Beckford's phone.

14 Q.    And what is the tracking number?

15 A.    E. J. 333283775 U.S.

16 Q.    Okay.  And where was that package delivered to?

17 A.    It was delivered North Attleboro, Massachusetts 02760 on

18 April 21st, 2021 at 2:45 p.m.

19 Q.    Now, during the investigation were you able -- relative to

20 this defendant, Kevin Jones, were you able to identify some

21 addresses that were connected or associated with Mr. Jones?

22 A.    Yes.

23 Q.    What were those addresses?

24 A.    6 Woodward Street, Wilkes-Barre Street, Pennsylvania, 14

25 Pottersville Road -- yeah, 14 Potters Road -- Ave -- apartment

138

1  2, Plainville, Massachusetts.

2  Q.    So regarding packages sent to those addresses, did you

3  look for one of the receipts or U. P. S. tracking receipts from

4  the website regarding those addresses?

5  A.    Yes.

6  Q.    Is this one of them?

7  A.    Yes.

8  Q.    5.6.  If you can zoom in on that, please.  Okay.  Where is

9  it being sent to?

10  A.    Plainville, Massachusetts, 02762.

11  Q.    What's the tracking number?

12  A.    Tracking number E. J. 333283855 U.S.

13  Q.    What's the delivery -- anticipated -- scheduled delivery

14  date?

15  A.    Scheduled delivery date May 3, 2021 by 3 p.m.

16  Q.    5.7.  And 5.7, what is that?

17  A.    It's again a confirmation that the package was delivered

18  and the tracking number tracking receipt.

19  Q.    Let's start on the right.  Where is it being sent to?

20  A.    Plainville, Massachusetts 02762.

21  Q.    Delivery date?

22  A.    5/27/21 by 6 p.m.

23  Q.    Tracking number?

24  A.    E. J. 762753588 U.S.

25  Q.    What's on the left?

1  A.  Confirmation that the package was delivered.

2  Q.  Same tracking number?

3  A.  Correct.

4  Q.  Go to 5.8.  What's on the right?

5  A.  Again, it's the receipt -- postal receipt containing the

6  tracking number.

7  Q.  What's the tracking number?

8  A.  This is a difficult one.  Let's try E. J. 613756011 U.S.

9  Q.  Okay.  Sent to?

10  A.  Plainville, Massachusetts.

11  Q.  What's the delivery date?

12  A.  6/25/21 by 6 p.m.

13  Q.  On the left is the --

14  A.  Confirmation it was actually delivered.

15  Q.  Same tracking number?

16  A.  Yes.

17  Q.  All from Mr. Beckford's phone?

18  A.  These were all from Mr. Beckford's phone.

19  Q.  Go to exhibit 5.9.  If we can start with the one on the

20  right.

21  A.  Yes, it's another receipt.  Tracking number is E. J.

22  842860400 U.S.  It's going to Plainville, Massachusetts on

23  Saturday.  Expected delivery date is July 24, 2021 by 6 p.m.

24  Q.  What's on the left?

25  A.  Confirmation that it was delivered July 24th, 2021 at 6

1  p.m.

2  Q.    Go to exhibit 5.10 starting with the one on the right.

3  A.    This is another receipt, tracking receipt found in Davon

4  Beckford's phone.  It's going to Plainville, Massachusetts,

5  02762.  It's got a tracking number of E. J. 954971621 U.S.  The

6  date is 9/1/2021 by 6 p.m.

7  Q.    And on the left?

8  A.    On the left is confirmation that the package was delivered

9  to Plainville, Massachusetts, September 1st, 2021.

10 Q.    Same tracking number?

11 A.    Yes.

12 Q.    Go to exhibit 5.11.

13 A.    So this is another receipt from the post office that

14 contains a tracking number of E. J. 954971286 U.S. going to

15 Wilkes-Barre 18702, September 16, 2021 by 6 p.m.

16 Q.    Exhibit 5.12.

17 A.    So this is another receipt going to Plainville,

18 Massachusetts 02762.  Tracking number is E. J. 954971428 U.S.

19 Its scheduled delivery date was October 6, 2021 by 6 p.m.  It

20 was received on Davon Beckford's phone.

21 Q.    If we can go to exhibit 5.13 .  You mentioned photographs

22 of packages?

23 A.    Yes, this would be photograph of the actual parcel.  It

24 contains the tracking number E. J. 954971428 U.S.  It's sent by

25 Bernard Rutland, 4141 West Glendale Avenue, Phoenix, Arizona

141

1 85051.   It's addressed M. Brown at 14 Potter Avenue Unit 2

2 Plainville, Massachusetts 02762.

3 Q.   Exhibit 5.14 if we can get started with the receipt on the

4 right.

5 A.   This is a receipt out of Davon Beckford's phone.  It's

6 going to Wilkes-Barre, Pennsylvania, tracking number E. J.

7 954971533 U.S.  It was scheduled to arrive October 23rd, 2021

8 by 6 p.m.

9 Q.   And on the right?

10 A.   On the left is --

11 Q.   I'm sorry, left.

12 A.   Confirmation that that package with the package tracking

13 number I just said was delivered in Wilkes-Barre, Pennsylvania,

14 October looks like 26th, 2021 at 4 p.m., 4:17 p.m.

15 Q.   From Mr. Beckford's phone?

16 A.   Yes, that was found in Davon Beckford's phone.

17 Q.   The last receipt, exhibit 5.15.

18 A.   Yes, this was another receipt he that was located in Davon

19 Beckford's phone.  It has a tracking number of E. J. 974093738

20 U.S.  it was scheduled to go to Wilkes-Barre, Pennsylvania,

21 18705, supposed to arrive November 26, 2021 by 6 p.m.

22 Q.   In conducting the Cellebrite examination did you also look

23 at -- pertinent to this case -- some notes that were found in

24 Mr. Beckford's phone?

25 A.   Yes.

142

1  Q.    If we can have exhibit 5.16.  What is that?

2  A.    It's a note contained in the Apple iPhone of Davon

3  Beckford.  It was modified on September 15, 2021.  To tell you

4  where it was found in the note section, source file, the

5  summary is Nanticoke, P.A. 18634, and the body is 100 Front

6  Street, Nanticoke P.A. 18634, 14 Potter Avenue Unit 2,

7  Plainville, Massachusetts, 02762.

8  Q.    I will interrupt you there.  Is that one of the addresses

9  associated with the Kevin Jones?

10  A.    Yes.

11  Q.    Is there a name below it?

12  A.    Mack Brown.

13  Q.    Is there another address listed associated with Kevin

14  Jones?

15  A.    Yes, 6 Woodward Street in Wilkes-Barre, 18705.

16  Q.    And is there another name listed?

17  A.    Yes, Kevin Brown.

18  Q.    Found in the notes section?

19  A.    Notes section of Davon Beckford's Apple iPhone when he was

20  arrested.

21  Q.    Were there also some text messages?

22  A.    Yes.

23  Q.    Exhibit 5.17.

24  A.    This is a printout of the Apple iPhone's conversation that

25  was utilizing the What's App application.

1  Q.    Okay.  What is the line at the top of the blue bubble

2  portion of the conversation?

3  A.    It's 18572946836 at What's App dot net with hat with -- I

4  guess they are emojis, three emojis.

5  Q.    What is the text of the conversation?

6  A.    It says bean, b-e-a-n, C. 22.

7  Q.    What's that based upon your investigation?  What was that?

8  A.    That's a Cash App name, but it's missing the dollar sign.

9  Cash App utilizes a dollar sign before the name so you -- he's

10 missing the dollar sign.  It wouldn't go through.

11 Q.    Is there a response in green?

12 A.    Yes.

13 Q.    Who is the response in green from?

14 A.    That's from Dolo to Hat.

15 Q.    Who is Dolo?

16 A.    Dolo, I'm sorry, Davon Beckford's a/k/a also known as

17 Dolo.

18 Q.    So Kevin Jones is Hat.  Davon Beckford was known as Dolo?

19 A.    That's correct.

20 Q.    What is the -- what is the substance of the text?

21 A.    It says, got you in like a half, let me drop this in the

22 bank real quick.

23 Q.    Go to the next screen.  I don't think I asked you the

24 date.  What's the date of this conversation?

25 A.    It's January 16, 2020.

1  Q.    And does Dolo respond with some conversation?

2  A.    Yes, it says, that's not the right name.

3  Q.    And does Hat respond?

4  A.    Yes, Hat responds with now the dollar sign b-e-a-n C. 22.

5  Again it won't go through without that dollar sign.

6  Q.    Based upon your investigation what did the dollar sign

7  bean C. 22 turn out to be?

8  A.    Sabrina Cleveland, Kevin Jones' girlfriend --

9  ex-girlfriend -- her Cash App vanity name.

10 Q.    Scroll up.  What does Dolo respond?

11 A.    Dolo responds -- Davon Beckford responds, oh, yeah.

12 Q.    Some further conversation?

13 A.    Davon Beckford asks Sabrina, question mark.

14 Q.    What does Hat respond?

15 A.    Kevin Jones responds, yeah.

16 Q.    Okay.  And does Dolo respond?

17 A.    Yes, Dolo responds, sent.

18 Q.    Was there some additional conversation later?

19 A.    Yes.

20 Q.    Exhibit 5.18, is that a different date?

21 A.    Yes, February 13, 2020.

22 Q.    What does Hat -- what message does he send?

23 A.    Bean C. 22.

24 Q.    And what's the response from Dolo?

25 A.    Copy.

145

1  Q.    Again, what was bean C. 22?

2  A.    Cash App for Sabrina Cleveland, Kevin Jones' ex-girlfriend

3  that lived in Massachusetts.

4        MR. O'HARA:  Your Honor, this may be appropriate time

5  to break since we got a bunch of financial records to start

6  next.  I defer to the Court's discretion.

7        THE COURT:  Let me just see counsel for a second.

8        (A discussion was held off the record at sidebar.)

9        THE COURT:  It appears a logical break for the day

10 since the next area will be a little different than this one.

11 We will break for the day.  Anyway, you had a long day because

12 you had to be here.  I have looked where everybody comes from.

13 There are one or two of you that come from a good distance, and

14 I say that in that technically over 60 miles is required for a

15 stay over.

16        But when I look at the time according to Google maps,

17 it would be to your general location of the city you're in, at

18 least two of you if not three are over an hour.  So those that

19 are in that circumstance if you wish to stay overnight, then

20 stay here when the jury is dismissed and we will have Mary

21 Ellen make arrangements for you -- for that or if you want to

22 stay over tomorrow night, we will make arrangements for that.

23 You just need to let me know tonight.

24        Aside from that in light of the distance that

25 everybody is, we normally start at 8:30 in the morning.  We

1  will start at 9:30 tomorrow morning to give everybody an

2  opportunity at a far distance to not get up early to be here.

3  Now, same admonitions.  No conversation and discussion with

4  anyone including among yourselves.  Don't form any opinions.

5  Keep an open mind.  You haven't heard all of the evidence in

6  the case or the law related to the case.  No listening or

7  reading anything about the case.  No research of any kind

8  concerning anything you heard, anything related to the case in

9  any way, shape or form, people, places, things, names, anything

10  including, you know, research on fentanyl or anything of that

11  -- nothing that relates to this case.  If anyone were to try to

12  speak to you, you must advise us of that immediately.  When you

13  get home, your mother, father, wife, significant other, the

14  first thing they will say, tell me something about the case

15  you've been sitting on all day.

16          You have to be able to tell them, I can't talk about

17  it now but the case will be over in a few days and when it's

18  over I will tell you everything you want to know.  It's

19  important you not have any conversation.  When you do that,

20  you're going to get a response similar to, me, you can't tell

21  me like I would tell somebody if you tell me.  The answer is

22  you cannot tell them.  It's your sworn duty as jurors in order

23  to make sure that our system is fair and honest and ethical.

24          It's your responsibility now not to do that so you

25  don't listen to anybody else give their opinion about something

1  they don't know or about facts they haven't heard or describe

2  some incident that's unrelated to this particular case and that

3  sticks in the back of your head someplace and now what happens

4  is you brought information into the case that none of your

5  fellow jurors have, and the result is that affects how our

6  system of justice works.  So I can't emphasize how important it

7  is not to speak about the case, and as I said tell them, as

8  soon as the case is done, tell them everything and anything

9  they want to know.  Then it's free game.  You can tell anybody

10  anything you want but just for the time being hold off.  All

11  right.  All that being said, have a safe trip home.  See you

12  all tomorrow morning at 9:30.  Anything else we need to cover?

13          MR. ROTTEVEEL:  No, Judge.

14

15

16

17

18

19

20

21

22

23

24

25

148

1                    REPORTER'S CERTIFICATE

2

3        I, Laura Boyanowski, RMR, CRR, Official Court Reporter for

4   the United States District Court for the Middle District of

5   Pennsylvania, appointed pursuant to the provisions of Title 28,

6   United States Code, Section 753, do hereby certify that the

7   foregoing is a true and correct transcript of the

8   within-mentioned proceedings had in the above-mentioned and

9   numbered cause on the date or dates hereinbefore set forth; and

10  I do further certify that the foregoing transcript has been

11  prepared by me or under my supervision.

12

13

14                     s/ Laura Boyanowski, RMR,CRR
                       Laura Boyanowski, RMR, CRR
15                     Official Court Reporter

16  REPORTED BY:

17      LAURA BOYANOWSKI, RMR, CRR
        Official Court Reporter
18      United States District Court
        Middle District of Pennsylvania
19      235 N. Washington Avenue
        Scranton, PA  18503

20

21          (The foregoing certificate of this transcript does not
    apply to any reproduction of the same by any means unless under
22  the direct control and/or supervision of the certifying
    reporter.)

23

24

25