1

```
 1          IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2

 3   UNITED STATES OF AMERICA :
                             :
 4                           :
                             :
 5       vs                  :    3:CR-23-26
                             :
 6                           :
                             :
 7   KEVIN JONES             :
                             :
 8                           :

 9

10

         BEFORE:      THE HONORABLE MALACHY E. MANNION
11
         PLACE:       COURTROOM NO. 3
12
         PROCEEDINGS: JURY TRIAL
13
         DATE:        MONDAY, JUNE 3, 2024
14

15

16   APPEARANCES:

17   For the United States:

18   ROBERT J. O'HARA, ESQ.
     GERARD T. DONAHUE, ESQ.
19   OFFICE OF THE U.S. ATTORNEY
     WILLIAM J. NEALON FEDERAL BUILDING
20   235 NORTH WASHINGTON AVENUE
     SCRANTON, PA 18501
21

22   For the Defendant:

23   CORNELIUS J. ROTTEVEEL, ESQ.
     ROTTEVEEL LAW
24   410 JEFFERSON AVENUE
     SCRANTON, PA 18510

25
```

2

1          THE COURT:  Any requests for additions, deletions?

2          MR. ROTTEVEEL:  No, Your Honor.

3          THE COURT:  How about you, Mr. O'Hara?

4          MR. O'HARA:  No, Your Honor.

5          THE COURT:  We're all set then.  The jury will not be

6    here until 9:30.  There's preliminary matters we need to cover

7    you guys are free to, you know, roam, do whatever you want to

8    do between now and 9:30, okay.

9          MR. DONAHUE:  Thank you, sir.

10          THE COURT:  I don't know if you're closing from the

11   podium -- turn that on.  And if you're going to be moving over

12   there, I'll have Gina put another one on the jury rail, okay.

13   All right.  Good.  We're set then, gentlemen.  Welcome back.  I

14   hope you had a good weekend.  Now, as I had mentioned to you

15   when we broke on Thursday, what we're going to do this morning

16   first I'm going to begin by giving you the charge, which is the

17   law here.  And we'll go through that first.  And then I will be

18   giving you a copy of that to take with you during your

19   deliberations if there's anything you wish to review or look at

20   during the course of the deliberations.

21          After I charge you on the law, then counsel will have

22   the opportunity to do their closing arguments, as I mentioned,

23   which means they will argue to you why they believe that you

24   should find in their favor, why the evidence shows that they

25   are correct.  The government goes first.  The defense goes

1  second.  Then the government has a short rebuttal.  The reason

2  for that is that each side gets an opportunity to hear what the

3  other side said and then respond to that.  After the closing

4  arguments are complete, then I will give you those housekeeping

5  instructions I mentioned just in terms of how to perform your

6  deliberations, and then you will be off to deliberate.  I've

7  mentioned to Mary Ellen I think the appropriate time would be

8  noon for your lunch.  So we have ordered the lunch, and

9  hopefully it will be delivered at noon.  But we will take that

10  up a little bit later just so you have some sense where we're

11  going and what's going on today.

12          Now, members of the jury, you have seen and heard all

13  of the evidence and will shortly hear the closing arguments of

14  the government and the defendant.  So now I'm going to instruct

15  you on the law in the case.  You have two duties as a jury.

16  The first duty is to decide the facts from the evidence that

17  you have heard and seen in this courtroom during this trial.

18  That's your job and yours alone.  I play no part in the finding

19  of the facts.

20          You should not take anything I may have said or done

21  during the trial as indicating what I think of the evidence or

22  what I think your jury verdict should be.  Now, your second

23  duty is to apply the law as I give it to you to the facts as

24  you find them.  Now, my role now is to explain to you the legal

25  principles that must guide you in your decision.  You must

4

1  apply my instructions carefully.  Each of the instructions is

2  important, and you must apply all of them.  You must not

3  substitute or follow your own notion or opinion about what the

4  law is or ought to be.  You must apply the law as I give it to

5  you whether you agree with it or not.  Now, whatever your

6  verdict, it must be unanimous.  All of you will have to agree

7  on it, or there will be no verdict.  In the jury room you will

8  discuss the case among yourselves, but ultimately each of you

9  will have to make up his or her own mind.  This is a

10  responsibility that each of you has and cannot be avoided.

11          Now, during your deliberations, you must not

12  communicate with or provide any information to anyone by any

13  means about this case.  You may not use any electronic devices

14  or media such as cell phones, internet service, text or

15  messaging services, chat rooms, blogs, web sites, Twitter now

16  X., Instagram or anything else of that nature to communicate to

17  anyone any information about this case or to conduct any

18  research about this case until you have completed your jury

19  verdict and I have accepted it.

20          In other words, you can't talk to anyone on the

21  phone, correspond with anyone or electronically communicate

22  anyone about the case.  You can only discuss the case in the

23  jury room with your fellow jurors during deliberations.  Now,

24  you may not use those electronic means to investigate or

25  communicate about the case because it is important that you

5

1  communicate about the case -- I'm sorry -- that it is important

2  that you decide the case based only on the evidence that has

3  been presented within the four walls of this courtroom.  You're

4  only permitted to discuss the case with your fellow jurors

5  during deliberations because they have seen and heard the same

6  evidence that you have.  In our judicial system, it is

7  important that you are not influenced by anything or anyone

8  outside of the courtroom.

9          Now, perform these duties fairly and impartially.  Do

10 not allow sympathy, prejudice, fear, public opinion or bias

11 including unconscious bias to influence you.  Now, unconscious

12 biases are stereotypes, attitudes or preferences that people

13 may consciously reject but may be expressed without conscious

14 awareness, control or intention.  Like conscious bias,

15 unconscious bias, too, can affect how we evaluate information

16 and make decisions.  You should also not be influenced by a

17 person's race, color, religion, national ancestry or gender.

18         Now, you're not to single out any one instruction as

19 stating the law but must consider these instructions as a

20 whole.  Neither are you to be concerned with the wisdom of any

21 rule of law.  Regardless of any opinion, you may have about

22 what the law ought to be, it would be a violation of your sworn

23 duty to base a verdict upon any other view of the law than that

24 given to you by these instructions by the Court.  Now, you must

25 make your decision in this case based only upon the evidence

6

1  that you saw and heard inside the courtroom.  Do not let

2  rumors, suspicions or anything else that you have seen or heard

3  outside of court influence your decision in any way.  The

4  evidence from which you are to find the facts consists of the

5  following:  Sworn testimony you heard from witnesses on the

6  stand, documents or other things, exhibits, that were received

7  into evidence, any facts or testimony that was stipulated to,

8  that is, formally agreed to agreed to by the parties.

9         The following are not evidence:  The indictment,

10  statements and arguments of the lawyers, questions by the

11  lawyers or any questions I may have asked, objections by

12  lawyers including objections in which they state the facts, any

13  testimony I instruct or told you disregard -- I don't think

14  there was anything, but if there was, you have to disregard it

15  -- anything you may have seen or heard outside of the

16  courtroom.  Now, you should use your common sense in weighing

17  the evidence.

18         Considering it in the light of your everyday

19  experience with people and events, and give it whatever weight

20  you believe it deserves.  If your experience and common sense

21  tells you that certain evidence reasonably leads to a

22  conclusion, you may reach that conclusion.  As I told you in my

23  preliminary instructions, the rules of evidence control what

24  can be received into evidence.  During the trial the lawyers --

25  there was one objection -- that's all I can remember in this

7

1  particular case, which was good -- in which the lawyers

2  objected, and basically they were asking me to make a

3  determination of whether or not that was allowed under the

4  rules of evidence.  When they do make an objection, it's simply

5  meant that the parties are asking the Court to decide what

6  evidence can be admitted.  You should not be influenced by the

7  fact that an objection was made.

8         You should not be influenced by my rulings on the

9  objections or any sidebar conferences that you may have

10 overheard during the trial.  When I overruled an objection, the

11 question was not answered and the exhibit would not be

12 admitted.  And you should treat that testimony or exhibit like

13 any others.  If I -- I'm sorry -- if I overruled the objection,

14 excuse me, the question was answered or the exhibit was

15 received into evidence, and you should treat that testimony or

16 exhibit just like any other.

17        If I allowed evidence for a limited purpose, I

18 instructed you to consider the evidence only for that limited

19 purpose, and you must do so.  Again, I only remember one

20 objection, and I think overruled the objection, and, therefore,

21 the witness answered.  You just consider it like any other

22 answer in the case.  Just to make sure we're complete in case

23 my recollection is mistaken, if I sustained an objection, the

24 question was not answered or the exhibit was not allowed in

25 evidence.  You must disregard the question entirely.  Do not

8

1   think about or guess what the witness might have said in answer

2   to the question.  Do not think about or guess what the exhibit

3   might have shown.  Sometimes it's possible a witness may have

4   already either answered or begun to answer before a party had

5   objected and before I ruled on the objection.  If that happened

6   and if I sustained the objection, you must disregard the answer

7   given.

8          The instructions also indicate if I ordered some

9   testimony or evidence to be stricken or removed from the

10  record, you must disregard it.  Again, I don't have a

11  recollection I did strike anything from the record during the

12  case.  Although the lawyers may call to your attention certain

13  facts or factual conclusions that they think are important,

14  what the lawyers will say in their closing arguments or during

15  the trial is not binding on you and is not evidence.  It is

16  your own recollection and interpretation of the evidence that

17  controls your decision in this case.

18          Also as I mentioned earlier, do not assume from

19  anything that I may have said or done in this case that I have

20  any opinion on any of the issues or on what your verdict should

21  be.  Now, as I mentioned to you preliminarily, there are two

22  types of evidence that may be used in a trial, direct evidence

23  and circumstantial evidence.  You may use both types of

24  evidence in reaching your verdict.  Direct evidence is simply

25  evidence which if believed directly proves a fact.  An example

1  of direct evidence occurs when a witness testifies about

2  something the witness knows from his or her own senses,

3  something the witness has seen, touched, heard or smelled.

4  Circumstantial evidence is evidence which if believed

5  indirectly proves a fact.  It is evidence that proves one or

6  more facts from which you could reasonably find or infer the

7  existence of some other fact or facts.  A reasonable inference

8  is simply a deduction or conclusion that reason, experience and

9  common sense lead you to make from the evidence.  A reasonable

10  inference, however, is not a suspicion or a guess.  It is a

11  reasoned, logical decision to find a disputed fact exists on

12  the basis of another fact.

13        I used the umbrella example.  I will use a different

14  one.  We all live in northeastern or north central

15  Pennsylvania, and so in January, you know, if you woke up and

16  you looked out before you went to bed one night and you looked

17  out in your lawn and you saw that dead brown grass out there,

18  and then when you woke up the next morning, you looked out the

19  window and it was a bright sunny day, but you looked down and

20  there was an inch of snow on your lawn, you did not see it

21  snow, but you can reasonably infer that during the night it

22  snowed.  If you woke in the middle of the night and you looked

23  outside and saw these white flakes falling from the sky, that

24  would be direct evidence that it was snowing.

25        Sometimes different inferences may be drawn from the

1  same set of facts.  The government may ask you to draw one

2  inference, and the defense may ask you to draw another

3  inference.  You and you alone must decide what reasonable

4  inferences you will draw from all of the evidence and your

5  reason, experience and common sense.  Now, you should consider

6  all of the evidence that is presented in this trial, direct and

7  circumstantial.  The law makes no distinction between the

8  weight that you should give to either direct or circumstantial

9  evidence.  It is for you to decide how much weight to be given

10 to any of the evidence.

11         Now, the government and the defendant have agreed

12 that the following facts are true, that is a stipulation of

13 facts.  The parties have stipulated that the chain of custody

14 of all government exhibits has been properly maintained.

15 Secondly, the parties further stipulate and agree that the

16 controlled substances allegedly purchased and seized in this

17 case are controlled substances namely, fentanyl, a schedule two

18 controlled substance in the amounts reflected in the

19 government's laboratory reports as follows.  There was D.E.A.

20 Exhibit No. 1, that was that controlled purchase on June 2nd,

21 2021, D.E.A. Exhibit 2, which was the controlled purchase on

22 July 12th, 2021, D.E.A. Exhibit 3, that was the controlled

23 purchase on September 28th, 2021 and D.E.A. Exhibit 4, which

24 was the controlled purchase on January 21st, 2022.  You should,

25 therefore, treat these facts as having been proved.  You are

1  not required to do so, however, since you are the sole judges

2  of the facts.

3          Now, as I stated to you in my preliminary

4  instructions at the beginning of the trial, in deciding what

5  the facts are, you must decide what testimony you believe and

6  what testimony you do not believe.  You are the sole judges of

7  the credibility of witnesses.  Now, credibility refers to

8  whether a witness is worthy of belief.  Was the witness

9  truthful?  Was the witness' testimony accurate?  You may

10  believe everything a witness says or only part of it or none of

11  it.  You may decide whether to believe a witness based upon his

12  or her behavior and manner of testifying, the explanations the

13  witness gave and all other evidence in the case just as you

14  would on any important matter where you were trying to decide

15  if a person was truthful, straightforward and accurate in his

16  or her recollections in your regular everyday life.

17          In deciding the question of credibility, remember to

18  use your common sense, judgment and worldly experience.  In

19  deciding what to believe you may consider a number of factors.

20  The opportunity and ability of the witness to see or hear or

21  know the things about which the witness testified, the quality

22  of the witness' knowledge, understanding and memory, the

23  witness' appearance, behavior and manner while testifying,

24  whether the witness has an interest in the outcome of the case

25  or any motive, bias or prejudice, any relation the witness may

1  have with a party in the case and any effect the verdict may

2  have on the witness, whether the witness said or wrote anything

3  before trial that was different from the witness' testimony in

4  trial, whether the witness' testimony was consistent or

5  inconsistent with other evidence that you believe and any other

6  factors that bear on whether the witness should be believed.

7       Now, inconsistencies or discrepancies in the witness

8  testimony or between the testimony of different witnesses may

9  or may not cause you to disbelieve a witness' testimony.  Two

10 or more persons witnessing an event may simply see or hear it

11 differently.  Mistaken recollection like failure to recall is a

12 common human experience.  In weighing the effect of an

13 inconsistency, you should also consider whether it's about a

14 matter of importance or an insignificant detail.  You should

15 also consider whether the inconsistency was innocent or

16 intentional.

17      Now, you are not required to accept testimony even if

18 it was not contradicted and the witness was not impeached.  You

19 may decide a witness is not worthy of belief because of the

20 witness' bearing or demeanor or because of the inherent

21 improbability of the testimony or for any other reasons

22 sufficient to you.  After you make your own judgment about the

23 believability of a witness, you can then attach to the witness'

24 testimony the importance or weight that you believe it

25 deserves.  Now, the weight of the evidence to prove a fact does

1  not necessarily depend on the number of witnesses who testified

2  or the quantity of evidence that was presented.  What's more

3  important than numbers or quantity is how believable the

4  witnesses were and how much weight you believe their testimony

5  deserves.  Now, you have heard testimony from law enforcement

6  officers.  The fact that a witness is employed as a law

7  enforcement officer does not mean that his or her testimony

8  necessarily deserves more or less credibility or greater or

9  lesser weight than any other witness.  At the same time it's

10  quite legitimate for the defense counsel to try to attack the

11  believability of a law enforcement witness on the ground that

12  his or her testimony may be colored by a personal or

13  professional interest in the outcome of the case.

14        You must decide after reviewing all of the evidence

15  whether you believe the testimony of a law enforcement witness

16  and how much weight, if any, it deserves.  Now, the rules of

17  evidence ordinarily do not permit witnesses to state their own

18  opinions about important questions in a trial, but about there

19  are some exceptions to those rules.  In this case you heard the

20  testimony from F.B.I. task force officer Shane Yelland.

21  Because of his knowledge, skill, experience, training and

22  education in the field of drug trafficking investigations,

23  agent Yelland was permitted to offer an opinion in that field

24  and the reasons for that opinion.

25        The opinion this witness stated should receive

14

1  whatever weight you think appropriate given all of the other

2  evidence in the case.  In weighing this opinion testimony, you

3  may consider the witness' qualifications, the reasons for the

4  witness' opinions and the reliability of the information

5  supporting the witnesses opinions as well as any other factors

6  discussed in these instructions for weighing the testimony of

7  witnesses.  You may disregard the opinion entirely if you

8  decide that agent Yelland's opinion is not based on sufficient

9  knowledge, skill, experience, training or education.  You may

10 also disregard the opinion if you conclude that the reasons

11 given in support of the opinion are not sound or if you

12 conclude that the opinion is not supported by the facts shown

13 by the evidence or if you think the opinion is outweighed by

14 other evidence.

15         Now, you heard evidence that some witnesses are

16 alleged coconspirators or someone who says he or she

17 participated in the crime charged or have made a plea agreement

18 with the government or received a benefit from the government

19 in exchange for testifying.  The testimony of those individuals

20 was received into evidence and may be considered by you.  The

21 government is permitted to present the testimony of those

22 witnesses, but you should consider the testimony with great

23 care and caution.

24         In evaluating their testimony, you should consider

25 this factor along with the others I have called to your

1  attention.  Whether or not their testimony may have been

2  influenced by the consideration given by the government or by

3  the alleged involvement in the crime charged is for you to

4  determine.  You may give their testimony such weight as you

5  believe it deserves.  Now, you must not consider the guilt of

6  any witness as evidence of the defendant's guilt.  An

7  individual -- an individual's decision to plead guilty is a

8  personal decision about his or her own guilt.  Such evidence is

9  offered only to allow you to assess the credibility of the

10  witness, to eliminate any concern that the defendant has been

11  singled out for prosecution and to explain how the witness came

12  to possess detailed firsthand knowledge of the events about

13  which he or she testified.

14        You may consider a witness' guilty plea only for

15  these purposes.  Now, if you believe that a witness knowingly

16  testified falsely concerning any important matter, you may

17  distrust that witness' testimony in other matters.  You may

18  reject all of the testimony, or you may accept such parts of

19  the testimony that you believe are true and give it such weight

20  that you believe it deserves.  Now, the defendant did not

21  testify in this case.  A defendant has an absolute

22  constitutional right not to testify.  The burden of proof

23  remains with the prosecution throughout the entire trial and

24  never shifts to the defense.  The defendant is never required

25  to prove that he is innocent.  You must not attach any

1  significance to the fact that the defendant did not testify.

2  You must draw no inferences, no adverse inferences against him

3  because he did not take the witness stand.  Do not consider for

4  any reason at all that the defendant did not testify.  Do not

5  discuss that fact during your deliberations or let it influence

6  your decision in any way.

7        Now, although the government is required to prove the

8  defendant guilty beyond a reasonable doubt, the government is

9  not required to present all possible evidence related to the

10  case or to produce all possible witnesses who might have some

11  knowledge about the facts of the case.  In addition, as I have

12  explained, the defendant is not required to present any

13  evidence or produce any witnesses.

14        Now, during the trial you heard testimony of

15  witnesses and argument by counsel that the government -- or you

16  may hear did not present certain specific investigative

17  techniques.  You may consider these facts in deciding whether

18  the government has met its burden of proof because as I have

19  told you, you should look at all of the evidence or lack of

20  evidence in deciding whether the defendant is guilty.  However,

21  there is no legal requirement that the government use any of

22  these specific investigative techniques or all possible

23  techniques to prove its case.

24        Your concern as I have said earlier is to determine

25  whether or not the evidence that is admitted in this trial

1  proves the defendant's guilt beyond a reasonable doubt.  Now,

2  the defendant pled not guilty to the offenses charged.  He is

3  presumed to be innocent.  He started the trial with a clean

4  slate, no evidence against him.  The presumption of innocence

5  stays with the defendant unless and until the government has

6  presented evidence that overcomes that presumption by

7  convincing you that the defendant is guilty of the offenses

8  charged beyond a reasonable doubt.  The presumption of

9  innocence requires that you find the defendant not guilty

10 unless you are satisfied that the government has proved his

11 guilt beyond a reasonable doubt.  The presumption of innocence

12 means that the defendant has no burden or obligation to present

13 any evidence at all or to prove that he is not guilty.  The

14 burden or obligation of proof is on the government to prove the

15 defendant is guilty, and this burden stays with the government

16 throughout the trial.

17        Now, in order for you to find the defendant guilty of

18 the offenses charged, the government must convince you that the

19 defendant is guilty beyond a reasonable doubt.  That means the

20 government must prove each and every element of the offenses

21 charged beyond a reasonable doubt.  A defendant may not be

22 convicted based on suspicion or conjecture but only on evidence

23 that proves guilt beyond a reasonable doubt.  Now, proof beyond

24 a reasonable doubt does not mean proof beyond all possible

25 doubt or to a mathematical certainty.  Possible doubts or

1  doubts based on conjecture, speculation or hunch are not

2  reasonable doubts.  A reasonable doubt is a fair doubt based

3  upon reason, logic, common sense and experience.  It is a doubt

4  that an ordinary reasonable person has after carefully weighing

5  all of the evidence and is a doubt of the sort that would cause

6  him or her to hesitate to act in matters of importance in his

7  or her own life.  It may arise from the evidence or from the

8  lack of evidence or from the nature of the evidence.

9        If having now heard all of the evidence you are

10  convinced the government has proven each and every element of

11  the offense charged beyond a reasonable doubt, you should

12  return a verdict of guilty for that offense.  However, if you

13  have a reasonable doubt about one or more of the elements of an

14  offense charged, then you must return a verdict of not guilty

15  for that offense.  Now, that first half of the charge is what

16  I'll call the general charge that we give in every criminal

17  case.

18        The second part of this charge is now going to relate

19  to the substantive charge, the conspiracy charge in this

20  particular case.  As you know, the defendant is charged in an

21  indictment with violating federal law.  Specifically, he is

22  charged with conspiracy to distribute and conspiracy to possess

23  with intent to distribute controlled substances, namely,

24  fentanyl.  As I explained at the beginning of the trial, the

25  indictment is just the formal way of specifying the exact crime

1    a defendant is accused of committing.  An indictment is simply

2    a description of the charge against the defendant.  It is an

3    accusation only.  An indictment is not evidence of anything,

4    and you should not give any weight to the fact that the

5    defendant has been indicted in making your decision in this

6    case.  Now, you'll note that the indictment charges that the

7    offenses were committed on or about a certain date.  The

8    government does not have to prove with certainty the exact date

9    of alleged offenses.

10          It is sufficient that the government prove beyond a

11   reasonable doubt that the offense was committed on a date

12   reasonably near the dates alleged.  Now, count one of the

13   indictment charges that from in or about January of 2020 the

14   exact date being unknown to on or about the date of the

15   indictment, which was February 14th, 2023, within the Middle

16   District of Pennsylvania and elsewhere the defendant, Kevin

17   Jones, agreed or conspired with one or more persons to

18   distribute and possess with intent to distribute fentanyl,

19   which is a controlled substance.

20          It is a federal crime for two or more persons to

21   agree or conspire to commit any offense against the United

22   States even if they never actually achieve the objective.  A

23   conspiracy is a kind of criminal partnership.  In order for you

24   to find the defendant guilty of conspiracy to distribute and/or

25   possess with intent to distribute a controlled substance, you

1  must find that the government proved beyond a reasonable doubt

2  each of the following three elements.  First, that two or more

3  persons agreed to distribute or possess with intent to

4  distribute fentanyl.  Second, that the defendant was a party to

5  or a member of that agreement and, third, that the defendant

6  joined the agreement or conspiracy knowing of its objective to

7  distribute or possess with intent to distribute fentanyl and

8  intending to join together with at least one other alleged

9  conspirator to achieve that objective.  That is, that the

10  defendant and at least one other alleged conspirator shared a

11  unity of purpose and the intent to achieve that objective.

12          I'll now explain to you those elements in a little

13  more detail.  The first element of the crime of conspiracy is

14  the existence of an agreement.  The government must prove

15  beyond a reasonable doubt that two or more persons knowingly

16  and intentionally arrived at a mutual understanding or

17  agreement either spoken or unspoken to work together to achieve

18  the overall objective of the conspiracy, that is, to distribute

19  or possess with intent to distribute fentanyl.  The government

20  does not have to prove the existence of a formal or written

21  agreement or an express oral agreement spelling out the details

22  of the understanding.

23          The government also does not have to prove that all

24  members of the conspiracy directly met or discussed between

25  themselves their unlawful objective or agreed to all of the

1  details or agreed to what the means were by which the

2  objectives would be accomplished.  The government is not even

3  required to prove that all people named in the indictment were,

4  in fact, parties to the agreement or that all of the members of

5  the alleged conspiracy were named or that all of the members of

6  the conspiracy are even known.  What the government must prove

7  beyond a reasonable doubt is that two or more persons in some

8  way or manner arrived at some type of agreement, mutual

9  understanding or meeting of the minds to try to accomplish a

10  common and unlawful objective.

11         You may consider both direct evidence and

12  circumstantial evidence in deciding whether the government has

13  proved beyond a reasonable doubt that an agreement or mutual

14  understanding existed.  You may find the existence of a

15  conspiracy based upon reasonable inference drawn from the

16  actions or statements of the alleged members of the conspiracy,

17  from the circumstances surrounding the scheme and from evidence

18  of related facts and circumstances which prove that the

19  activities of the participants in a criminal venture could not

20  have been carried out except as a result of a preconceived

21  agreement, scheme or understanding.

22         Now, if you find that a criminal agreement or

23  conspiracy existed, then in order to find the defendant guilty

24  of conspiracy, you must also find that the government proved

25  beyond a reasonable doubt that the defendant knowingly and

22

1   intentionally joined that agreement or conspiracy during its

2   existence.  The government must prove that the defendant knew

3   the goals or objectives of the agreement or conspiracy and

4   voluntarily joined it during its existence intending to achieve

5   the common goals or objectives and to work together with others

6   -- other alleged conspirators toward those goals or objectives.

7            Now, the government need not prove that the defendant

8   knew everything about the conspiracy or that he knew everyone

9   involved in it or that he was a member from the beginning.  The

10  government also does not have to prove that the defendant

11  played a major substantial role in the conspiracy.  You may

12  consider both direct and circumstantial evidence in deciding

13  whether the defendant joined the conspiracy, knew of its

14  criminal objectives and intended to further those objectives.

15           Evidence which shows that the defendant only knew

16  about the conspiracy or only kept bad company by associating

17  with members of the conspiracy or was only present when it was

18  discussed or when a crime was committed is not sufficient to

19  prove that the defendant was a member of the conspiracy even if

20  the defendant approved of what was happening and did not object

21  to it.  Likewise, evidence showing the defendant may have done

22  something that happened to help the conspiracy does not

23  necessarily prove that he joined the conspiracy.  You may,

24  however, consider this evidence with all the other evidence in

25  deciding whether the government has proved beyond a reasonable

23

 1  doubt that the defendant joined the conspiracy.  Now, in order

 2  to find the defendant guilty of conspiracy, you must find that

 3  the government proved beyond a reasonable doubt that the

 4  defendant joined the conspiracy knowing of its objectives and

 5  intending to help further or achieve those objectives.  That

 6  is, the government must prove that the defendant knew of the

 7  objective -- objectives or goals of the conspiracy, that the

 8  defendant joined the conspiracy intending to help further or

 9  achieve those goals or objectives and that the defendant and at

10  least one other alleged coconspirator shared a unity of purpose

11  toward those objectives or goals.

12          Once again, you may consider both direct and

13  circumstantial evidence including the defendant's own words or

14  conduct and other facts and circumstances in deciding whether

15  the defendant had the required knowledge and intent.  Now, the

16  government is not required to prove that any members of the

17  conspiracy were successful in achieving any or all of the

18  objectives of the conspiracy.

19          You may find the defendant guilty of conspiracy if

20  you find the government proved beyond a reasonable doubt the

21  elements that I have explained even if you find that the

22  government did not prove that any of the conspirators actually

23  committed any of the offenses against the United States.

24          Conspiracy is a criminal offense separate from the

25  offenses that were charged -- were the objectives of the

24

conspiracy.  Conspiracy is complete without the commissions of those offenses.  Now, the conspiracy ends when the objectives of the conspiracy have been achieved or all members of the conspiracy have withdrawn from it.  However, a conspiracy may be a continuing conspiracy and if it is it lasts until there is some affirmative showing that it has ended or that all of its members have withdrawn.  A conspiracy may be a continuing one if the agreement includes an understanding that the conspiracy will continue over time.  Also a conspiracy may have a continuing purpose or objective and, therefore, be a continuing conspiracy.

Now, in the indictment it charges that the conspiracy to distribute and possess with intent to distribute a controlled substance began in or about January of 2020 and continued up until February 14th of 2023.  The government need to not prove that the conspiracy existed throughout the entire time period alleged in the indictment.  Rather it is sufficient that you find a conspiracy was formed and existed for some of the time within the period set out by the indictment.

Now, evidence that be admitted in this case that certain persons who are alleged to be coconspirators of the defendant did and said certain things.  The acts or statements of any member of a conspiracy are treated as the acts or statements of all members of the conspiracy if these acts or statements were performed or spoken during the existence of the

25

1 conspiracy and to further the objectives of the conspiracy.

2 Therefore, you may consider as evidence against the defendant

3 any acts done or statements made by any members of the

4 conspiracy during the existence of and to further the

5 objectives of the conspiracy.

6           You may consider these acts and statements even if

7 they were done and made in the defendant's absence and without

8 his knowledge.  As with all evidence presented in this case, it

9 is for you to decide whether you believe this evidence and how

10 much weight to give to it.  Now, count one of the indictment

11 charges the defendant with conspiracy to distribute and possess

12 with intent to distribute controlled substances, namely,

13 fentanyl, which is a violation of federal law.

14           I will now provide you with the elements of the

15 offense of distribution and possession with intent to

16 distribute a controlled substance, which is the offense the

17 defendant is charged with conspiring to commit.  That offense

18 has four elements.  First, that the defendant possessed a

19 mixture or substance containing a controlled substance, second,

20 that the defendant possessed the controlled substance knowingly

21 or intentionally, third, that the defendant distributed or

22 intended to distribute the controlled substance and, fourth,

23 that the controlled substance was fentanyl.

24           I'll now explain to you each of those elements.  To

25 possess a controlled substance means to have it within a

1  person's control.  The government does not have to prove that

2  the defendant physically held the controlled substance, that

3  is, had actual possession of it.  As long as the controlled

4  substance was within the defendant's control, he or she

5  possessed it.  If you find the defendant either had actual

6  possession of the controlled substance or had the power and

7  intention to exercise control over it even though it was not in

8  the defendant's physical possession, that is, that the

9  defendant had the ability to take actual possession of the

10 controlled substance when the defendant wanted to do so, you

11 may find that the government has proved possession.  Possession

12 may be momentarily or fleeting.  Proof of ownership of a

13 controlled substance is not required.

14         The law also recognizes that possession may be sole

15 or joint.  If one person alone possesses a controlled

16 substance, that is sole possession.  However, more than one

17 person may have the power and intention to exercise control

18 over a controlled substance.  This is called joint possession.

19 If you find that the defendant had such power and intention,

20 then he possessed the controlled substance even if he possessed

21 it jointly with another.  Mere proximity to a controlled

22 substance or mere presence on the property where it's located

23 or mere association with a person who does control the

24 controlled substance or the property is not enough to support a

25 finding of possession.

1          Now, distribute as used in the offenses charged means
2    to deliver or to transfer possession or control of a controlled
3    substance from one person to another.  Distribute includes the
4    sale of controlled substances by one person to another but does
5    not require a sale.  Distribute also includes a delivery
6    without any financial compensation such as a gift or a trade.
7    Now, you are instructed as a matter of law that fentanyl is a
8    controlled substance that is some kind of prohibited drug.  It
9    is solely for you, however, to decide whether the government
10   has proved beyond a reasonable doubt that the defendant
11   conspired to distribute or possess with intent to distribute a
12   mixture or substance containing fentanyl.
13          Now, I'm going to talk to you about knowingly and
14   intentionally.  To act knowingly as used in the offenses
15   charged means that the defendant was conscious and aware that
16   he was engaged in the acts charged and knew of the surrounding
17   facts and circumstances that make out the offenses.  Knowingly
18   does not require the defendant knew the acts charged and
19   surrounding facts amounted to a crime.  To act intentionally as
20   used in the offense charged means to act deliberately and not
21   by accident.  Intentionally does not require the defendant
22   intend to violate the law.  The phrase knowingly and
23   intentionally as used in the offenses charged requires the
24   government to prove beyond a reasonable doubt that the
25   defendant knew that what he conspired to distribute or possess

28

1  with intent to distribute was a controlled substance.  In

2  addition, the government must also prove beyond a reasonable

3  doubt that the controlled substance was, in fact, fentanyl.

4  However, as long as you find the government proved beyond a

5  reasonable doubt that the defendant knew that he conspired to

6  distribute and possess with intent to distribute a controlled

7  substance, you need not find that the defendant knew that the

8  controlled substance was fentanyl.  In deciding whether the

9  defendant acted knowingly and intentionally you may consider

10  evidence about what the defendant said, what the defendant did

11  or failed to do, how he acted and all of the other evidence and

12  facts and circumstances shown by the evidence that may prove

13  what was in the defendant's mind at the time.

14        Now, in order to find the defendant guilty of

15  conspiracy to possess a controlled substance with intent to

16  distribute, you must find that the government proved beyond a

17  reasonable doubt that the defendant intended to conspire to

18  distribute a mixture or substance containing a controlled

19  substance.  To find that the defendant had the intent to

20  distribute you must find that the defendant had in mind or

21  planned in some way to deliver or transfer possession or

22  control of the controlled substance to someone else.  In

23  determining whether the defendant had the intent to distribute,

24  you may consider all of the facts and circumstances shown by

25  the evidence presented including the defendant's own words and

1  actions.  In determining the defendant's intent to distribute

2  controlled substances, you may also consider among other things

3  the quantity and purity of the controlled substance, the manner

4  in which the controlled substance was packaged and the presence

5  or absence of weapons, large amounts of cash or equipment used

6  in the processing or sale of controlled substances.  Now, if

7  you find that the defendant is guilty of the offense charged in

8  count one, you must answer some questions called jury

9  interrogatories to decide whether the offense involved certain

10 weights and quantities of controlled substances.

11      Do not answer these jury interrogatories until you

12 have reached your verdict on count one.  If you find that the

13 government has not proved the defendant guilty of the offense

14 charged in count one, then you need not answer these jury

15 interrogatories.  If you find the defendant guilty, then in

16 answering these interrogatories as in deciding your verdict,

17 you must be unanimous.  And in order to find that the offense

18 involved a certain weight or quantity of controlled substances,

19 you must all be satisfied that the government has proved weight

20 wet and quantity beyond a reasonable doubt.

21      Weight or quantity means the total weight of any

22 mixture or substance which contains a detectable amount of the

23 controlled substance charged.  Now, jury interrogatory 1.1

24 relates to the amount of fentanyl involved in the conspiracy.

25 Jury interrogatory 1.1 as I mentioned relates to count one and

1  first asks whether you unanimously find beyond a reasonable

2  doubt the weight or quantity of fentanyl involved in the

3  conspiracy that is attributable to the defendant was 400 grams

4  or more.  In making this decision, you should consider the

5  quantities of fentanyl the defendant actually possessed with

6  intent to distribute, distributed or intended to distribute as

7  well as the conduct of his coconspirators that was reasonably

8  foreseeable to him as part of the conspiracy.

9       If you answer the question -- if you answer -- if

10  your answer to this question is yes, that completes your jury

11  interrogatory number one.  If you answer -- if your answer to

12  that jury interrogatory 1.1 is no, then you should answer the

13  next question, which asks whether you unanimously find beyond a

14  reasonable doubt that the weight or quantity of fentanyl

15  involved in the conspiracy that is attributable to the

16  defendant was 40 grams or more.  Again, in making the decision

17  you should consider the quantities of fentanyl that the

18  defendant actually possessed with intent to distribute,

19  distributed or intended to distribute as well as the conduct of

20  his coconspirators that was reasonably foreseeable to him as

21  part of the conspiracy.

22       If you unanimously find that the government did not

23  prove beyond a reasonable doubt that the offense involved 40

24  grams or more of fentanyl but rather it involved an amount less

25  than that, you should answer that interrogatory 1.2 with a no.

1  All right.  That is the substantive charge on the case.  As I

2  mentioned to you, we will now go into closing arguments of

3  counsel and begin with that unless you would like to take a

4  short break before we do that.  Anyone need a short break at

5  this stage?  Okay.  Then we will go into closing arguments and

6  begin with the government, Mr. O'Hara.

7            MR. O'HARA:  Yes, thank you, Your Honor.  May it

8  please the Court and counsel.  Good morning, ladies and

9  gentlemen.  I hope everyone had a nice weekend.  I hope it was

10  a restful one for you.  Let me begin by saying thank you to

11  each and every one of you for serving as jurors in this case.

12            We worked the last few days.  We worked a few feet

13  away from you.  You probably see us running around getting

14  exhibits ready, shuffling our witnesses in and out, putting the

15  exhibits up on the witness stand.  We're just a few feet away

16  from you.  Please remember, please know that we do not take you

17  for granted, not for one second, not for one minute.  This

18  system doesn't work without you.

19            We want you to know that we appreciate your time,

20  your attention and your service.  We say thank you.  Judge

21  Mannion just spent a great deal of time instructing you on the

22  charge of conspiracy, and I'm not going to go over all of the

23  instructions, but essentially the government must prove an

24  agreement that two or more people came to an agreement to

25  commit a crime, there was a meeting of minds, a common

32

1  understanding so to speak to accomplish an unlawful objective,

2  in this case to distribute and possess with the intent to

3  distribute fentanyl.

4       We need to show there was a unity of purpose.  The

5  government does not have to show that the defendant was a

6  member of a conspiracy from the beginning or that he was the

7  main guy or that he was the lead defendant.  The government

8  must show is that at some point during the dates charged in the

9  conspiracy the defendant was a member of that conspiracy, that

10 the defendant and at least one other person shared a unity of

11 purpose toward that goal of possessing fentanyl with the intent

12 to distribute it and with the distribution of fentanyl.

13      This case began with exhibit 17, three pills marked

14 M. and 30 found in the vehicle of Michaelena Kowakczyk in

15 February of 2021.  There was an overdose.  She was found dead

16 in her vehicle with three blue pills marked M. 30.

17      The toxicology results confirmed it was an overdose.

18 Officer Shane Yelland, a Wilkes-Barre police officer and a

19 member of the F.B.I. task force investigates.  Officer Yelland

20 identifies Krystina Shumway who was charged in this

21 investigation as the initial dealer, initial person who sold

22 the pills to Michaelena Kowakczyk.  She sold her four pills.

23 They found three in the vehicle.  She died -- Michaelena died

24 from ingesting just one pill.  Krystina Shumway cooperates in

25 the investigation, and she leads the F.B.I. to her dealer, Akee

33

1   Miller, who was known as Mitch, and we heard a lot about Mitch
2   in this case.  Miller cooperates with the police and identifies
3   his source for pills, Davon Beckford, who was known as Dolo,
4   who was in Arizona.

5        He was originally in the Wilkes-Barre area.  He got
6   out of prison in November of 2019.  He takes up with Tyla
7   Griffin, and by February of 2020 Davon Beckford and Tyla
8   Griffin move to Arizona where they started dealing pills.  So
9   with the cooperation of Akee Miller, June 2nd of 2021, officer
10  Yelland arranged for a controlled buy through the mail from
11  Davon Beckford under his supervision.  The important details
12  they ordered up to 200 pills for a thousand dollars from Davon
13  Beckford.

14        The police send the money to Beckford in Arizona.  He
15  doesn't know it's the police.  He thinks it's Akee Miller, a
16  customer.  They tell Beckford to send the pills to 450 South
17  Franklin Street in Wilkes-Barre, an address that was under the
18  control of law enforcement.  Beckford sends a tracking number.
19  He sends a tracking number to the police.  He doesn't know it's
20  the police, but because the tracking number on the package, U.
21  P. S. seizes the parcel -- U.S.P.S seizes the package.

22        It was found to contain 200 pills in an express mail
23  package.  The lab report confirms a mixture and substance
24  containing fentanyl, a schedule two controlled substance.
25  There's the envelope it came in.  Government's Exhibit 1.1.

1  Inspector Lauren Fetch told you that drug traffickers typically

2  use priority express mail for three reasons.  No. 1, it's got

3  this tracking number up here in the upper right-hand corner.

4  Both the sender and the recipient can use that tracking number

5  to track the package on the internet.  No. 2, typically it's

6  one day delivery.

7         It's typically overnight delivery although we learn

8  sometimes it wasn't.  Sometimes it took more than one day.

9  Then No. 3, there's no signature required.  The person

10  receiving the package does not have to sign for the package.

11  It can be left on the porch or the stoop or left next to the

12  door.  So there's the first package -- the blue pills --

13  containing these little blue M. 30 pills.  The lab report

14  confirmed it contained the presence of fentanyl.  The address

15  450 South Franklin Street in Wilkes-Barre, that's the address

16  under the control of law enforcement.  The names we learn are

17  fake.  Kelly Chapman is not a real person.  You can see that it

18  was sent from Elite Kutz in Phoenix Arizona.  It was mailed

19  from Phoenix, Arizona, the first package, the first piece of

20  evidence in this case.

21         When Davon Beckford testified he said, yep, that's my

22  handwriting, that's my envelope, I sent it, that's my

23  handwriting on the envelope.  The first controlled buy.  The

24  second controlled buy remember Tyla Griffin.  She and Beckford

25  wore a couple.  They moved to Arizona in February of 2020.  By

1  November of 2020 they break up.

2  When they were together they were selling fentanyl

3  pills.  In fact, it was Tyla who developed the source.  She

4  found him on the internet, a guy named Miguel, who was Mexican,

5  who she obtained pills from.  So police officer Yelland again

6  uses Akee Miller to set up a controlled buy again through the

7  mail from Tyla Griffin.  Under his supervision they end up

8  getting 249 pills for $1,650.  They use Cash App and Zelle to

9  send the money.  The Cash App records turned out to be

10  something that was very important in this case.  They send the

11  money to Tyla by Cash App.  Tyla -- she's told to send the

12  pills to 450 South Franklin Street in Wilkes-Barre.  Tyla

13  Griffin sends the police the tracking number.  She doesn't know

14  it's the police.  It's Akee Miller acting as an informant.  She

15  sends him the tracking number.  The tracking number is seized

16  -- the parcel is seized.  The tracking number is sent.  The

17  parcel is seized by postal authorities.  They get -- actually

18  receive 249 pills in that package, and again the lab report

19  confirms a mixture and substance containing fentanyl, a

20  schedule two controlled substance.

21  Government's Exhibit 2.1, the package sent by Tyla

22  Griffin, again that 450 South Franklin Street in Wilkes-Barre,

23  that's an address under the control of law enforcement.  Again,

24  the package contains that tracking number under the bar code,

25  very important.  The sender names and the recipient names we

36

1  know are false.

2       It's sent from Phoenix, Arizona.  Now, police

3  investigate.  They were actually able to get footage from the

4  post office in Arizona.  And in the upper right-hand corner and

5  the lower left-hand corner, that's Tyla Griffin at the post

6  office in Arizona mailing the very package I just showed you.

7  She said, yes, yes, that's me.  Government's Exhibit 2.5, more

8  of those pills marked M. and 30.

9       That's what's in that package.  Tyla Griffin also

10  told us some interesting things during her testimony.  She and

11  Davon Beckford split up in November of 2020.  But she

12  remembered that the Davon Beckford when they were together as a

13  couple -- she remembered that Davon Beckford was sending pills

14  to someone known as Hat, and she knew it because Beckford

15  talked about sending pills to someone named Hat.  September

16  28th of 2021, officer Yelland arranges yet another controlled

17  buy.

18       Now, we are back to Davon Beckford, controlled buy

19  No. 3.  Under the supervision of officer Yelland they use

20  utilize the confidential informant.  He sends a -- they sent

21  $2,000 to Davon Beckford.  They get 249 pills.  They tell

22  Beckford to send the pills to 450 South Franklin Street in

23  Wilkes-Barre.  Beckford sends the police -- and he doesn't know

24  it's the police -- he sends the police the tracking number.

25  Postal authorities seize the package.  It contains 249 pills in

37

1  a United States Postal Service express package.

2          The lab report confirms those pills contained a

3  mixture and substance containing fentanyl, a schedule two

4  controlled substance.  Exhibit 3.1, here's the exhibit.  Here's

5  the envelope.  Again, it's an express priority mail express

6  envelope.  It contains this tracking number in the top

7  right-hand corner.  It's sent from Phoenix to 450 South

8  Franklin Street in Wilkes-Barre, the address under the control

9  of law enforcement.  Again, the names are fake, Amanda Blake

10  and Samuel Smart.  Davon Beckford testified the police were

11  able to obtain footage from the post office at Arizona.  Davon

12  Beckford testified in the lower right-hand corner -- in the

13  lower left-hand corner, that's me.  That's Davon Beckford at

14  the post office in Arizona mailing the very package that I just

15  showed you.  Yes, that's me.

16          Now, what does Davon Beckford do during the

17  controlled purchase?  He texts to Akee Miller -- he texts the

18  receipt from the post office.  You can see we have highlighted

19  for you the receipt contains the tracking number, and the

20  receipt contains the destination where the package is being

21  mailed to.  Exhibit 3.5, that package contains little blue

22  pills marked M. 30 found to contain fentanyl.  January 21st of

23  2022, officer Yelland arranges for a fourth controlled

24  purchase, the third one from Davon Beckford.  Again, under his

25  supervision police eventually obtain 450 pills for $3,000 they

38

1  sent to Davon Beckford.

2          Beckford is told to send the pills to 450 South

3  Franklin Street in Wilkes-Barre.  Beckford sends them the

4  receipt.  Postal authorities seize the package.  It actually

5  was found to contain 462 pills, more than the 450 they ordered

6  in an express mail package.  Again, the lab report confirms a

7  mixture and substance containing a detectible amount of

8  fentanyl, a schedule two controlled substance.  Exhibit 4.1,

9  there's the envelope they came in.  This time it is sent from

10  Scottsdale, Arizona to 450 South Franklin Street in

11  Wilkes-Barre, the address under the control of law enforcement.

12  Again, the names are fake.  Beckford provides a screen shot,

13  took a picture -- took a picture of the receipt from the post

14  office, and he sends it to what he thinks is a customer when

15  it's really the police.  You can see again a receipt contains

16  the tracking number, and it contains the destination,

17  Wilkes-Barre, Pennsylvania.

18          Open up the package, and it contains a box of toys,

19  Legos, open up the Lego box and they have exhibit 4.6.  Photo.

20  Pills are found inside the box of toys with the labels.  I will

21  show you exhibit 4.4, more little blue pills marked M. 30 found

22  to contain fentanyl.  Lab reports confirm all the pills I

23  showed you are fentanyl.  That is not in dispute.  The

24  government agrees, and the defense agrees those pills contain

25  fentanyl.  You heard the stipulation placed on the record.  All

1  the parties agree that the pills contained fentanyl.

2         Let's talk a bit about the drug weight, and Judge

3  Mannion told you there is a question, an interrogatory in the

4  verdict form.  And the interrogatory asks whether with the

5  amount of fentanyl involved in the conspiracy that is

6  attributable to this defendant, Kevin Jones, as a result of his

7  own conduct and the conduct of his coconspirators reasonably

8  foreseeable to him is more than 400 grams.  The report from the

9  controlled buy No. 1, 200 pills purchased by the police turned

10 out to be 20.684 grams, a ratio of ten to one meaning ten pills

11 equals one gram.  Here are 200 pills equals 20 grams.  That ten

12 to one ratio holds true throughout each of the lab reports.

13        Controlled buy No. 2, we receive 249 pills.  That

14 turned out to be better than ten to one, 25.8595 grams.  It's

15 better than ten to one.  We use ten to one as our guide.

16 Controlled buy No. 3, again, 249 pills turned out to be 26.905

17 5 grams.  Again, that ten to one ratio holds true even a little

18 bit better this time.  Controlled buy No. 4, 462 pills turned

19 out to be 50 grams, again better than a ten to one ratio, ten

20 pills equaling one gram.  So after the controlled buys are

21 completed, the F.B.I. now understands the Beckford and Griffin

22 method of distributing these pills.

23        A local dealer requests a package of pills.  Beckford

24 and Griffin request initial payment upfront.  Upon receipt of

25 the payment, Beckford and Griffin go to their source to obtain

40

1  the pills.  Beckford and Griffin -- Beckford or Griffin package

2  fentanyl pills in U.S.P.S. express mail package hidden in toys

3  or beauty supplies.  Beckford and Griffin mail the package in

4  an express mail package which contains a tracking number

5  typically a one day delivery and no signature required when the

6  package arrives.

7          Beckford or Griffin text a screen shot of the

8  U.S.P.S. receipt that contains that tracking number which

9  allows the customer to track the package on the internet.  When

10  the local dealer here in Pennsylvania or Massachusetts receives

11  the package, they send additional payments.  Now, February of

12  2022, the police get a break in the case.  Davon Beckford

13  travels from Arizona to Pennsylvania, and officer Yelland told

14  you about the lengths that they went through to catch him

15  there.  His flight got cancelled.  He ended up flying

16  someplace.  He didn't land in Avoca because of bad weather, but

17  when he was leaving he left from Avoca.  The police were

18  waiting for him at the Avoca airport known as the Wilkes-Barre

19  Scranton airport.

20          Beckford is arrested at the Wilkes-Barre Scranton

21  airport in February of 2022.  Tyla Griffin is arrested in

22  Phoenix -- Phoenix, Arizona, February of 2022.  Davon Beckford

23  after meeting with his attorney having an attorney appointed

24  for him agrees to cooperate.  He turns over his phone just a

25  month later in March 2022.  He agrees to cooperate with law

1  enforcement, and he turns over his phone.  He tells the police

2  his source for pills, a man named Shane Burns in Arizona, who

3  was also charged as part of this investigation.

4          Just a month after his arrest -- he was arrested in

5  February.  By March after obtaining counsel he's cooperating.

6  He tells the police his network of distributors including Kevin

7  Jones, this defendant known as Hat, Akee Miller known as Mitch,

8  and Rahmel Wigfall known as Inf and others all who have been

9  charged in this investigation.  These are the people he is

10  sending the pills to.  He tells them that in March of 2022

11  after obtaining a lawyer and agreeing to cooperate.  The police

12  go through Davon Beckford's phone, his cell phone, and he has

13  got a treasurer trove of information in there.  He took

14  photographs.

15          Remember how he was sending the receipts.  They found

16  the photographs of hundreds of receipts with the tracking

17  numbers in his phone, screen shots of receipts, tracking

18  results and even some of the envelopes.  There's over 100

19  pictures of receipts from the post office.  There's over 25

20  results from tracking U.S.P.S. website.  These ones have the

21  green check mark.  Remember you heard the testimony you can go

22  through the postal service website and check on the package and

23  the ones with the green check marks on them were the tracking

24  results from the website and even had pictures of packages --

25  pictures of seven packages found in that phone.  Now,

42

1    investigators start following the mail.

2              Remember I told you what I highlighted in yellow.

3    Every one of those receipts has a tracking number.  Postal

4    inspector Lauren Fetch starts checking and searching the postal

5    service databases.  She starts compiling the data, starts

6    building this spreadsheet of data.  From the tracking numbers,

7    which are on the right-hand side, all the tracking numbers from

8    the receipts, she is able to tell a great deal of information

9    about the packages, where they're being sent from, where

10   they're being sent to, the weight of the packages, who they're

11   being sent to and who they're being sent from, although we know

12   many of the names are false.  She starts building --

13   painstakingly building this database.

14             Investigators are able to identify two addresses

15   associated with this defendant, Kevin Jones, 6 Woodward Street

16   in Wilkes-Barre where he resided and 14 Potter Avenue, Unit 2,

17   Plainville, Massachusetts where he resided with his girlfriend,

18   Sabrina Cleveland.  Going through Davon Beckford's phone they

19   find a note in the note section of the phone in Davon

20   Beckford's phone.  He's got 14 Potter Avenue, Plainville,

21   Massachusetts with the name Mack Brown, and he's got 6 Woodward

22   Street in Wilkes-Barre, Pennsylvania also listed in the note

23   section of his phone, the addresses of Kevin Jones.

24             They even find a screen shot address, the name Mack

25   Brown addressed to M. Brown, Plainville, Massachusetts, Unit 2,

1  14 Potter Avenue in Plainville, Massachusetts, Unit 2.  There's

2  nobody named Brown that lives at that address.  That's Sabrina

3  Cleveland's house.  She told you she resides there with her two

4  children and at some point the defendant moved in and lived

5  with her.  Nobody named Brown lives there.  It's a false name

6  like all the other false names on all of the other packages

7  containing fentanyl.  They find receipts, ten receipts for

8  packages for the two addresses associated with Kevin Jones.

9  Pictures of those receipts are found in Davon Beckford's phone.

10  You can see the ten April 20th -- March -- April 30th, May

11  26th, June 24th, July 23rd, August 31st, September 15th,

12  October 6th, October 22nd, November 24th, ten receipts for

13  packages sent to the addresses associated with Kevin Jones.

14  Now, from her database, inspector Fetch was able to seize some

15  of the same addresses over and over and over again.  One of

16  them was 42 Red Maple Avenue in Mountain Top.  That was the

17  address for Rachel Smyden's grandfather.  Rachel Smyden

18  testified in this case from the receipts inspector Fetch was

19  able to determine that 11 packages were sent from Arizona to 42

20  Red Maple Avenue in Mountain Top.

21          Rachel Smyden says, I had them sent to my

22  grandfather's address because I thought it would be a safe

23  address to send the pills to.  Rachel Smyden told you that she

24  became an addict.  As I recall, she met an old boyfriend or had

25  an old boyfriend who introduced her to these pills and it was

1 like rocket fuel to her.  It was euphoric for her.  She became

2 an addict.

3         She told you in 2020 within the time period of this

4 conspiracy Rachel Smyden purchased fentanyl pills every other

5 day from Kevin Jones known as Hat, every other day.  She had a

6 criminal past.  She went to jail for a little while.  In jail

7 she met Tyla Griffin.  When Tyla moved to Arizona, Rachel found

8 out that she could get pills directly from Tyla Griffin much

9 cheaper than she can buy them from anybody else.  She said she

10 would order up to a thousand pills at a time from Tyla Griffin.

11 A thousand pills at a time.  She used them.  She got high.  She

12 sold them, too.  She got in trouble for doing it.  She was

13 charged as part of this investigation.  She pled guilty to

14 conspiracy to distribute fentanyl as a result of this

15 investigation.

16         Every one of these packages that you see there's a

17 total of 11.  She said every time she received a package from

18 Arizona it contained fentanyl pills every single time.  She

19 told you about her attempts at recovery and rehab .  She went

20 to recovery.  She has a one-year-old son.  She is clean, and

21 she's fighting to stay clean.  During the time period of this

22 conspiracy she bought pills every other day from Kevin Jones

23 known as Hat.

24         Another address that inspector Fetch found over and

25 over and over again, 82 Parsonage Street in Pittston.  That was

1  an address used by Samantha Smart, who also testified in this

2  case.  Inspector Fetch was able to determine she received 13

3  packages and then told you they came from Davon Beckford in

4  Arizona.

5          She told you she was -- some of her history.  She had

6  some health issues.  She was prescribed some pills by a doctor

7  for severe arthritis issues.  Then eventually she turned to the

8  streets to get more pills.  She told you that within the

9  timeframe of this conspiracy she bought fentanyl pills from

10 Kevin Jones on at least three occasions.  She said it could be

11 more, but I remember three.  She knew Kevin Jones as Hat as

12 everyone did from the bars and the clubs in Wilkes-Barre and at

13 least three occasions during this conspiracy -- the time period

14 of the conspiracy -- she bought fentanyl pills from Kevin

15 Jones.  She was an addict.

16         When you need your pills, you got to find them.  You

17 got to find them from somebody.  He wasn't her main dealer.  He

18 wasn't her main distributor.  When she needed pills on at least

19 three occasions, she purchased them from Kevin Jones.

20         She found out about Dolo, Davon Beckford, out in

21 Arizona.  As she found out she can get pills directly from

22 Davon Beckford in Arizona at a much cheaper price than she was

23 paying on the streets.  She had 13 packages sent to her address

24 82 Parsonage Street.  She said every single time she received a

25 package from Arizona it contained fentanyl pills sent by Davon

1  Beckford.  She used them.  She got high.  She sold some, and

2  she got charged as part of this conspiracy.  She has pled

3  guilty as a result of this investigation to distributing --

4  conspiracy to distribute fentanyl.

5          Another address showed up over and over and over

6  again, 15 Lanning Lane in Wilkes-Barre.  That was the address

7  of Shayna Colon Acosta, the little tiny girl you saw up on the

8  witness stand, young girl who had never been in trouble before

9  in her life.

10         She developed a pill problem.  She had some surgery

11 to her face, and she took Percocet, and eventually she turned

12 to the streets to buy pills.  She said, Percocet took my pain

13 away, but fentanyl made me feel like Super Woman.  It made me

14 feel euphoric.  She got addicted.  There was a little bit of a

15 twist here because Davon Beckford was sending the pills to her

16 house not for her but for his coconspirators Rahmel Wigfall and

17 Akee Miller known as Inf, Akee Miller known as Mitch.  She said

18 Mitch was my dealer, Akee Miller.  He was my first dealer.

19 Later it became Rahmel Wigfall known as Inf.

20         They approached her, and they said, let us have

21 packages sent to your house -- to your house at 15 Lanning Lane

22 and we will give you either 200 bucks or $200 worth of pills.

23 He made her that offer, first Akee Miller and later Rahmel

24 Wigfall.  Every time she told you she took the pills.  Every

25 time she took the pills over the money.  She said Akee Miller

1  and Rahmel Wigfall would track the packages on the internet,

2  and they would show up at her house to pick up the pills.  She

3  knew the packages contained fentanyl.  She got some of the

4  pills.  She remembers one time one of the packages tore open

5  and she saw the pills.  But they gave her the pills when they

6  picked up the packages, Akee Miller and Rahmel Wigfall.  She

7  used the pills, and she told you she got high.  She sold some

8  of those pills as well.

9          She got charged, and she pled guilty to conspiracy to

10  distribute fentanyl, a user, a member of the conspiracy.  They

11  used her because they could.  Addict.  They had the pills sent

12  to her house as a safe place to have the pills sent.  And if

13  the police come knocking, she's the one that gets in trouble.

14  They used her.  She told you she knew Kevin Jones.  She knew

15  Hat from Donohue's bar in Wilkes-Barre where people from this

16  circle all hung around, Hat, Rahmel Wigfall known as Inf, Akee

17  Miller, her dealer, one of her dealers known as Mitch.  They

18  all hung around the same bar, same place.  She went to rehab.

19  She told you she still is working at keeping her sobriety.

20          Every time, every single time she received a package

21  from Arizona it contained fentanyl pills.  Davon Beckford, Tyla

22  Griffin testified every single time they sent a package from

23  Arizona to Pennsylvania or someplace else like Massachusetts it

24  contained fentanyl pills.  That was their business.  That's how

25  they made money.  They were drug dealers, pill dealers.  Every

1 single time they went to the post office the package contained

2 fentanyl.

3          Rachel Smyden and Samantha Smart and Shayna Colon

4 Acosta told you that every time they received a package in the

5 mail from Arizona it contained fentanyl pills every single

6 time.  Remember the Cash Apps?  Remember how police sent the

7 money for the controlled buys via Cash App to Davon Beckford?

8 Now, investigators start following the money trail.  Kevin

9 Jones' Cash App records they subpoena.  There's a treasure

10 trove of information there.  His displayed name on the

11 right-hand side, Hat.  Everybody knows him as Hat.  The

12 addresses are listed 6 Woodward Street in Wilkes-Barre, 14

13 Potter Avenue, Unit 2 in Plainville, one in Pennsylvania, one

14 in Massachusetts.  There's also a phone number listed under

15 alias.  That phone number would turn out to be important.  He

16 had a business we learn, a party promotion business that was

17 known as F. W. A. H., which was we found out stood for Fuck

18 With a Hat.  He's the one that named the business, so forgive

19 my language.  The Cash App records showed you were 16 payments

20 from Kevin Jones known as Hat, sender name always is Hat, to

21 recipient Justin Case.  Justin Case was Davon Beckford's Cash

22 App account.

23          It changed at one point.  Justin Case -- Justin Case,

24 he said his Cash App account got suspended, he came up with a

25 new Cash App account and name, Millionaire Mindset

1  Entertainment.  Each and every time the sender was Hat.  Each
2  and every time the recipient is one of Davon Beckford's Cash
3  App names, Justin Case or Millionaire Mindset.  There was some
4  subject in the subject line.  Sometimes Jones put leather
5  jacket, new speakers, new transmission.  Davon Beckford says, I
6  wasn't sending any leather jackets or speakers or a new
7  transmission in the mail.  Every one of those payments was for
8  fentanyl pills, every single one.

9          Again, the second page, 16 pages, every single time
10 the sender is Hat.  Every single time the recipient is
11 Millionaire Mindset Entertainment, which was one of Davon
12 Beckford's Cash App names and not a leather jacket.  I guess he
13 needed two.  Davon Beckford told you he wasn't selling any
14 leather jackets.  Total up the money, $20,850 and 16 payments
15 -- 20,850 sent by Kevin Jones via Cash App to Davon Beckford.
16 Six months Kevin Jones sends Cash Apps totaling $20,850 to
17 Davon Beckford's Cash App accounts.  Beckford's phone also had
18 some text messages, text messages between Hat and Dolo, who is
19 Beckford .

20         Back in 2020 Kevin Jones sends his girlfriend's Cash
21 App account name Bean C. 22, and it's from -- you can see up
22 above there's a phone number, same phone number that's part of
23 the account information for Kevin Jones' Cash App Hat.  He
24 sends Bean C. 22.  Davon Beckford responds, that's not the
25 right name.  Hat sends it again, dollar sign Bean C. 22, and

50

1  Davon Beckford asks Sabrina.  And the response was, yes, we --
2  I cut it off on my slide.  Why is Kevin Jones sending his
3  girlfriend's Cash App account name to Davon Beckford?  Here's
4  why.  They also subpoenaed Sabrina Cleveland's Cash App
5  account.  Her display name was Sabrina, 14 Potter Avenue,
6  Plainville, Massachusetts.  Here's her Cash App, Bean C. 22
7  that Jones sent to her.  Let's talk about Sabrina Cleveland for
8  a moment.
9         She told you that Kevin Jones was known as Hat, he
10 had a party promotion business known as F. W. A. H. which stood
11 for Fuck With a Hat.  They met online.  They got close.  He
12 moved in with her and her children at 14 Potter Avenue in
13 Plainville, Massachusetts.  When they came to Pennsylvania they
14 stayed at his place on Woodward Street in Wilkes-Barre where
15 she sometimes paid the rent.  She told you at the direction of
16 Kevin Jones -- at his direction she sent over $10,000 in 70
17 days to someone with the Cash App name Justin Case.  We know
18 Justin Case is Davon Beckford.  You can see each time the
19 sender is Sabrina.  Each time the recipient is Justin Case, who
20 is Davon Beckford.  Some of her Cash Apps were declined.  They
21 didn't go through so she had to resend them.  She sent over
22 $10,000 in 70 days.  She said Kevin Jones would always
23 reimburse her in cash.  He always reimbursed her in cash for
24 the payments that she made.
25         Ask yourselves, where does that cash come from?  What

51

1  cash business could he possibly be involved in?  Just like when
2  Davon Beckford is arrested at the airport in Avoca with over
3  $9,000 in cash on his person, where did that cash come from on
4  Davon Beckford?  It came from dealing drugs.  Where did Kevin
5  Jones get the cash to reimburse Sabrina Cleveland for the money
6  she sent via Cash App?  She told you that she sometimes used
7  the name Hat in the subject line.  Here's two examples, Hat and
8  Hat, so the recipient would know who the money was from, who it
9  was coming from.  She said after the payments packages started
10  coming to her house in Massachusetts.  She told you none of the
11  packages were for her.  They didn't have her name.

12         She claimed she didn't know what was inside them.
13  She told you that she worked a lot in her father's construction
14  business, that that required her to travel a great deal.  She
15  didn't know what Kevin Jones was up to when he wasn't with her.
16  She also said something else important.  Unlike the other
17  witnesses, Shayna Colon Acosta or Sam Smart or Rachel Smyden,
18  Kevin Jones was not a fentanyl pill user.  He didn't use.  He
19  wasn't an addict.  This was a business for him.  This was a way
20  to make money.  So the pills sent to him by Davon Beckford
21  aren't for his own use.  They were for distribution to others.
22  You heard that Kevin Jones had a party planning business.  It
23  wasn't too successful during COVID.

24         Davon Beckford had a party planning business, too.
25  Davon Beckford said he financed his business by selling drugs.

1  Mr. Rotteveel asked him on cross examination, Davon, didn't

2  Kevin Jones take you under his wing and try to teach you the

3  party planning business, wasn't he a mentor to you, and Davon

4  Beckford said, yeah, he did.  I asked him on redirect, I said,

5  Davon, how did you finance your party planning business.  He

6  said by selling drugs.  Who taught him that?  Who was his

7  mentor?  Who taught him -- who took him under his wing?  Davon

8  Beckford said, yeah, I sold drugs to finance my business.  You

9  see all the payments.

10        In 70 days, 70 days, Sabrina Cleveland at the

11  direction of Kevin Jones sent $10,825 in 70 days and Kevin

12  Jones always reimbursed her in cash.  70 days, $10,825.  You

13  combine the two accounts, Kevin Jones' own account and the

14  money he directed Sabrina to send and over the course of eight

15  months you have $31,675.  That buys a boat load of fentanyl

16  pills.  Now, we will show you the anatomy of a drug dealer made

17  through the mail.

18        Package one, April 20th of 2021, remember that

19  Beckford Griffin method.  You had to send money first,

20  typically half, send the money upfront.  You can see on April

21  10th and April 14th, April 17th and April 19th there's money

22  sent by Sabrina Cleveland using the Hat Cash App, using the Hat

23  subject line.  She sends money to Davon Beckford.  There's the

24  receipt found in Beckford's phone, the picture of the receipt

25  for that transaction.  Taking the tracking number from that

1  receipt inspector Fetch can track that package.  Here's the

2  number, tracking number.  There's the tracking number down

3  here.

4         You can see that it's sent to 14 Potter Avenue

5  Plainville, Massachusetts.  There's the proof of the mailing of

6  the package.  After the package gets there, boom, more money

7  sent.  Here's the summary.  April 10th to April 19th, $2,300.

8  The package is sent.  The receipt is sent.  After the receipt

9  is sent there's another $700 payment, total payments $3,000.  I

10  asked Davon Beckford, how much would you typically charge for a

11  pill.  He said typically $6, sometimes as low as four,

12  sometimes as high as seven or eight a pill but typically $6.

13  What was your typical amount you sent to Kevin Jones?  He said

14  never less than 500 pills.  Sometimes it's more up to a

15  thousand but never less than 500 pills.  50 pills at $6 a pill,

16  $3,000, boom.  That's called corroboration, ladies and

17  gentlemen.  I will talk about that in a few moments.

18         The package No. 2, April 30th, 2021, money sent

19  upfront by Sabrina, $700 sent with the subject name Hat to

20  Justin Case, Davon Beckford's Cash App number.  Beckford sends

21  the receipt.  There's the picture of the receipt from his

22  phone.  It has got the tracking number.  Inspector Fetch can

23  take that tracking number, and she can tell you a lot about

24  that package.  There's the proof of the package being mailed,

25  Potter Avenue, Plainville, Massachusetts.

1          After the package is mailed, remember the method,

2    more money, half upfront, more later after the package is sent.

3    You see the rest of the money being sent by Sabrina and here's

4    the total.  There's a summary, initial payment, package sent,

5    receipt sent, the package arrives, more money, $4,475.

6          Package 3, May 26, 2021, initial payment made through

7    Sabrina's Cash App account to Justin Case first $250 and then a

8    thousand dollars.  Here's the receipt from Davon Beckford's

9    phone that contains the tracking number.  Here's the receipt

10   from the website -- U.S.P.S. website found in Davon Beckford's

11   phone.  Inspector Fetch takes that tracking number.  There's

12   the package sent to 14 Potter Avenue in Massachusetts.

13   Afterwards more money is sent 1,250 ahead of time.  Package is

14   sent.  1,250 afterwards.  Notice that the initial payment is

15   from Sabrina Cleveland's Cash App account.  After the package

16   arrives the second payment is from Kevin Jones' Cash App

17   account, 1,250 each for a total of $2,500 half sent from

18   Sabrina's account and half sent from Kevin Jones' account.

19          Then we had a question about a hand-to-hand

20   transaction.  Davon Beckford told you in June of 2021 he

21   returned to Pennsylvania from Arizona for a birthday party for

22   a person who went by the name of Hollywood.  He told you that

23   while he was in Wilkes-Barre for the party the reason he came

24   here was for the party -- not at the party -- when he was in

25   Wilkes-Barre for the party he met with Kevin Jones in person

55

1  and he sold him 500 fentanyl pills.  Kevin Jones paid for them

2  by Cash App.

3          June 5th of 2021, $2,000 paid.  Look and see it's

4  early in the -- about 4:55 p.m.  And after midnight on June 6

5  another thousand dollar payment is made from Kevin Jones' Cash

6  App account, $3,000 sent to Davon Beckford by Cash App.  500

7  pills at $6 dollars is $3,000.  That's from Kevin Jones' Cash

8  App to Davon Beckford.  Package four, June 24th, again same

9  process, money sent upfront.  The subject line says it's for a

10 leather jacket.  You know by now it wasn't a leather jacket.

11 Beckford wasn't selling leather jackets.  These were payments

12 for fentanyl pills he told you.  There's the tracking receipt

13 found in Beckford's phone.

14          There's the U. P. S. -- postal service site tracking

15 result.  Taking the tracking numbers from those two documents

16 Lauren Fetch is able to track that package.  There's proof of

17 the mailing of that package to Plainville, Massachusetts.

18 After the package is received, another payment, $2,450.

19 There's the summary.  $4,950 sent by Kevin Jones to Davon

20 Beckford.  Package five, July 24th, same process.  There's the

21 money sent, the proof of the package, here's the receipt.

22 Here's the receipt.  Package sent 7/23.  Recepit sent 7/23.

23 Package arrived 7/24.

24          Package six, a thousand dollars paid up.  Now it's

25 Millionaire Mindset.  Remember Davon Beckford said his Just in

1  Case account got suspended.  He came up with new account name,

2  Millionaire Mindset, a thousand bucks for new speakers.

3  Thousand bucks for new speakers in Arizona?  No, Davon Beckford

4  said that was payment for fentanyl.  The receipt from his phone

5  with the tracking number, the receipt from the postal site, the

6  proof of the mailing of the package following the tracking

7  number and after the package is sent more payment, more

8  payment, and the summary $2,500, total of $2,500 sent.  Package

9  seven, September 15th, the sender is Hat.  $1,250 paid to

10 Millionaire Mindset, Davon Beckford's Cash App account.  Here's

11 the receipt from the phone with the tracking number.  Inspector

12 Fetch follows that tracking number.  There's the package to 6

13 Woodward Street in Wilkes-.Barre after the package is received,

14 more money, 1,250, totaling $2,500.

15          Package eight, October 6, 2021, supposedly for

16 another leather jacket.  No.  Fentanyl pills.  1,250 upfront.

17 The receipt from Davon Beckford's phone.  Taking the tracking

18 number from that receipt inspector Fetch runs down the package.

19 It's sent to Potter Avenue in Massachusetts.  After the package

20 is received, more money, 1,250, to Millionaire Mindset.

21 There's a summary a total of $2,500.

22          Remember the photo from Beckford's phone, M. Brown as

23 in the note found in Beckford's phone alongside Kevin Jones'

24 address.  There's nobody named M. Brown at that address.  That

25 package was for Kevin Jones.  It's a fake name just like all

1  the other fake names on all other packages containing fentanyl.

2  Package nine, October 22nd of 2021, Hat paying Millionaire

3  Mindset $1,250.  Here's the receipt in Beckford's phone with

4  the tracking number.  There's the tracking number from the

5  postal website.  Taking the tracking number inspector Fetch can

6  run down that package.  It's sent to 6 Woodward Street in

7  Wilkes-Barre.  After the package is received, another 750 sent

8  by Hat to Millionaire Mindset.  This package was late.  The

9  package is sent October 22nd.  It doesn't arrive until October

10  25th.  The total payment was $2,000 dollars.

11          Those of you who shop on the internet, if you buy

12  something from Amazon and it says you will get it on Saturday

13  and it doesn't come on Saturday, what do you do?  You go to the

14  site and you check.  You go to your e-mail, and you check.  You

15  check on the status of the package.  Kevin Jones did the same

16  thing when this package was late.  You heard the testimony

17  about I. P. addresses, internet protocol addresses, that this

18  I. P. number tracked that package six times, six times

19  inspector Fetch told you.

20          I think she said the internet I. P. address

21  information was only held for 60 days.  She was able to track

22  that one.  This number beginning with 24 that belongs to

23  PenTeleData.  So they sent a subpoena to PenTeleData.  They

24  said, who does that I. P. address belong to.  The account

25  holder is Kevin Jones, 6 Woodward Street in Wilkes-Barre.

1   That's who is tracking that package.  Why is he concerned that

2   package is late?  Six times he checks between October 22nd and

3   October 23rd.  The scheduled delivery date was October 23rd.

4   It was late.  It didn't arrive until the 25th.  The package was

5   late.  He was worried about it.  That's money that he shelled

6   out for drugs.  That's money to be made by selling drugs, and

7   the package was late.  So he tracked it.  Package ten, last

8   one, November 24th, 2021, 1,250 sent money upfront from Hat to

9   Millionaire Mindset.  There's the receipt from the phone of

10  Davon Beckford.  Taking the tracking number from that receipt

11  inspector Fetch can run down that package.  It is sent to 6

12  Woodward Street in Wilkes-Barre.  After the package arrives

13  more money sent.  A total of 1,750.  That package was also

14  late.  Inspector Fetch was able to tell from the database the

15  very same I. P. number, very same I. P. address that previously

16  tracked the last package is now tracking package No. 10, this

17  number beginning with 24.

18          Again, that I. P. address belongs to PenTeleData.

19  They send a subpoena to PenTeleData tell, and they tell us who

20  was the account holder for that account, Kevin Jones, 6

21  Woodward Street, Wilkes-Barre, Pennsylvania, which is where the

22  package was being sent.  Again, why is he so concerned about

23  that package?  It's late.  That's money that he shelled out for

24  drugs.  That's money to be made by selling drugs.  Where is my

25  package?  Where is it?  I'm worried about it.

1          So we just showed you ten packages sent through the

2    mail to Kevin Jones known as Hat by Davon Beckford.  The

3    minimum was 500 pills.  Then we had the hand-to-hand

4    transaction in Wilkes-Barre when Davon Beckford returned from a

5    party, which was another 500 pills.  Each distribution from

6    Beckford to Jones was at least 500 pills.  Remember that ten to

7    one ratio that I talked about with the lab reports of 200

8    pills, right, was 20 grams, 5,500 pills would be 550 grams of

9    fentanyl, which is more than 400 grams, which is what you're

10   being asked in the interrogatory.  And that's on the low end.

11   Sometimes the packages contained more.  Kevin Jones possessed

12   fentanyl pills with the intent to distribute, ten packages and

13   one hand to hand containing a minimum of 5,500 pills over the

14   course of eight months.

15          On the low end that's 5,500 pills, on the high end if

16   it's a thousand it's 10,000 pills or more.  $31,675 paid over

17   those eight months for those packages plus the hand to hand.

18   Shane Yelland, he's been doing narcotics cases for 20 years,

19   been in law enforcement since 2005.  We qualified him as an

20   expert in narcotics trafficking.  He said his opinion based on

21   his training and his experience gained from the streets of

22   northeastern Pennsylvania doing drug trafficking investigations

23   all these years that that amount of pills and that amount of

24   money spent for those pills that's -- those were pills

25   possessed for distribution to others.

1    He possessed those pills with intent to distribute

2  them.  There's no evidence whatsoever in this case that Kevin

3  Jones was an addict or a user.  Every single time Davon

4  Beckford and Tyla Griffin said, every single time I went to the

5  post office in Arizona I mailed a package it contained fentanyl

6  pills.  Rachel Smyden, Samantha Smart, Shayna Colon Acosta said

7  every time they received a package from Arizona it contained

8  fentanyl pills every single time.  We told you from the

9  beginning when Jerry Donahue got up in his opening statement he

10 said when you get on a pirate ship you're going to find a few

11 pirates and when you're investigate drug trafficking cases

12 you're going to find people who sell drugs, you're going to

13 find people who use drugs and you're going to find people who

14 do both.

15    There were at least six witnesses who testified in

16 this case who have been charged as a result of this

17 investigation.  We showed you the full range, right.  We showed

18 you people like Rachel Smyden and Samantha Smart and Shayna

19 Colon Acosta who all took different paths but became addicts,

20 pill users.  One thing they all had in common they purchased

21 fentanyl pills from someone connected to this conspiracy

22 including Kevin Jones.  Rachel Smyden told she purchased from

23 him every other day in 2020, and Samantha Smart told you she

24 purchased from him at least three times.

25    We showed you people like Davon Beckford and Tyla

61

1  Griffin who were selling fentanyl pills from Arizona and making
2  money doing it.  You don't have to like them.  You shouldn't
3  like Davon Beckford or Tyla Griffin.  They were dealing drugs.
4  They were selling fentanyl pills.  For that matter you don't
5  have to like any of these people.  Rachel Smyden, Samantha
6  smart, Shayna Colon Acosta, you don't have to like them.  But
7  ask yourselves is their testimony credible?  Does it have what
8  is called a ring of truth?  Is it corroborated by the other
9  evidence, the documents, the postal records, the -- the stuff
10 that is in the phone?  That's why we went through all those
11 documents and all those receipts.

12         I know it wasn't the most riveting testimony, but it
13 was necessary.  Ask yourselves this -- you know, it's one thing
14 to get up on the stand and say, hey, I didn't do nothing, I'm
15 not the guilty party here, it's easy to point the finger at
16 Kevin Jones and say he's the criminal, he did it, I didn't do
17 nothing.  That's not what they said.  It's quite another thing
18 to take the stand and say, yeah, I sold fentanyl, I'm guilty.
19 I participated in this drug trafficking conspiracy.  I pled
20 guilty to participating in this drug trafficking conspiracy.
21 Yeah, I did it.  You know what, Kevin Jones did it, too.  Kevin
22 Jones was a member of this conspiracy.  He was part of this,
23 too.  That's what they are telling you.

24         It's not, I didn't do it, he did it all.  It's we all
25 did it.  I did it, yes, I did.  You know what, he was part of

1  it, too.  He was part of the conspiracy.  February of 2022
2  Davon Beckford is arrested at the airport in Avoca.  A month
3  later after obtaining a lawyer he sits down with investigators.
4  He gives them his phone, which has all of this information in
5  it, and he sits down, and he tells them his network of dealers.
6  Yeah, I was sending package to Rahmel Wigfall, sending packages
7  to Akee Miller, known as Mitch, and I was sending packages to
8  Kevin Jones, this defendant known as Hat, and other people as
9  well and it was for further distribution.  It's all about
10  making money selling pills.  That's a conspiracy.  That
11  testimony is supported by the evidence.  The evidence in
12  Beckford's phone, the tracking receipts, the text messages, the
13  postal records, databases, the information that inspector Fetch
14  painstakingly put together, Cash App records and all the money
15  and the testimony of all the other witnesses, Rachel Smyden,
16  Samantha Smart, Shayna Colon Acosta, people who were receiving
17  pills in the mail through Davon Beckford and paying for it by
18  Cash App, $31,675 that's what Jones sent to Beckford.  That
19  buys a boat load of fentanyl pills.  That's a conspiracy,
20  ladies and gentlemen, and Kevin Jones was part of that
21  conspiracy and the evidence shows it.  We ask to find you this
22  defendant guilty of conspiracy to distribute and possess with
23  intent to distribute fentanyl pills.  Thank you.
24           THE COURT:  All right.  Thank you, Mr. O'Hara.  We're
25  going to take a five minute break.  It has been longer than

63

1  expected.  Now, keep an open mind.  You haven't heard the other

2  closing or rebuttal and that end law stuff.  So no discussion

3  or conversation among yourselves yet.  And so we will take a

4  quick bathroom break and come back in about five minutes, all

5  right.

6              (A brief recess was taken.)

7              THE COURT:  Welcome back.  Mr. Rotteveel.

8              MR. ROTTEVEEL:  Thank you.  Good morning, ladies and

9  gentlemen.  I also would like to thank you for taking the time

10  to listen to this case.  The gleaning it over, the kind of

11  under the radar making sure everyone is paying attention, and

12  what I have noticed is that everyone is paying attention.  We

13  do appreciate that.  It's tough to do.

14              I promise my closing argument will not be as long as

15  Mr. O'Hara's closing argument.  I would like to get right to

16  the point.  The government in their closing they did a really,

17  really good job.  They proved the case beyond a reasonable

18  doubt against Davon Beckford, against Tyla Griffin, against

19  Akee Miller, against a Krysten Shumway where they set up these

20  controlled buys with the oversight of the F.B.I. and

21  Wilkes-Barre police.

22              They were tracking everything and set it up.  They

23  were able to provide buy money in the Cash App to send it out

24  to Mr. Beckford and in return set up a place where the drugs

25  would be delivered at an abandoned house in Wilkes-Barre.  They

1  were able to follow the communications between the two.  They

2  were able to recover the drugs.  They were able to send the

3  drugs to the lab.  The lab was able to test these drugs.  These

4  drugs are, in fact, fentanyl, and that can all be attributed to

5  the case that they can prove beyond a reasonable doubt against

6  Mr. Beckford, against Tyla Griffin, against Akee Miller against

7  Mr. Burns.  The puzzle against Kevin Jones is incomplete.  The

8  you judge went over a series of instructions with you.  It is a

9  lot to take in.  It took a good hour to go over those

10  instructions, and that's what happens.  The one instruction I

11  want you to focus is on my client's absolute right not to take

12  the stand.  I told you in my opening statement, you know, we

13  don't have to do anything.  It comes to we would do stuff.  I

14  would cross-examine their witnesses.  I would test their

15  credibility.

16          My client does not have to take the stand.  That is a

17  constitutional right he shares with you and everyone else in

18  this courtroom and everyone else is who is a United States

19  citizen.  He does not have to take the stand.  He has an

20  absolute right to remain silent.  The presumption of innocence

21  again, he starts with a clean slate.  He's just as innocent as

22  everyone in this room, and the burden rests on the government

23  to prove his case beyond a reasonable doubt, our highest legal

24  standard.  It's their responsibility.  It's their job to cross

25  their T.s and dot their I.s because if they are going to bring

1    an action like this, they got to bring it right.

2         They cannot leave you guessing.  You cannot go back

3    there and assume something.  You can't guess.  If they leave

4    you with guesses and questions you cannot answer, you cannot

5    answer today, you cannot answer a week from now, you cannot

6    answer a year from now when you're watching a movie where a

7    jury is present in the movie, you're, like, I remember when I

8    was on jury duty, I still have questions about that.  If you

9    have questions, they have not proven their case beyond a

10   reasonable doubt.  Questions equal doubt.  If you have to stop

11   and think about it, that is doubt.  You cannot convict by law.

12        So where are your doubts?  There were no drugs

13   recovered associated with my client like they were in the first

14   four controlled buys that involve Mr. Beckford, that involved

15   Tyla Griffin and involved Shane Burns and Akee Miller.  Those

16   were successful drug investigations proven beyond a reasonable

17   doubt.  And in this case no drugs, no crime.  They need to

18   recover those pills.  Why didn't the police do more?  Could

19   they not have?

20        Do you remember agent Yelland -- detective Yelland

21   testifying, oh, we didn't search his house because we didn't

22   have probable cause to search his house.  You mean to tell me

23   packages of fentanyl being allegedly delivered to a specific

24   location associated with my client and they can't get a warrant

25   to search the house?  Do you really think Sabrina Cleveland

1  would say, no, you can't search my house?  Absolutely she would

2  consent to search the house.  They just didn't do it.  They

3  didn't search his vehicles.  They didn't search his other

4  address.

5          So instead, what do they do, they rely on Samantha

6  smart, Tyla Griffin, Rachel Smyden, Shayna Acosta Colon,

7  Sabrina Cleveland and Davon Beckford.  They know their puzzle

8  is incomplete, so they take these broken puzzle pieces and try

9  to make it complete.  That's all they're trying to do.  Rachel

10 Smyden, how many times is she going to get probation in her

11 life?  Retail theft, she gets probation.  Felony drug

12 distribution charges, six months' probation, false I. D. to law

13 enforcement -- she's basically lied to a cop -- probation.  New

14 federal charges, she's out.  She's clean.  She's sober.  And

15 she's got one thing waiting for her at home that any mother and

16 father would be so desperate to do to stay with that child.

17 They always say the child needs a mother.  In this case mother

18 needs the child.  She will do whatever it takes to stay with

19 that child.  I hardly blame her.  I'm a father.  I would do

20 anything for my children.

21         She claims to have purchased drugs off my client.

22 Recently within the last six months she comes to the police --

23 she comes to law enforcement.  She says, oh, I bought drugs off

24 Kevin.  I wonder how that conversation went.  Is she asking the

25 F.B.I. agent, oh, I about bought drugs off Kevin in 2019, 2020,

1  does that help me out?  It's not the question does this help

2  the government's case out against Kevin Jones.  Her question

3  is, does it help me out.  She knows what she's doing.  She

4  knows how to get on probation.  She will do whatever it takes

5  especially with that new born baby.  I hope to God she remains

6  sober.

7          I've been in this business way too long to see too

8  many people the likes of Rachel Smyden who are clean, sober

9  here testifying today.  Where will she be a year from now?  I

10  hope in the same spot.  I hope incarcerated.  I hope sober.

11  Hopefully having a child will change that direction for her.

12  Samantha Smart, she promised to cooperate with law enforcement.

13  She didn't seem very reluctant to take responsibility for her

14  actions.  She seemed reluctant to cooperate, too.  Anyone who

15  is a friend she wasn't naming until pressed.

16          She saw what was at stake when she realizes she

17  wasn't cooperating, her ticket home, her freedom.  Two weeks

18  prior to trial-- it's amazing a lot of information comes up two

19  weeks prior to trial of Kevin Jones.  I bought drugs off Kevin

20  on three occasions but more than that but I remember three in

21  2020, 2019 -- 2019 into 2020.  She has a history of retail

22  theft and again lying to the police by presenting a false

23  identification to them, trying conceal who she was.

24          Why does someone try to conceal who they are to law

25  enforcement?  Because they know they're guilty.  They know

1  they're wanted, and they don't want to be caught.  They don't

2  want to go to jail.  Tyla Griffin, she has goals.  I asked her

3  flat out, what is your goal here.  It's to go home, right, to

4  get out of jail.  Yeah.  Absolutely it is.  She has children.

5  She'll do anything to reunite with those children.  Interview

6  No. 1 in February 2022, no mention of Kevin.  Understandably

7  she was just arrested that day, probably a lot going on in her

8  mind.  Interview No. 2, March 2022, more extensive interview

9  with the F.B.I. she goes over customers.  She names all of her

10  customers.  She names all of Davon Beckford's customers.  And

11  at no point in time does she name Kevin Jones as a customer.

12        Interview No. 3, another opportunity were three

13  individuals' names are brought up during the course of the

14  interview, not Kevin Jones.  Interview No. 4, again,

15  conveniently two weeks prior to trial, oh, I remember Kevin,

16  yes, Davon Beckford mentioned him as being a customer back in,

17  you know, when we were together no later than 2020 even though

18  any transactions associated with my client don't occur until

19  2021.  Of course, her criminal history is riddled with retail

20  theft, access device fraud, robbery and again lying to the

21  police, false identification to law enforcement.

22        Sabrina Cleveland, should she have even pled guilty?

23  She testified she saw no pills, never met Davon Beckford,

24  didn't know what were in any packages.  Do people admit guilt

25  to something they didn't do?  Did do they feel forced and

1  strong armed by the government to do this because they don't

2  want to risk it or they want to put it behind them as she so

3  put it?  She also testified that, you know, Kevin did own a

4  business.  It's not a business I'll run, but it's a business

5  he's interested in.  It's a business she was interested in and

6  so far -- so much so as she kept its bookkeeping, so much so

7  she actually invested money into it.  He needed money to bring

8  a performer that she witnessed that actually did happen.  He

9  worked.  He worked at bars.  He worked at clubs.  He worked

10  late hours, but he worked and he showed up the next day and he

11  treated her right.  He treated her children, his stepchildren

12  right.  Shayna Acosta Colon, the saddest story I heard here

13  today besides the death of the individual where this all

14  started.

15         Here's someone who trusts their doctor and say, hey,

16  here's some pills and so it relieve the pain of your facial

17  injury.  And these stories are a tale is old as time.  These

18  are sad.  This is someone who is young, never been in trouble

19  before, trust their doctor, says, you know, this will be all

20  right, you're going to be fine, this will relieve the pain.  We

21  all heard the stories about how the pharmaceutical companies,

22  you know, sending out these pills, advertising them as

23  non-addictive.  It's interesting how they're not prosecuted.

24         Then Davon Beckford doesn't know her, but she knows

25  Davon Beckford.  It's one of many victims Davon Beckford does

1  not know or does not care about.  Oh, and what's key here is

2  the most honest out of all of them other than maybe Sabrina

3  Cleveland got up here and said, no, I never purchased drugs off

4  Kevin Jones -- she easily could have gotten up here and lied

5  and said, yeah, does this help your case, government, does this

6  help my case, government.  No.  She told the truth.  And then

7  the No. 1 witness, the star witness who this all boils down to

8  is Davon Beckford facing life imprisonment.  Well, he was until

9  he cut a deal with the government.  It's written in the plea

10 agreement.  He was hustling drugs.  Now he's hustling for his

11 liberty.  He's working to save 25 years of his life maybe even

12 more depending on how good he does.  He even admitted that he

13 needs Kevin Jones to be convicted in order to get out of jail.

14 This is someone who has a checkered past.  This is someone who

15 has sold drugs before.

16          He basically lived his late teenage years through his

17 late 20s, the ten-year period of just committing crimes not

18 giving a damn about anybody, not caring about anyone's life.

19 He cared about his vacations.  He cared about his cars.  He is

20 America's worst nightmare.  Other individuals you can call them

21 pirates or scoundrels.  This is something different.  This is

22 America's most biggest nightmare.  He's in bed with the federal

23 government working hand in hand.  So is the government trying

24 to present a case that he's guilty by association?  I've seen

25 him working at a bar before.  Samantha Smart, Tyla Griffin, I

1  saw him on a -- I heard his name through Davon Beckford and saw

2  him on a Face Time video once.  Rachel Smyden, I have seen him

3  working at a bar before.  One name I left off there was Shayna

4  Acosta Colon, yeah, he was managing Donohue's bar, he was

5  working a nine to five, something honorable, something okay.

6  He had this other business he tried to set up to supplement his

7  income.  He was learning the bar and club industry and wanted

8  something.  Davon Beckford even agreed, well, yeah, I tried

9  setting up the same thing on the west coast.  Kevin was

10 successful with it.  He was getting somewhere with it.  Yeah,

11 did it struggle during COVID, what bar, club, restaurant

12 struggle during COVID?  Again, back to the lack of evidence, no

13 drugs, no drugs, no drugs, no testing -- any lab testing that

14 the government presented here today dealt with four controlled

15 buys concerning other individuals, no controlled buys

16 concerning my client, no searching of his residence looking for

17 these U.S. priority mails or the infamous little blue pill with

18 the M. 30.  Nothing like that was done to help you answer your

19 questions during your deliberations.

20         And how about the agreements with the government?

21 Rachel Smyden signed a cooperation agreement with the

22 government.  She's facing up to 20 years in prison.  She's

23 clean and sober for now.  Fingers crossed.  Has a one year old

24 at home.  Tyla Griffin is facing life in prison.  She's also

25 facing a ten-year mandatory sentence, and with that cooperation

1  agreement she can get less than that ten years.  Samantha Smart

2  is facing 20 years imprisonment, signed an agreement with the

3  government.  Davon Beckford is facing life in prison for

4  killing another, signed an agreement with the government.  They

5  shook hands on this.

6        Everyone signed off on it, and he's facing a 20-year

7  mandatory minimum, and he could get less than that.  It's

8  amazing how this works.  It's disappointing how this works.  I

9  think I've already talked about how convenient some of this

10  evidence is, how it all comes to light two weeks prior to a

11  trial concerning Kevin Jones.  I know Kevin.  Yep, scouts

12  honor, you can trust me, I never lied to a cop before.  You

13  know the question is, you know, are they sitting with the

14  F.B.I. agents during these interviews about two weeks ago

15  saying, does this help your case to convict this bad guy

16  because I changed my ways, and I found God and, you know, this

17  is the path of righteousness I'm on, or is the question they're

18  answering subconsciously in their head, how is this going to

19  help me, is this going to make it better for me?

20        Ladies and gentlemen, a lot of what was presented

21  here today is something called government fluff.  They have a

22  case.  They have a case with holes in it.  They have a case

23  with missing pieces in it.  So they bring out of the woodworks

24  the likes of a Tyla Griffin, a Rachel Smyden, a Samantha Smart,

25  and they try to balance it out with the likes of Shayna Acosta

73

1  Colon and say, look, it's not everybody.  There's so many holes
2  to the pieces of their puzzle, so many puzzle pieces missing.
3  Now, they are stealing from other puzzles and trying to put it
4  together.

5          It won't work because of their burden, because of the
6  responsibility to you to answer all your questions so when you
7  go back there you discuss this case and you deliberate you can
8  make a right answer.  That's their job.  You should be able to
9  go back there without question and be, like, it was a
10  controlled buy, put it together.  They sent money.  They
11  collected drugs.  Here we go.  They don't have that here.
12  Ladies and gentlemen, if you're back there and if you have
13  questions, which you should, those questions are doubt.

14          If you have doubt, you have questions, you cannot
15  convict.  It's really that simple.  You can put the onus and
16  responsibility on the government for failing to investigate, or
17  you can put the onus of responsibility on these individuals who
18  will lie for anything.  I mean, they're not lying to buy a nice
19  car or, you know, to get a job or, you know, I don't know --
20  for a million dollars.  They're lying to get out of jail.
21  You're locked up and incarcerated and you foresee the next ten
22  years of your life, next 20 years of your life where you're
23  going to be or who you're going to be without, you will say
24  anything.  Anything.  The government has not proven their case
25  beyond a reasonable doubt, and as such you should find my

74

1  client not guilty.  Thank you.

2          THE COURT:  Thank you, Mr. Rotteveel.  Mr. O'Hara?

3          MR. O'HARA:  Ladies and gentlemen, the government is

4  given a few minutes to respond to the arguments of defense

5  counsel.  It's the old liar, liar, pants on fire defense.

6  Everybody is lying even though they came here and took an oath

7  to tell the truth.  We went through the plea agreements of each

8  of these individuals, and it's not the most riveting testimony

9  either, but there was a provision in everybody's plea agreement

10 regarding perjury.  If you lie, if you commit perjury or false

11 statement or swearing -- false swearing, you can be prosecuted.

12         The penalties in this case for the people who

13 testify, it's not up to me or MR. DONAHUE.  They're not up to

14 you.  They're up to the judge.  If it's not Judge Mannion, it's

15 Judge Mariani down the hall because some of the defendants pled

16 guilty before him.  The judge takes many factors into

17 consideration.  Does anybody think Davon Beckford is getting

18 out of jail sometime soon?  His pills killed somebody.  He's

19 looking at 20 to life.  He was arrested in February of 2022.  A

20 month later after obtaining a lawyer he sits down and

21 cooperates and gives up his entire distribution network before,

22 what, a year, year and a half prior to trial.  Is his testimony

23 corroborated?

24         That means is it supported by the other evidence?

25 The Cash App, what are the packages for?  What was the money

1  for?  $31,000 we didn't hear a word about that.  What else was
2  in the packages?  Toys, cosmetics, fentanyl pills.  You know,
3  if people were going to take the stand and lie, I would hope to
4  God they come up with a better story than that.  You know,
5  addicts know one thing.  They know who they get their drugs
6  from because when they're sick, when they're dope sick and they
7  need those pills and they can't find a supplier, they'll get
8  them from anywhere.  Samantha Smart who is addict said, yeah, I
9  got pills from him three times I remember, probably more but
10  three times I remember.  Rachel Smyden said, yeah, I got from
11  him every other day until I found out about Tyla Griffin in
12  Arizona and I can get them much, much cheaper through the mail.

13        If they were going to lie, wouldn't they come up with
14  a better lie than that?  Come on, common sense.  Use your
15  common sense.  When you talk about reasonable doubt, the
16  emphasis is the word reasonable.  You need to use your ability
17  to reason to put two and two together.  If two plus two equals
18  four, you must be willing to say so.  Davon Beckford was out of
19  business when he got arrested at the Avoca airport in February
20  of 2022.  It makes no sense -- he's not sending any more pills.
21  He's in jail.

22        It makes no sense a year later in February of 2023 to
23  try to get a search warrant for anybody's residence.  What are
24  you going to say to the judge?  A year ago?  A year ago Davon
25  Beckford told us you sold him drugs.  Do you expect those drugs

1  to be at anybody's house?  Do you expect those drugs to be in

2  anybody's car?  Were any drugs found on anyone in this case?

3  The answer is no.  Missing pieces of a puzzle, I think not.

4  Where are the drugs?  The drugs were in the hands of the

5  customers of this drug trafficking conspiracy.  Where are the

6  drugs?  We bought the drugs.  We know what was in the packages.

7  You know what was in them, too.  Every single time, every

8  package Kevin Jones got contained fentanyl pills, too.  There's

9  no lie about that, not beyond a reasonable doubt, it's beyond a

10  shadow of a doubt.  We will ask you to convict him.  Thank you.

11          THE COURT:  Thank you, Mr. O'Hara.  All right.

12  Ladies and gentlemen, now let me explain to you some things

13  about your deliberations in the jury room and your possible

14  verdicts.  First, the first thing you should do in the jury

15  room is to choose someone to be your foreperson.  The

16  foreperson will speak for the jury here in court.  He or she

17  will also preside over your discussions.  However, the views

18  and the vote of the foreperson are entitled to no greater

19  weight than those of any other juror.  Second, I want to remind

20  you that your verdict, whatever it is, guilty or not guilty,

21  must be unanimous.  To find the defendant guilty of the

22  offense, every one of you must agree that the government has

23  overcome the presumption of innocence with evidence that proves

24  each element of the offense beyond a reasonable doubt.  To find

25  a defendant not guilty, every one of you must agree that the

1 government has failed to convince you beyond a reasonable

2 doubt.  Third, if you decide that the government has proved the

3 defendant guilty, then it will be my responsibility to decide

4 what the appropriate punishment is.  You should never consider

5 possible punishment in reaching your verdict.  Fourth, as I

6 have said before, your verdict must be based only on the

7 evidence received in this case and the law that I have given

8 you.

9        You should not take anything I said or did during

10 this trial as indicating what I think your verdict is or what I

11 think the evidence shows.  What the verdict should be is the

12 exclusive responsibility of the jury.  Fifth, now that all of

13 the evidence is in, you are free to talk in the jury room about

14 the case.  In fact, it is your duty to talk with each other

15 about the evidence and to make every reasonable effort you can

16 to reach a unanimous agreement.  Talk with each other.  Listen

17 carefully and respectfully to the views of others.  Keep an

18 open mind.  Listen to what your fellow jurors have to say.  Do

19 not hesitate to change your mind if you are convinced that

20 other jurors are correct and that your original position was

21 wrong.

22        But do not ever change your mind just because other

23 jurors see it differently or just to get the case the case

24 other with.  In the end your vote must be exactly that, your

25 own vote.  It's important for you to reach a unanimous

78

1  agreement but only if you can do so honestly and in good

2  conscience.   Listen carefully to what the other jurors have to

3  say and then decide for yourself whether the government has

4  proved the defendant guilty beyond a reasonable doubt.   Now, no

5  one will be allowed to hear your discussions in the jury room.

6  No record will be made of what you say.   You should all feel

7  free to speak your minds in that jury room.   Remember if you

8  elected to take notes during the trial, your notes should only

9  be used as memory aids.

10         You should not give your notes greater weight than

11  your independent recollection of the evidence.   You should rely

12  upon your own independent recollection of the evidence or lack

13  of evidence, and you should not be unduly influenced by the

14  notes of other jurors.   Notes are not entitled to any more

15  weight than memory and impression of each juror.

16         Six, once you start your deliberations, do not talk,

17  communicate with or provide any information about this case by

18  any means to the court officers, to me or anyone else except

19  each other.   During your deliberations you may not use your

20  electronic devices.   Many judges take your phones during

21  deliberations.   I don't do that.   I think you hopefully

22  understand the gravity of what you're doing.   Please do not use

23  your phones including using any website or anything related to

24  the electronic devices.   You may not use these electronic

25  devices to communicate about the case because it's important

1  that you decide the case based solely on the evidence presented

2  within the four walls of this courtroom.  Information on the

3  internet or available through social media might be wrong,

4  incomplete and inaccurate.  You're only permitted to discuss

5  the case with your fellow jurors during deliberations because

6  they have seen and heard the same evidence that you have.  In

7  our judicial system, it is vitally important that you are not

8  influenced by anything or anyone outside of the courtroom.

9         Otherwise your decision may be based upon information

10  only known by you and not by your fellow jurors or the parties

11  in this case.  This would unfairly and adversely impact the

12  judicial process.  Seventh, if you have any questions or

13  messages, your foreperson should write them down on a piece of

14  paper, sign it and give it the court officer who will be

15  outside who will then give it to me.  I will first -- it should

16  always be in the form of a question.  I will first ask the

17  lawyers -- we will sit down and talk about it and make a

18  determination how we will respond to any questions.  In the

19  meantime if possible, continue your deliberations on some other

20  subject matter in the case.

21         One more thing about messages, do not ever write down

22  or tell anyone how you or anyone else voted.  That should stay

23  secret until you have finished your deliberations.  So if you

24  have occasion to communicate with the Court while you are

25  deliberating, do not disclose the number of jurors who have

1   voted to convict or acquit on the indictment.  As a final

2   matter with respect to deliberations, I'm going to send back to

3   you a copy of the instructions.  They are marked as Court

4   Exhibit No. 2.  You will be able to look at them or any of them

5   that you wish during your deliberations.  A verdict form has

6   also been prepared in the case.  It is marked Court Exhibit No.

7   1.  Take this form with you in the jury room.  When you have

8   reached your unanimous verdict, the foreperson should write the

9   verdict on form, date it and sign it and notify us by knocking

10  on the door, and the court officer will indicate that you have

11  said you have a verdict in the case.  If you decide the

12  government has proved the defendant guilty of the offenses

13  charged beyond a reasonable doubt, say so by having your

14  foreperson mark the appropriate form on the verdict slip.  If

15  you decide the government has not proved the defendant guilty

16  of the offense charged beyond a reasonable doubt, say so by

17  having the foreperson mark that appropriate location on the

18  verdict slip.

19          Now, finally in the jury room is what is called the

20  JERS system.  It's a big T.V.  When you are taken to the jury

21  room to deliberate, you will be able to use that system to view

22  the exhibits entered in the case.  It is a 50 inch T.V. screen,

23  and next to it there's a smaller touch screen tablet.  On the

24  bottom right-hand side there's a button that says menu

25  exhibits.  Push that button.  It will bring up the menu of

1  exhibits.  When it does that, the large screen will show the

2  exhibits entered in the case.  If you want to see an exhibit,

3  touch the large screen and it will come up.  You can scroll the

4  exhibit like you can on your iPhone or iPad to go up or down as

5  you want to.  When you have finished with an exhibit at the

6  bottom there's -- touch the menu.  On the menu there's a close

7  exhibit.  Close the exhibit.  You can then push back, bring up

8  the rest of the exhibits, and you can see anything else that

9  you want in the case.  All right.  Your lunch is -- we have the

10  alternates.  So your lunch is in there.  These closing

11  instructions together with those instructions on the JERS

12  system are included at the back of the jury charge, all right.

13          So all of that being said, we will leave you to

14  deliberate.  When you go back, you can have your lunch and then

15  start.  You can start and have your lunch or you can eat your

16  lunch while you're deliberating.  Whatever you want to do is

17  completely up to you.  All right.  That all being said, we will

18  leave you to deliberate.

19          When we went through the exhibits all exhibits were

20  admitted except for No. 15.

21          MR. O'HARA:  C. V.

22          THE COURT:  That's only exhibit that I believe was

23  not admitted.  Everybody is in agreement to that?

24          MR. ROTTEVEEL:  Yes, Judge, yeah.

25          MR. O'HARA:  Yes, Your Honor.

1          THE COURT:  Okay.  All right.  I'm going to spend a

2    couple minutes with the alternates, and then I'm going to

3    discharge the alternates, all right.  Anyone have any objection

4    to that?

5          MR. ROTTEVEEL:  No, Your Honor.

6          MR. O'HARA:  Everybody feeling good, Your Honor?

7          THE COURT:  I think so.  Before we bring the jurors

8    in -- so the jury has sent back a note, which I have marked as

9    Court Exhibit No. 3.  I have discussed with counsel the note

10   reads, what if we cannot come to a unanimous verdict, question

11   mark.  And I would note that apparently that began with them

12   knocking on the door and saying to the court officer that what

13   if we can't come to unanimous verdict, which, of course, is not

14   in compliance with what I have told them is the method by which

15   they are to communicate with the Court.  It's to be in writing

16   in the form of a question and signed by the foreperson of the

17   jury.

18         They were told they needed to do that and resulted in

19   a note I just mentioned.  Well, it's normally my practice with

20   counsel to discuss whatever a question is and send back a

21   written response or bring the jurors back in to give a

22   different response.  In this case, it appears in my discussions

23   with counsel that it would be appropriate to bring them back

24   in, and I am going to read to them part of the fifth, sixth and

25   seventh enumerated paragraphs in the final aspect of the

83

1    charge.  That is what I was calling those housekeeping

2    instructions that -- that's from page 77, 78, 79 and 81 and 82

3    from those final housekeeping instructions as I call them that

4    it describes for the jurors how to proceed with their

5    deliberations.

6            I also intend to identify for them that they have

7    been out for 55 minutes including lunch which was sent and that

8    is not a sufficient time for them to review a multi-day trial.

9    All of that being said, my understanding that's acceptable to

10   counsel.  Is that correct?

11           MR. ROTTEVEEL:  It is, Judge.

12           MR. O'HARA:  It is, Your Honor.

13           THE COURT:  All right.  You can bring them back in.

14   Ladies and gentlemen of the jury, initially it appears that

15   there was a knock on the door and a verbal communication with

16   the court security officer.  You may not have remembered, but

17   in my directions I indicated to you any request from the jury

18   should only be in writing signed and dated by the foreperson.

19   There is no oral communication that occurred between you and

20   anyone in the courtroom including me, and so that's No. 1.  And

21   I'll read through that instruction again.

22           Secondly, this is a multi-day case for less than 55

23   minutes and lunch included when you came back and indicated

24   that you are unable to reach a unanimous verdict.  This is a

25   very insufficient period of time to review the evidence in the

1  case.  You have all day today to review the evidence in the

2  case and beyond that if necessary.  I want to read those final

3  instructions, and you can find them on pages 77 through 82 the

4  parts I'm going to read in that charge that I gave you a

5  written copy of.  Starting with the fifth section, now that all

6  of the evidence in, you are free to talk about the case in the

7  jury room.  In fact, it is your duty to talk about the case

8  with each other and about the evidence and to make every

9  reasonable effort you can to reach a unanimous agreement.  Talk

10  with each other.  Listen carefully and respectfully to each

11  other's views, and keep an open mind as you listen to what your

12  fellow jurors have to say.

13        Do not hesitate to change your mind if you are

14  convinced that other jurors are right and your original

15  position is wrong, but do not ever change your mind just

16  because other jurors think differently or just to get the case

17  over with.  In the end your vote must be exactly that, your own

18  vote.  It is important for you to reach a unanimous agreement

19  but only if you can do so honestly and in good conscience.

20  Listen carefully to what the other jurors have to say, and then

21  decide for yourself if the government has proved the defendant

22  guilty beyond a reasonable doubt.

23        No one will be allowed to hear your discussions in

24  the jury room, and no record will be made of what you say.  You

25  should all feel free to speak your minds.  Sixth, once you

85

1  start deliberating, do not talk, communicate with or provide

2  any information about this case by any means to the Court

3  officials or to me or to anyone else except each other.  If you

4  have questions or messages, your foreperson should write them

5  down on a piece of paper, sign them and then give them to the

6  court official who would then give it to me.  I will first talk

7  with the lawyers about what you have asked, and I will respond

8  as soon as I can.  In the meantime, if possible continue your

9  deliberations on some other subject.  One more thing about

10  messages.  Do not ever write down or tell anyone how you or

11  anyone else voted.

12         They should -- that should remain secret until you

13  have finished your deliberations.  If you have occasion to

14  communicate with the Court while you are deliberating, do not

15  disclose the number of jurors who have voted to convict or

16  acquit of any of the offenses.  All right.  That being said,

17  we're going to send you back to continue your deliberations in

18  the case.  Any objection?

19         MR. ROTTEVEEL:  No.

20         MR. O'HARA:  No.

21         THE COURT:  Obviously 55 minutes is not enough for a

22  jury to decide the case.  That's never occurred before I am

23  aware of.  But we want them to go through the evidence.  That

24  being said, we have your cell phones.  You're free to go until

25  we come back and hear something different or another question.

86

1   All right.

2           We will mark the second note as Exhibit No. 4.  And

3   it reads, can we get a further explanation on, quote,

4   conspiracy to distribute and possess with intent to distribute

5   a controlled substance, end quote -- then a plus sign as an and

6   -- also how to determine an amount whether it is personal use

7   or intent to distribute, question mark.  It is dated today and

8   signed by the foreperson.  So after discussions with counsel,

9   what we will do is read to them if we can pages 41 through 66

10  of the charge which are the pages that discuss the definitions

11  of conspiracy and then the underlying facts of possession with

12  intent to distribute and distribution of a controlled

13  substance.  That's agreeable to counsel?

14          MR. ROTTEVEEL:  It is, Judge.

15          MR. O'HARA:  It is, Your Honor.

16          THE COURT:  Welcome back.  There's a question from

17  the jurors that reads as follows:  Can we get a further

18  explanation on, quote, conspiracy to distribute and possess

19  with intent to distribute a controlled substance, end of quote,

20  the plus sign meaning and, also how to determine an amount

21  whether it is personal use or intent to distribute, question

22  mark, dated today and signed by the foreperson.  I'll mark that

23  as Court Exhibit No. 4.  The charge can be complicated at

24  times.

25          So there are two different things.  I'm going to read

1  you again the charge related to that.  There's a conspiracy,

2  which is the count that's charged here.  The underlying

3  substantive offense is possession with intent to distribute or

4  distribution of a controlled substance.  The defendant is not

5  charged with the second offense, the substantive offense of

6  possessing with intent to distribute or distribution of a

7  controlled substance.  He's charged with a conspiracy to do

8  that act.  So you need to know the elements of conspiracy, and

9  then you need to know the elements of the substantive act to

10  see if he conspired to do that.  All right.  So it's in the

11  charge that I had given you pages 41 to 66.  We will go through

12  them again.

13        So count one, conspiracy to distribute controlled

14  substances.  Count one of the indictment charges that from in

15  or about January of 2020, the exact date being unknown to on or

16  about the date of the indictment, February 14th, 2023, within

17  the Middle District of Pennsylvania and elsewhere, the

18  defendant, Kevin Jones, agreed or conspired with one or more

19  persons to distribute and possess with intent to distribute

20  fentanyl, which is a controlled substance.  It is a federal

21  crime for two or more persons to agree or conspire to commit an

22  offense against the United States even if they never actually

23  achieve their objective.

24        A conspiracy is a kind of criminal partnership.  In

25  order for you to find the defendant guilty of conspiracy to

distribute and possess with intent to distribute a controlled

substance, you must find that the government proved beyond a

reasonable doubt the following three elements:  First, that two

or more persons agreed to distribute or possess with intent to

distribute fentanyl, second, that the defendant was a party to

or member of that agreement and, third, that the defendant

joined the agreement or conspiracy knowing of its objective to

distribute or possess with intent to distribute fentanyl and

intending to join together with at least one other alleged

coconspirator to achieve that objective, that is, that the

defendant and at least one other alleged coconspirator shared a

unity of purpose and the intent to achieve that objective.

I'll now explain each of these elements in a little more

detail.

So the first element is the existence of an

agreement.  The first element of the crime of conspiracy is the

existence of an agreement.  The government must prove beyond a

reasonable doubt that two or more persons knowingly and

intentionally arrived at a mutual understanding or agreement

either spoken or unspoken to work together to achieve the

overall objective of the conspiracy, that is, to distribute or

possess with intent to distribute fentanyl.  The government

does not have to prove existence of a formal or written

agreement or an express oral agreement spelling out the details

of the understanding.  The government also does not have to

1  prove that all the members of the conspiracy directly met or

2  discussed between themselves their unlawful objectives or

3  agreed to all of the details or agreed to what the means were

4  by which the objectives would be accomplished.  The government

5  is not required to prove that all people named in the

6  indictment were, in fact, parties to the agreement or that all

7  members of the alleged conspiracy were named or that all

8  members of the conspiracy are even known.

9         What the government must prove beyond a reasonable

10 doubt is that two or more persons in some way or manner arrived

11 at some type of agreement, mutual understanding or meeting of

12 the minds to try to accomplish a common and unlawful goal.

13 Now, you may consider both direct evidence and circumstantial

14 evidence in deciding whether the government has proved beyond a

15 reasonable doubt that an agreement or mutual understanding

16 existed.  You may find the existence of a conspiracy based on

17 reasonable inferences drawn from the actions and statements of

18 the alleged members of the conspiracy, from the circumstances

19 surrounding the scheme and from evidence of related facts and

20 circumstances which prove that the activities of the

21 participants in a criminal venture could not have been carried

22 out except as a result of a preconceived agreement, scheme or

23 understanding.

24        Now, conspiracy as described, membership in the

25 agreement, if you find that a criminal agreement or conspiracy

1   existed, then in order to find the defendant guilty of

2   conspiracy, you must also find that the government proved

3   beyond a reasonable doubt that the defendant knowingly and

4   intentionally joined that agreement or conspiracy during its

5   existence.

6           The government must prove that the defendant knew the

7   goals or objectives of the agreement or conspiracy and

8   voluntarily joined it during its existence intending to achieve

9   the common goals or objectives and to work together with the

10  other alleged conspirators toward those goals or objectives.

11  The government need not prove that the defendant knew

12  everything about the conspiracy or that he knew everyone

13  involved in it or that he was a member from the beginning.

14          The government also does not have to prove that the

15  defendant played a major or substantial role in the conspiracy.

16  You may consider both direct evidence and circumstantial

17  evidence in deciding whether the defendant joined the

18  conspiracy, knew of its criminal objectives and intended to

19  further those objectives.  Evidence which shows that the

20  defendant only knew about the conspiracy or only kept bad

21  company by associating with members of the conspiracy or was

22  only present when it was discussed or when a crime was

23  committed is not sufficient to prove that the defendant was a

24  member of the conspiracy even if the defendant approved of what

25  was happening or did not object to it.  Likewise, evidence

1   showing that the defendant may have done something that

2   happened to help a conspiracy does not necessarily prove that

3   the defendant joined the conspiracy.  You may, however,

4   consider this evidence with all of the other evidence in

5   deciding whether the government proved beyond a reasonable

6   doubt that the defendant joined the conspiracy.  Now, as to the

7   mental state, in order to find the defendant guilty of

8   conspiracy, you must find that the government proved beyond a

9   reasonable doubt that the defendant joined the conspiracy

10  knowing of its objectives and intending to help further or

11  achieve those objectives.

12          That is, the government must prove, one, that the

13  defendant knew of the objectives or goals of the conspiracy.

14  Two, that the defendant joined the conspiracy intending to help

15  further or achieve those goals or objectives and, three, that

16  the defendant or at least one other alleged conspirator shared

17  a unity of purpose toward those objectives or goals.  You may

18  consider again both direct evidence and circumstantial evidence

19  including the defendant's words or conduct or other facts and

20  circumstances in deciding whether the defendant had the

21  required knowledge and intent.

22          Now, the government is not required to prove that any

23  member of the conspiracy were successful in achieving any or

24  all of the objects of the conspiracy.  You may find the

25  defendant guilty of a conspiracy if you find that the

1  government proved beyond a reasonable doubt the elements I have

2  explained even if you find that the government did not prove

3  that any of the conspirators actually committed any other

4  offense against the United States.  Conspiracy is a criminal

5  offense separate from the offenses that were the objects of the

6  conspiracy.  Conspiracy is complete without the commission of

7  those offenses.

8          Now, a conspiracy ends when the objectives of the

9  conspiracy have been achieved or when all members have

10  withdrawn from it.  However, a conspiracy may be a continuing

11  conspiracy, and if it is, it lasts until there's some

12  affirmative showing that it has ended or that all members have

13  withdrawn.  A conspiracy may be a continuing one if the

14  agreement includes an understanding that the conspiracy will

15  continue over time.  Also a conspiracy may have a continuing

16  purpose or objective and, therefore, may be a continuing

17  conspiracy.

18          As to the time period the indictment charges that the

19  conspiracy to distribute and possess with intent to distribute

20  a controlled substance began in or about January of 2020 and

21  continued to on or about February 14th, 2023.  The government

22  need not prove that the conspiracy existed throughout the

23  entire time period alleged in the indictment.  Rather, it is

24  sufficient if you find that a conspiracy was formed and existed

25  for some of the time within the period set forth in the

1   indictment.  Now, evidence has been admitted in this case that

2   certain persons who are alleged to be coconspirators of the

3   defendant did or said certain things.  The acts or statements

4   of any member of a conspiracy are treated as the acts or

5   statements of all members of the conspiracy if these acts or

6   statements were performed or spoken during the existence of the

7   conspiracy and to further the objectives of the conspiracy.

8   Therefore, you may consider as evidence against the defendant

9   any acts done or statements made by any members of the

10  conspiracy during the existence of and to further the

11  objectives of the conspiracy.  You may consider these acts and

12  statements even if they were done and made in the defendant's

13  absence and without his knowledge.  As with all evidence

14  presented in this case, it is for you to decide whether you

15  believe this evidence and how much weight to give it.  That's

16  the definitional aspect of conspiracy.

17          The charge here is that he conspired to possess with

18  intent to distribute and/or distribute controlled substances,

19  fentanyl.  That's the conspiracy act of it.  This is the

20  underlying offense that he's not actually charged with in terms

21  of the substantive offense, but he's charged with conspiring

22  with others to commit the offense of possession with intent to

23  distribute and distribution of a controlled substance.  Now I

24  am going to read the elements of that which he then -- that you

25  have to determine whether the defendant conspired to do that.

1          Count one of the indictment charges the defendant

2    with conspiracy to distribute and conspiracy to possess with

3    intent to distribute controlled substances, namely fentanyl,

4    which is a violation of federal law.  I'll now provide you with

5    the elements of the offense of distribution and possession with

6    intent to distribute a controlled substance which is the

7    offense the defendant is charged with conspiring to commit.

8          That offense has four elements.  First, that the

9    defendant possessed a mixture or substance containing a

10   controlled substance, second, that the defendant possessed the

11   controlled substance knowingly and intentionally, third, that

12   the defendant distributed or intended to distribute the

13   controlled substance and, fourth, that the controlled substance

14   was fentanyl.

15         Now, possession is defined as follows:  To possess a

16   controlled substance means to have it within a person's

17   control.  The government does not have to prove that the

18   defendant physically held the controlled substance, that is,

19   that he had actual possession of it.  As long as the controlled

20   substance was within the defendant's control, he or she

21   possessed it.  If you find that the defendant either had actual

22   possession of a controlled substance or had the power and

23   intention to exercise control over it even though it was not in

24   the defendant's physical possession, that is, that the

25   defendant had the ability to take actual possession of the

substance when the defendant wanted to do, so you may find that

the government has proved possession.  Possession may be

momentarily or fleeting.  Proof of ownership of a controlled

substance is not required.  The law also recognizes that

possession may be sole or joint.  If one person alone possesses

a controlled substance, that is sole possession.  However, more

than one person may have the power and intention to exercise

control over a controlled substance.  This is called joint

possession.

        If you find that the defendant had such power and

intention, then he or she possessed the controlled substance

even if he or she possessed it jointly with another.  Mere

proximity to a controlled substance or mere presence on the

property where it's located or mere association with a person

who does control the controlled substance or the property is

not enough to support a finding of possession.  While I

hesitate to give you other examples, I'm going to anyway.

        If you're married and you own a house, you may be

sitting here.  That's still your possession.  If you own it

with a husband or a wife, you both own it, you both have

possession of that even if you're not physically present on it.

So possession can be actual possessing these papers.  They're

mine.  I got them here, or it can be books I have in my office

are under my control and possession even though I don't

physically have them.  That's hopefully a more practical

1  application of possession at any rate.  Controlled substances

2  distribution defined.  Distribute as used in the offense

3  charged means to deliver or to transfer possession or control

4  of a controlled substance from one person to another.

5  Distribute includes the sale of a controlled substance by one

6  person to another but does not require a sale.  Distribute also

7  includes delivery without any financial compensation such as a

8  gift or a trade.  Now, controlled substances you are instructed

9  that as a matter of law fentanyl is a controlled substance,

10  that is, a kind of prohibited drug.  It is solely for you,

11  however, to decide whether the government has proved beyond a

12  reasonable doubt that the defendant conspired to distribute or

13  conspired to possess with intent to distribute a mixture or

14  substance containing fentanyl.

15       Now, knowingly and intentionally defined.  To act

16  knowingly as used in the offenses charged means that the

17  defendant was conscious and aware that he was engaged in the

18  acts charged and knew of the surrounding facts and

19  circumstances that make out the offenses.  Knowingly does not

20  require that the defendant knew that the acts charged or

21  surrounding facts amounted to a crime.  To act intentionally as

22  used in the offense charged means to act deliberately and not

23  by accident.  Intentionally does not require the defendant

24  intended to violate the law.  The phrase knowingly and

25  intentionally as used in the offense charged requires the

1  government to prove beyond a reasonable doubt that the

2  defendant knew that what he conspired to distribute or

3  conspired to possess with intent to distribute was a controlled

4  substance.  In addition, the government must also prove beyond

5  a reasonable doubt that the controlled substance was, in fact,

6  fentanyl.  However, as long as you find that the government

7  proved beyond a reasonable doubt that the defendant knew that

8  what he conspired to distribute or conspired to possess with

9  intent to distribute was a controlled substance, you need not

10  find that the defendant knew that the controlled substance was

11  fentanyl.  In deciding whether the defendant acted knowingly or

12  intentionally, you may consider evidence about what the

13  defendant said, what the defendant did and failed to do, how he

14  acted and all the other facts and circumstances shown by the

15  evidence that may prove what was in the defendant's mind at the

16  time.  It's up to page 68.

17          The last definitional section fits within your second

18  question also how to determine an amount whether it's for

19  personal use or intent to distribute.  So the definition of

20  controlled substances intent to distribute on page 67.  In

21  order to find the defendant guilty of conspiracy to possess a

22  controlled substance with intent to distribute, you must find

23  that the government proved beyond a reasonable doubt that the

24  defendant intended to conspire to distribute a mixture or

25  substance containing a controlled substance.  To find that the

98

1    defendant had the intent to distribute, you must find that the

2    defendant had in mind or planned in some way to deliver or

3    transfer possession or control over the controlled substance to

4    someone else.  In determining whether the defendant had the

5    intent to distribute, you may consider all of the facts and

6    circumstances shown by the evidence presented including the

7    defendant's own words and actions.  In determining the

8    defendant's intent to distribute controlled substances, you may

9    also consider among other things the quantity and purity of the

10   controlled substance, the amount -- I'm sorry -- the manner in

11   which the controlled substance was packaged and the presence or

12   absence of weapons, large amounts of cash or equipment used in

13   the processing or sale of controlled substances.  All right.

14          So that is a reread of the definition of conspiracy,

15   first, what a conspiracy is, and then in this case it's the

16   conspiracy -- the charge is to possess with intent to

17   distribute or to distribute controlled substances, so you have

18   the definition of what it means to possess with intent to

19   distribute and distribute a controlled substance, and you also

20   have the definition of what it means to conspire to do that.

21   All right .  We will leave you to deliberate.  Any objection?

22          MR. O'HARA:  No.

23          MR. ROTTEVEEL:  No.

24          THE COURT:  We will mark that as the next court

25   exhibit.  All right.

1          So we have another letter -- note from the jury.

2    Deliberating for three and one half hours.  Despite getting new

3    definitions on the charge, I do not foresee anybody changing

4    their views on the matter, and we remain deadlocked and stuck

5    at a standstill, signed by the foreperson and dated today.  I

6    don't know that we gave them any new definitions.  We read

7    basically the old definition but at any rate.  So having

8    discussed it with counsel, I am going to dismiss the jury for

9    the day, tell them to go home, see them at 9:30 tomorrow

10   morning, give them an opportunity to get a good night's sleep

11   and see where we go then.  All right.

12          We have received your most recent note.  It has been

13   a long day reading and listening, so we are going to break for

14   the day to give you an opportunity to think about the evidence

15   overnight and see everybody tomorrow morning at 9:30.  Have a

16   safe trip home.

17

18

19

20

21

22

23

24

25

100

REPORTER'S CERTIFICATE

1

2

3      I, Laura Boyanowski, RMR, CRR, Official Court Reporter for

4  the United States District Court for the Middle District of

5  Pennsylvania, appointed pursuant to the provisions of Title 28,

6  United States Code, Section 753, do hereby certify that the

7  foregoing is a true and correct transcript of the

8  within-mentioned proceedings had in the above-mentioned and

9  numbered cause on the date or dates hereinbefore set forth; and

10 I do further certify that the foregoing transcript has been

11 prepared by me or under my supervision.

12

13

14                    s/ Laura Boyanowski, RMR,CRR
                      Laura Boyanowski, RMR, CRR
15                    Official Court Reporter

16 REPORTED BY:

17     LAURA BOYANOWSKI, RMR, CRR
       Official Court Reporter
18     United States District Court
       Middle District of Pennsylvania
19     235 N. Washington Avenue
       Scranton, PA  18503

20

21        (The foregoing certificate of this transcript does not
   apply to any reproduction of the same by any means unless under
22 the direct control and/or supervision of the certifying
   reporter.)

23

24

25